**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SENSIVA HEALTH, LLC**<br><br>**VERSUS**<br><br>**UNIVERSAL MEDITECH, INC. and KAREKIN KHATCHADOORIAN** | **CIVIL ACTION NO. 21-00598**<br><br>**JUDGE GREG GERARD GUIDRY**<br><br>**MAGISTRATE JUDGE MICAHEL NORTH**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff, Sensiva Health, LLC, files this Amended Complaint against Defendants, Universal Meditech, Inc. and Karekin Khatchadoorian, and alleges the following:

## PARTIES

1. Plaintiff herein is Sensiva Health, LLC ("Sensiva"), a Louisiana Limited Liability Company with the members thereof being citizens of Florida and South Carolina, and with its headquarters in New Orleans, Louisiana.

2. Defendant herein is Universal Meditech, Inc. ("UMI"), a California Corporation with, on information and belief, its principal place of business in Fresno, California.

3. Also named as a Defendant herein is Karekin Khatchadoorian ("Khatchadoorian"), an individual of the full age of majority, who, on information and belief, is a citizen of and is domiciled in the State of California.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because this dispute is between citizens of different states and the amount in controversy is in excess of $75,000.00 exclusive of interest and costs.

5. This Court has personal jurisdiction over UMI because the contractual relationship between UMI and Sensiva that is the subject of this lawsuit arises out of contacts that UMI created with the forum state of Louisiana, and this dispute arises directly from those contacts. Further, UMI negotiated a contract with persons located in Louisiana when it transmitted numerous emails and made numerous phone calls into Louisiana, all in connection with the subject matter of this litigation. Additionally, the terms of the agreement at issue contemplated delivery to Sensiva, and UMI received $525,000.00 in payments from the Louisiana bank account of Sensiva.

6. UMI does not dispute that this Court has personal jurisdiction over it, and has waived any challenge to personal jurisdiction by previously filing a Rule 12(b) motion (R. Doc. 4) that did not include any challenge to personal jurisdiction over UMI. See Fed. R. Civ. P. 12(g)(2); *see also Cruson v. Jackson Nat'l Life Ins. Co*., 954 F.3d 240, 249 (5th Cir. 2020).

7. This Court has personal jurisdiction over Khatchadoorian because Khatchadoorian intentionally directed tortious conduct into the State of Louisiana. Specifically, as set forth in detail below, Khatchadoorian directed communications containing fraudulent misrepresentations to Sensiva (which he knew to be a Louisiana company) through Sensiva's representative (whom Khatchadoorian knew to be located and live in the State of Louisiana), in connection with the subject matter of this litigation.

8. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claims brought in this action occurred in this district and/or constituted actions directed towards this district.

## BACKGROUND

9. Khatchadoorian is the General Manager of UMI. R. Doc. 4-1, at 1.

10. In late 2020, Khatchadoorian began discussions with Sensiva, through Sensiva's representatives Tarun Jolly, Ben Williamson and Donovan Blakney. The parties' discussions

contemplated Sensiva's purchase of Lateral Flow Devices (equipment used in laboratory testing) (hereinafter "LFDs") from UMI.

11. During these discussions, Sensiva's representatives informed UMI that Sensiva was headquartered in New Orleans, LA.

12. On January 3, 2021, Karekin Khatchadoorian, from Fresno, California, sent an email to Tarun Jolly and Ben Williamson of Sensiva. At the time of this email, Khatchadoorian knew that Sensiva was headquartered in Louisiana and that Jolly was located in and lived in Louisiana based on prior conversations and prior correspondence with Sensiva's representatives. Indeed, Khatchadoorian had previously mailed some sample materials to Sensiva at its Louisiana location on or around November 27, 2020.

13. In the January 3, 2021 email, Khatchadoorian represented to Sensiva's representatives that, should Sensiva move forward with the contemplated purchase of LFDs from UMI, the LFD cassettes would be of a certain specific color, quality and grade (as depicted in a photograph attached to the email) and the accompanying diluent solution would be packaged in a specific sterile fashion (also as depicted in the photograph attached to the email):

> "I have attached the pictures below on how it will look for the print cassette CT and the diluent."

*See* Khatchadoorian's January 3, 2021 email and photographs of sample/exemplar cassette and diluent attached thereto, attached hereto as **Ex. A.**

14. At the time Khatchadoorian made these representations to Sensiva, Khatchadoorian knew that they were false, and knew that the LFDs that Sensiva would ultimately be getting would be made with flimsy, low-grade, translucent Chinese-made cassettes, and not with the solid, opaque, and high-quality plastic that was depicted in the photograph contained in the January 3,

2021 email. He also knew that the diluent would not be prepared and packaged in a sterile fashion as depicted in the photograph contained in the January 3, 2021 email.

15. Khatchadoorian's intent in misrepresenting these facts to Sensiva was to increase the amount of money UMI made on the deal, at Sensiva's expense, by employing a "bait and switch" technique: he aimed to "bait" Sensiva in with the promise of high-quality materials, and then after Sensiva had already paid for the materials, "switch" by providing Sensiva with flimsy, low-grade, translucent Chinese-made cassettes and diluent that was neither prepared nor packaged in a sterile fashion.

16. Khatchadoorian successfully induced Sensiva into purchasing the LFDs and diluent based on the misrepresentations he made in his January 3, 2021 email.

17. Based on Khatchadoorian's fraudulent misrepresentations made in the January 3, 2021 email, Sensiva entered into Purchase Order No. PO-0128 (the "Purchase Order") with UMI, attached hereto as **Ex. B**, whereby Sensiva agreed to purchase 700,000 Lateral Flow Devices from UMI for $2,100,000.00.

18. In accordance with the Purchase Order, Sensiva made multiple prepaid deposits, totaling $525,000.00, to UMI before UMI provided any materials to Sensiva. The payments were made via wire transfers from Sensiva's account with a Louisiana bank.

19. UMI was required to abide by certain specifications pertaining to the LFDs and positive controls under the terms of its contract with Sensiva.

20. Sensiva's payment was conditioned on the LFDs' conformance to certain listed specifications contained in the Purchase Order and the satisfactory completion of a Quality Control inspection of the LFDs by Sensiva's personnel.

21. On March 4, 2021, Sensiva and UMI executed a Letter Agreement, attached hereto as **Ex. C**, which amended the Purchase Order to provide a schedule for the remaining payments due by Sensiva to UMI for the LFDs to be provided pursuant to the Purchase Order.

22. All payments referenced in and required by the Purchase Order were expressly "[s]ubject to clearance of Sensiva Quality Control ("QC") inspection that shall be performed at UMI's facility." *See* **Ex. B**, at FNs 1&2.

23. After the Letter Agreement was executed by the parties, on March 12, 2021, Donovan Blakney, the Vice President of Operations for Sensiva, arrived at UMI's facility to conduct the QC inspection of the LFDs prior to UMI's shipment and Sensiva's payment of the remaining contract balance.

24. Upon Blakney's arrival at UMI, he was greeted by Khatchadoorian.

25. Immediately after his arrival, Blakney found the limited number of LFDs he was actually permitted to inspect (as discussed below, he was only allowed to inspect a subset of the LFDs, and was denied access to inspect the remaining LFDs) to be substantially out of compliance with the specifications set forth in the Purchase Order.

26. Blakney also discovered the diluent solution stored in several large non-sterile water jugs on the floor.

27. Diluent solutions have strict quality control standards that require strict sterilizations measures to be followed during manufacturing, transport, storage and usage.

28. Blakney was told by Khatchadoorian that it was not possible for Blakney to enter any portion of UMI's facility except for one conference room in which only a subset of the LFDs would be provided for inspection.

29. Blakney inquired as to where Sensiva's remaining LFDs were being stored.

30. Khatchadoorian informed Blakney that some LFDs were stored in the boxes in the lobby (which would be made available for Blakney's inspection in the adjacent conference room) while the rest were being stored in a separate storage area of UMI's facility.

31. Blakney requested to see the inside of this storage area, but Khatchadoorian denied him access, citing UMI's "sensitive and secret" business practices surrounding the LFDs.

32. Blakney clarified that he only needed access to the storage area itself, to confirm whether the entirety of Sensiva's order was complete and on-site, but Blakney's request was again denied and he was told by Khatchadoorian that UMI "could not make this accommodation."

33. Blakney then inquired whether he could see a picture of the finished LFDs within the storage area which he was denied access to. Khatchadoorian also denied this request.

34. Blakney therefore proceeded with his inspection of the limited subset of the LFDs that were made available for him in the conference room.

35. Of the LFDs he was permitted to inspect, none of them were in compliance with the specifications set forth in the Purchase Order.

36. Under the Purchase Order, Sensiva specified that the LFDs be "BULK SHIPPED & VACUUM SEALED WITH DESICCANT IN BAG." *See* **Ex. B.** However, the LFDs were not shipped and sealed with any desiccant.

37. When Mr. Blakney voiced his concern over the lack of desiccant, Khatchadoorian provided no cognizable explanation.

38. Additionally, Blakney noticed that the LFDs were missing the required positive control liquid—another condition required under the specifications.

39. Most significantly, Blakney noticed that the plastic cassettes housing the LFDs did not at all conform to the sample/exemplar cassette that UMI had sent to Sensiva for approval—the

cassettes were made with flimsy, low-grade, translucent Chinese-made material, and not with the solid, opaque, and high-quality plastic that was shown to Sensiva in the exemplar LFD.

40. Finally, the diluent that was shown to Blakney for inspection was not be prepared and packaged in a sterile fashion as promised by UMI, but was instead housed in non-sterile water jugs.

41. When Blakney brought these deficiencies to Khatchadoorian's attention, Khatchadoorian dismissed Blakney's concerns.

42. After the inspection of the limited subset of materials that Blakney was given access to was complete, Khatchadoorian asked Blakney to sign a document stating that UMI had passed Sensiva's inspection. Blakney declined to sign the document

43. In the days following the failed inspection, Khatchadoorian informed Sensiva that UMI no longer wished to hold on to the inventory as it was ready to ship it.

44. Ben Williamson, in turn, voiced his concerned with the products following Blakney's inspection and informed Khatchadoorian that Sensiva would not be making any further payments to UMI until the LFD's specifications were met in accordance with the Purchase Order.

45. UMI has since (1) refused to cure the LFD's deficiencies, (2) refused to provide replacement LFDs to Sensiva, (3) refused to allow Sensiva access to inspect the LFDs that Blakney was denied access to at the initial inspection, and (4) refused to refund Sensiva the prepaid deposits that it made totaling $525,000.00.

## COUNT ONE: BREACH OF CONTRACT (AGAINST UMI)

46. Plaintiff re-alleges the allegations contained in Paragraphs 1 through 45 of this Complaint as if the same were restated herein.

47. UMI breached its obligations owed to Sensiva under both the Purchase Order and the Letter Agreement (which breaches caused and continue to cause Sensiva to incur substantial

direct and consequential damages), and is indebted to Sensiva for Sensiva's damages incurred thereunder, by failing to provide adequate LFDs owed to Sensiva under the Purchase Order and the Letter Agreement that conform to the specifications set forth in the Purchase Order.

48. Despite UMI's failure to provide adequate LFDs owed to Sensiva under the Purchase Order and the Letter Agreement that conform to the specifications set forth in the Purchase Order, UMI has failed to reimburse the substantial deposit in the amount of $525,000.00 that Sensiva paid to UMI under the Purchase Order.

**COUNT TWO: FRAUD (AGAINST UMI AND KHATCHADOORIAN)**

49. Plaintiff re-alleges the allegations contained in Paragraphs 1 through 48 of this Complaint as if the same were restated herein.

50. Defendants through Khatchadoorian made the misrepresentations detailed above in Paragraphs 12 through 16 to Sensiva with the intention to obtain an unjust advantage and to cause a loss or inconvenience to Sensiva.

51. Sensiva relied on Khatchadoorian's misrepresentations (detailed above in Paragraphs 12 through 16) to its detriment, and Khatchadoorian successfully induced Sensiva to enter into the contract to purchase the LFDs by making these misrepresentations.

52. Sensiva has incurred substantial damages due to these misrepresentations, including but not limited to the amount of the deposits that Sensiva paid to UMI (which UMI refuses to return), the value of business opportunities that Sensiva lost due to not having the LFDs that UMI contracted to provide, and the increased costs that Sensiva has incurred or will incur to acquire replacement materials.

**COUNT THREE: VIOLATION OF LUTPA (AGAINST UMI AND KHATCHADOORIAN)**

53. Plaintiff re-alleges the allegations contained in Paragraphs 1 through 52 of this Complaint as if the same were restated herein.

54. The Louisiana's Unfair Trade Practices Act ("LUTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," La.R.S. 51:1405, and grants a right of action to any person "who suffers an ascertainable loss" as a result of another person's use of such practices. *Cheramie Servs., Inc. v. Shell Deepwater Prod.*, Inc., 09-1633, p. 6 (La. 4/23/10), 35 So. 3d 1053, 1057.

55. Here, Defendants engaged in fraud and deception through Khatchadoorian by convincing Sensiva to believe it was paying for a specific product, when in fact, Defendants knew it would not and could not fulfill Sensiva's wishes.

56. Defendants' actions offended public policy, were done with malice, and were unethical and constitute fraud and misrepresentation.

57. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount to be proven at trial, including, but not limited to, the loss of $525,000.00 that Sensiva paid to UMI under the Purchase Order.

58. Notice of this Amended Complaint will be sent to the Attorney General pursuant to La. R.S. § 51:1409(B) immediately upon filing.

59. Plaintiffs also seek treble damages and attorney's fees under LUTPA.

**COUNT FOUR: DETRIMENTAL RELIANCE (AGAINST UMI AND KHATCHADOORIAN)**

60. Plaintiff re-alleges the allegations contained in Paragraphs 1 through 59 of this Complaint as if the same were restated herein.

61. Plaintiff asserts the claim of detrimental reliance in the alternative to Counts 1-3 asserted above.

62. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. *Louisiana Office of Risk Mgmt. v. Richard*, 13-0890, p. 5 (La. 10/15/13), 125 So.3d 398, 402.

63. Sensiva relied on the representations of Khatchadoorian to enter into the Purchase Order and the Letter Agreement.

64. Sensiva's reliance was reasonable and justified.

65. Since execution of the Purchase Order and the Letter Agreement, Defendants have changed their position by both failing to produce the product to Sensiva as promised and specified, and also not agreeing to alter their product to fit the needs and specifications of Sensiva under the Purchase Order and Letter Agreement.

66. Despite deliberately not abiding by the Purchase Order and Letter Agreement, Defendants still demand payment from Sensiva.

67. In doing so, Defendants have harmed Plaintiff.

68. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount to be proven at trial, including, but not limited to, the loss of $525,000.00 that Sensiva paid to UMI under the Purchase Order.

**COUNT FIVE: UNJUST ENRICHMENT (AGAINST UMI)**

69. Plaintiff re-alleges and incorporates all allegations set forth herein.

70. Plaintiff asserts the claim unjust enrichment in the alternative to Counts 1-3 asserted above.

71. Louisiana Civil Code art. 2298 provides, in pertinent part, that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person." The requisite elements of a claim for unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) no other available remedy at law. *Pinegrove Elec. Supply Co., Inc. v. Cat Key Const., Inc.*, 11-660, p. 5 (La.App. 5 Cir. 2/28/12), 88 So.3d 1097, 1100.

72. As set forth above, Defendants have neither complied with the Purchase Order nor the Letter Agreement; however, Sensiva has made multiple payments to Defendants in hopes of obtaining the product that was promised to them.

73. As a result of Defendants' actions, Defendants have been enriched, without cause, at the expense of Plaintiff.

74. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount to be proven at trial, including, but not limited to, the loss of $525,000.00 that Sensiva paid to UMI under the Purchase Order.

## JURY DEMAND

75. Sensiva requests a trial by jury on all claims so triable.

WHEREFORE, Sensiva demands a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court. Additionally, Sensiva prays that after all due proceedings had, there be a judgment in favor of Plaintiff, Sensiva Health, LLC, and against Defendants, Universal Meditech, Inc. and Karekin Khatchadoorian for all sums due to the Plaintiff, together

with interest thereon at the legal rate, as well as all reasonable costs and attorney's fees associated with this litigation and proceedings. Plaintiff further prays for all other general and equitable relief in the premises.

Respectfully submitted,

*/s/Trey K. Bartholomew*
TARAK ANADA (#31598)
TREY K. BARTHOLOMEW (#39114)
JONES WALKER LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
and
445 North Blvd., Ste. 800
Baton Rouge, LA 70802
Telephone: (504) 582-8322
Facsimile: (504) 589-8322
E-Mail: tanada@joneswaker.com
tbartholomew@joneswalker.com

*Attorneys for Sensiva Health, LLC*

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that the foregoing was served on all counsel of record by operation of this Court's CM/ECF system on the 11th day of June, 2021.

*/s/Trey K. Bartholomew*
Trey K. Bartholomew