**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **SENSIVA HEALTH, LLC** | * | **CIVIL ACTION NO. 21-00598** |
| | * | |
| **Versus** | * | **JUDGE GREG GERARD GUIDRY** |
| | * | |
| **UNIVERSAL MEDITECH, INC. and KAREKIN KHATCHADOORIAN** | * | **MAGISTRATE JUDGE MICHAEL NORTH** |
| | * | |
| | * | **JURY TRIAL DEMANDED** |

**UNIVERSAL MEDITECH INC.'S ANSWER AND COUNTERCLAIM**

NOW INTO COURT, through undersigned counsel, comes Defendant, Universal Meditech Inc., who responds as follows to the Complaint and Amended Complaint filed by Plaintiff, Sensiva Health, LLC.

## AFFIRMATIVE DEFENSES

1.

Plaintiff fails to state a cause of action upon which relief may be granted.

2.

Plaintiff's claims and damages are barred in whole or in part by the terms of the agreements entered between UMI and Cormeum Lab Services, Inc. and/or Sensiva Health, LLC.

3.

UMI pleads the terms of the applicable agreements entered between UMI and Cormeum Lab Services and/or Sensiva Health, LLC as if copied herein *in extenso*, including any and all rights and/or defenses available to UMI.

4.

UMI has performed under all applicable agreements. Plaintiff's claims are barred under the doctrines of performance, accord, and satisfaction.

5.

Plaintiff's claims and damages are barred, in whole or part, by the doctrines of equitable estoppel, waiver, consent, acquiescence, unclean hands, laches, and ratification.

6.

UMI acted in good faith and in conformity with all applicable contracts.

7.

Any recovery to which Plaintiff may be entitled, if proven, must be precluded or reduced by its own failure to mitigate damages.

8.

Plaintiff's claims and damages are barred in whole or in part because Plaintiff's prior breach of contract excused performance by UMI.

9.

Plaintiff's claims and damages are barred in whole or in part because Plaintiff has failed to act in good faith in its business dealings with UMI.

10.

Plaintiff's claims are barred in whole or in part by the fraudulent and/or negligent misrepresentations of Plaintiff.

11.

Plaintiff's claims and damages are barred in whole or in part because conditions precedent to Plaintiff's recovery have not been satisfied.

12.

If and to the extent Plaintiff is entitled to damages against UMI, UMI is entitled to a set off against any other amounts or damages that are due and owing, or determined to be due and owing, from Plaintiff to UMI.

13.

Plaintiff is barred from the recovery of attorney's fees because there is no applicable contract between the parties that explicitly provides for the payment of attorney's fees and there is no applicable statute that provides for the recovery of attorney's fees.

14.

The Plaintiff's rejection of conforming goods constitutes a breach of the contract of sale.

15.

UMI reserves the right to amend its Answer to plead such other affirmative defenses as may be developed in the course of discovery and/or investigation into the facts of this matter.

AND NOW, for their Answer to each Paragraph of the Complaint, UMI avers as follows:

**ANSWER**

1.

UMI denies the allegations for lack of knowledge or sufficient information to justify a belief therein.

2.

Admitted.

3.

Admitted.

4.

The allegations in paragraph 4 are conclusions of law that require no response.

5.

The allegations in paragraph 5 are conclusions of law that require no response.

6.

For its response to paragraph 6, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 6 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied.

7.

UMI denies the allegations except to admit that Sensiva made part of its deposit owed under the terms of the parties' agreement in the amount of $525,000.

8.

For its response to paragraph 8, UMI avers that the Letter Agreement is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 8 are in conflict with any of the terms, provisions, and/or limitations of the Letter Agreement, they are denied.

9.

For its response to paragraph 9, UMI avers that the Purchase Order and Letter Agreement are written documents which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 9 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order and Letter Agreement, they are denied.

10.

For its response to paragraph 10, UMI avers that the Letter Agreement is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 10 are in conflict with any of the terms, provisions, and/or limitations of the Letter Agreement, they are denied. UMI admits that an inspection of the LFD's took place at UMI's facility on March 12, 2021.

11.

UMI denies the allegations in paragraph 11.

12.

UMI denies the allegations in paragraph 12.

13.

UMI denies the allegations in paragraph 13.

14.

For its response to the allegations of paragraph 14, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-13.

15.

UMI denies the allegations in paragraph 15.

16.

UMI denies the allegations in paragraph 16.

17.

For its response to the allegations of paragraph 17, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-16.

18.

The allegations of paragraph 18 appear to be directed at Karekin Khatchadoorian and do not require a response from UMI. To the extent the allegations are directed toward UMI, UMI has filed a Motion to Dismiss the Fraud claims that are presently pending before the Court.

19.

The allegations of paragraph 19 appear to be directed at Karekin Khatchadoorian and do not require a response from UMI. To the extent the allegations are directed toward UMI, UMI has filed a Motion to Dismiss the Fraud claims that are presently pending before the Court.

20.

The allegations in paragraph 20 are conclusions of law that require no response.

21.

The unnumbered final paragraph of the Complaint on page 4 constitutes nothing more than a prayer for relief. To the extent a response is required, all allegations are denied in their entirety.

AND NOW, for its Answer to each Paragraph of the Amended Complaint, UMI avers as follows:

1.

UMI denies the allegations for lack of knowledge or sufficient information to justify a belief therein.

2.

Admitted.

3.

Admitted.

4.

The allegations in paragraph 4 are conclusions of law that require no response.

5.

The allegations in paragraph 5 are conclusions of law that require no response.

6.

The allegations in paragraph 6 are conclusions of law that require no response.

7.

The allegations in paragraph 7 are conclusions of law that require no response.

8.

The allegations in paragraph 8 are conclusions of law that require no response.

9.

Admitted.

10.

UMI admits that Mr. Khatchadoorian began discussions with Tarun Jolly, Ben Williamson, and Donovan Blakney in 2020 regarding the purchase of Lateral Flow Devices. The allegations in Paragraph 10 are otherwise denied.

11.

Admitted.

12.

For its response to paragraph 12, UMI avers that the January 3, 2021 email is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 12 are in conflict with any of the terms, provisions, and/or limitations of the email, they are denied. UMI admits that Mr. Khatchadoorian was aware that Sensiva and Tarun Jolly were located in Louisiana. The allegations in Paragraph 12 are otherwise denied.

13.

For its response to paragraph 13, UMI avers that the January 3, 2021 email is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 13 are in conflict with any of the terms, provisions, and/or limitations of the email, they are denied.

14.

UMI denies the allegations in paragraph 14.

15.

UMI denies the allegations in paragraph 15.

16.

UMI denies the allegations in paragraph 16.

17.

UMI denies the allegations in paragraph 17.

18.

For its response to paragraph 18, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 18 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied. UMI admits that it received payments in the amount of $525,000 in connection with the Purchase Order. The remaining allegations are denied for lack of sufficient information to justify a belief therein.

19.

For its response to paragraph 19, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 19 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied.

20.

For its response to paragraph 20, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations

of paragraph 20 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied.

21.

For its response to paragraph 21, UMI avers that the Letter Agreement is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 21 are in conflict with any of the terms, provisions, and/or limitations of the Letter Agreement, they are denied.

22.

For its response to paragraph 22, UMI avers that the Purchase Order and Letter Agreement are written documents which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 22 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order or Letter Agreement, they are denied.

23.

For its response to paragraph 23, UMI avers that the Letter Agreement is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 23 are in conflict with any of the terms, provisions, and/or limitations of the Letter Agreement, they are denied. UMI admits that an inspection of the LFD's took place at UMI's facility on March 12, 2021. The remaining allegations are otherwise denied.

24.

UMI admits that an inspection of the LFD's took place at UMI's facility on March 12, 2021 and Blakney and Mr. Khatchadoorian were present.

25.

UMI denies the allegations in paragraph 25.

26.

UMI denies the allegations in paragraph 26.

27.

UMI denies the allegations in paragraph 27.

28.

UMI admits that UMI did not provide Mr. Blakney access to UMI's manufacturing warehouse. As Sensiva is readily aware, the LFD manufacturing process is confidential and proprietary. Due to such concerns, it is customary in the industry that only employees are permitted in the manufacturing warehouse. Further, there is nothing in the parties' contractual agreement that would provide Sensiva any grounds to access UMI's manufacturing warehouse.

29.

UMI admits that Blakney inquired where LFDs were being stored.

30.

UMI admits that Blakney was permitted to inspect LFDs . The remaining allegations are denied as written.

31.

UMI admits that UMI did not provide Mr. Blakney access to UMI's manufacturing warehouse. As Sensiva is readily aware, the LFD manufacturing process is confidential and proprietary. Due to such concerns, it is customary in the industry that only employees are permitted in the manufacturing warehouse. Further, there is nothing in the parties' contractual agreement that would provide Sensiva any grounds to access UMI's manufacturing warehouse.

32.

UMI admits that UMI did not provide Mr. Blakney access to UMI's manufacturing warehouse. As Sensiva is readily aware, the LFD manufacturing process is confidential and proprietary. Due to such concerns, it is customary in the industry that only employees are permitted in the manufacturing warehouse. Further, there is nothing in the parties' contractual agreement that would provide Sensiva any grounds to access UMI's manufacturing warehouse.

33.

UMI admits that UMI did not provide Mr. Blakney access to or a picture of UMI's manufacturing warehouse. As Sensiva is readily aware, the LFD manufacturing process is confidential and proprietary. Due to such concerns, it is customary in the industry that only employees are permitted in the manufacturing warehouse. Further, there is nothing in the parties' contractual agreement that would provide Sensiva any grounds to access UMI's manufacturing warehouse.

34.

UMI admits that Blakney was permitted to inspect LFDs. The allegations of paragraph 34 are otherwise denied.

35.

UMI denies the allegations in paragraph 35.

36.

For its response to paragraph 36, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 36 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied.

37.

UMI denies the allegations in paragraph 37.

38.

For its response to paragraph 38, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 38 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied. UMI admits that Mr. Khatchadoorian told Mr. Blakney that the positive controls would be provided upon shipment of the LFDs. Otherwise the allegations in paragraph 38 are denied.

39.

For its response to paragraph 39, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 39 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied.

40.

For its response to paragraph 40, UMI avers that the Purchase Order is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*. To the extent any of the allegations of paragraph 40 are in conflict with any of the terms, provisions, and/or limitations of the Purchase Order, they are denied.

41.

UMI denies the allegations in paragraph 41.

42.

UMI admits that after the inspection was completed Mr. Blakney indicated the inspection went as planned and Mr. Khatchadoorian provided him a document concerning the inspection. UMI avers that the document is a written document which is the exclusive evidence of its terms, provisions, and limitations, all of which are adopted by reference and incorporated herein as if copied *in extenso*.

43.

UMI denies the allegations in paragraph 43 as written.

44.

UMI denies the allegations in paragraph 44 except to admit that Sensiva failed to make its payments as required under the terms of the Purchase Order.

45.

UMI denies the allegations in paragraph 45.

46.

For its response to the allegations of paragraph 46, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-45.

47.

UMI denies the allegations in paragraph 47.

48.

UMI denies the allegations in paragraph 48.

49.

For its response to the allegations of paragraph 49, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-48.

50.

UMI denies the allegations in paragraph 50.

51.

UMI denies the allegations in paragraph 51.

52.

UMI denies the allegations in paragraph 52.

53.

For its response to the allegations of paragraph 53, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-52.

54.

The allegations in paragraph 54 are conclusions of law that require no response.

55.

UMI denies the allegations in paragraph 55.

56.

UMI denies the allegations in paragraph 56.

57.

UMI denies the allegations in paragraph 57.

58.

The allegations in paragraph 58 are conclusions of law that require no response. To the extent a response is required the allegations are denied.

59.

UMI denies the allegations in paragraph 59.

60.

For its response to the allegations of paragraph 60, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-59.

61.

The allegations in paragraph 61 are conclusions of law that require no response. To the extent a response is required the allegations are denied.

62.

The allegations in paragraph 62 are conclusions of law that require no response.

63.

UMI denies the allegations in paragraph 63.

64.

UMI denies the allegations in paragraph 64.

65.

UMI denies the allegations in paragraph 65.

66.

UMI denies the allegations in paragraph 66.

67.

UMI denies the allegations in paragraph 67.

68.

UMI denies the allegations in paragraph 68.

69.

For its response to the allegations of paragraph 69, UMI incorporates, reiterates, and reavers all defenses, denials and responses set forth in paragraphs 1-68.

70.

The allegations in paragraph 70 are conclusions of law that require no response. To the extent a response is required the allegations are denied.

71.

The allegations in paragraph 71 are conclusions of law that require no response.

72.

UMI denies the allegations in paragraph 72.

73.

UMI denies the allegations in paragraph 73.

74.

UMI denies the allegations in paragraph 74.

75.

The allegations in paragraph 75 are conclusions of law that require no response.

76.

The unnumbered final paragraph of the Amended Complaint on pages 11-12 constitutes nothing more than a prayer for relief. To the extent a response is required, all allegations are denied in their entirety.

## UMI'S COUNTERCLAIM

AND NOW, assuming the position of Plaintiff-in-Counterclaim UMI avers as follows:

### Parties

1.

Plaintiff-in-Counterclaim is Universal Meditech, Inc. ("UMI") a California Corporation whose principal place of business is in Fresno, California.

2.

Defendant-in-Counterclaim is Sensiva Health, LLC ("Sensiva"), a Louisiana Limited Liability Company with a domicile address of 935 Gravier Street, Suite 2020, New Orleans, 70112. Upon information and belief, none of its members are citizens of California.

3.

Defendant-in-Counterclaim Cormeum Lab Services, LLC ("Cormeum"), a Louisiana limited liability company with a domicile address of 935 Gravier Street, Suite 2020, New Orleans,

70112. Upon information and belief, Cormeum is a wholly owned subsidiary of Sensiva Health, LLC.

4.

Upon information and belief, Defendant-in-Counterclaim Tarun Jolly, M.D. is an individual and principal of Cormeum and Sensiva who resides and regularly conducts business in New Orleans, Louisiana. Dr. Jolly recently settled a *qui tam* action with the United States Department of Justice in which he and other defendants agreed to pay a $1 million fine in connection with a Medicare fraud investigation. Jolly's scheme involved kickbacks in exchange for referrals for medical testing conducted by a laboratory co-owned by Jolly. Also in connection with the fraud investigation, Jolly's laboratory agreed to forego collection of over $41 million of billing to Medicare that was associated with the kickback scheme and received a 25-year ban excluding the lab from doing business with the Centers for Medicare & Medicaid Services. Upon information and belief, Jolly's lab recently ceased operations entirely.

5.

Upon information and belief, Co-Defendants-in-Counterclaim, Cormeum and Sensiva are affiliated and share common ownership and/or management by Defendant-in-Counterclaim Tarun Jolly and James Silliman and Benjamin Williamson.

## JURISDICTION AND VENUE

6.

Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because this dispute is between citizens of different states and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

7.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Co-Defendants-in-Counterclaim all reside in the State of Louisiana in the Eastern District of Louisiana.

8.

This Court has personal jurisdiction over Co-Defendants-in-Counterclaim as they conduct substantial business in the State of Louisiana, in particular, in the Eastern District of Louisiana and UMI's counterclaims relate to Co-Defendants-in-Counterclaim's activities within the jurisdiction of this Court.

## FACTUAL BACKGROUND

9.

This case arises out of a development agreement entered between UMI and Cormeum in December of 2020 ("Development Agreement") where the parties contracted for UMI to manufacture SARS-Cov-2-Antigen Testing Kits (Covid-19 "Test Kits" or Lateral Flow Devices "LFDs").[1]

---

[1] Exhibit A.

10.

Prior to entering into the Development Agreement, negotiations took place between UMI's general manager, Karekin Khatchadoorian, and Tarun Jolly in his capacity as an employee, officer, and/or member of Cormeum and/or Sensiva. During telephone conversations on multiple occasions including, but not limited to, on or about November 5, 2020, Tarun Jolly informed Karekin Khatchadoorian that he could 100% guarantee that Cormeum/Sensiva would be granted an Emergency Use Authorization ("EUA") from the Food and Drug Administration ("FDA") for the Test Kits UMI was to manufacture.

11.

UMI relied on these representations to its detriment because it would not have entered into the Development Agreement if there was not a guarantee that Cormeum/Sensiva would be able to get an EUA from the FDA. At the time, other individuals and companies were reaching out to UMI in connection with hiring UMI to manufacture Test Kits. As a result, UMI would not have granted Cormeum "the exclusive sales and distribution for the domestic market in the USA" absent Tarun Jolly's statements given the numerous other vendors in the marketplace seeking UMI's manufacturing services.[2] UMI would have instead not committed to an exclusive agreement but would have only agreed to sell Test Kits to Sensiva/Cormeum while still leaving the door open to sell the Test Kits to other suppliers in the USA.

12.

Upon information and belief, Mr. Jolly and/or Cormeum/Sensiva knew that as a result of the COVID-19 global pandemic and the dearth of available test kits in the market that there were other vendors seeking to obtain UMI's services as a test kit manufacturer and he could gain an

[2] Exhibit A, p.1.

unjust advantage in obtaining an exclusive rights contract and/or cause a loss or inconvenience to UMI (prohibiting it from entering into agreements with other sellers in the USA) if he intentionally misrepresented to UMI that he could 100% guarantee that Cormeum/Sensiva would be granted an EUA from the FDA for the Test Kits UMI was to manufacture. Tarun Jolly knew or had reason to believe such statements were false as evidenced by among other things his education and training in the medical field and his experience as principal of Cormeum, Sensiva, and other medical entities he has been associated with.

13.

Also during the negotiations between Mr. Jolly and Mr. Khatchadoorian Mr. Jolly fraudulently misrepresented to Mr. Khatchadoorian during a telephone conversation on or about November 5, 2020 that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva. Further, on November 5, 2020, Mr. Jolly represented to UMI in a correspondence that that "we will partner with you for everything."

14.

UMI relied on these representations to its detriment because it would not have entered into the Development Agreement if there was not a guarantee that it would be the exclusive supplier for Cormeum/Sensiva. At the time, other individuals and companies were reaching out to UMI in connection with hiring UMI to manufacture Test Kits. As a result, UMI would not have granted Cormeum "the exclusive sales and distribution for the domestic market in the USA" absent Tarun Jolly's statements given the numerous other vendors in the marketplace seeking UMI's manufacturing services.[3] UMI would have instead not committed to an exclusive agreement but

[3] Exhibit A, p.1.

would have only agreed to sell Test Kits to Sensiva/Cormeum while still leaving the door open to sell the Test Kits to other suppliers in the USA.

15.

Upon information and belief, Mr. Jolly and/or Cormeum/Sensiva knew that as a result of the COVID-19 global pandemic and the dearth of available test kits in the market that there were other vendors seeking to obtain UMI's services as a test kit manufacturer and he could gain an unjust advantage in obtaining an exclusive rights contract and/or cause a loss or inconvenience to UMI (prohibiting it from entering into agreements with other sellers in the USA) if he intentionally misrepresented that UMI would be the exclusive supplier for the Covid Testing kits for Cormeum/Sensiva. Tarun Jolly knew or had reason to believe such statements were false as evidenced by Cormeum/Sensiva's retention of one or more other suppliers to manufacture the Testing Kits and/or Cormeum/Sensiva's own production of the Testing Kits.

16.

Based on the statements made by Mr. Jolly, the Parties entered the Development Agreement in December of 2020. The Development Agreement "require[d] a 50% down payment before a Production Order is generated by Universal Meditech Inc. to begin manufacturing of the listed product in this Development Agreement. Once completion of order takes place, the remaining 50% equaling the total 100% shall be paid including shipping costs provided by Cormeum or its clients." The purpose of the down payment provision was to allow UMI to purchase the materials to begin the manufacturing process.

17.

Further, under the Development Agreement Cormeum agreed to purchase: 50,000 Test Kits in December 2020, 100,000 Test Kits in January 2021, and 200,000 or more Test Kits in February 2021. In January of 2021, UMI delivered 80,000 Test Kits that were accepted by Cormeum for a total purchase price in excess of $300,000.

18.

An additional order of 700,000 Test Kits was placed with UMI on January 28, 2021, for the price of $2,100,000. Rec. Doc. 1-1, p.1. For reasons unbeknownst to UMI and Mr. Khatchadoorian, Tarun Jolly requested that the January 28, 2021 Purchase Order be placed by Sensiva Health LLC (instead of Cormeum) who ultimately issued the Purchase Order. The Payment schedule was set out as follows:

**PAYMENT SCHEDULE**

| DATE | DEPOSIT / BALANCE | AMOUNT | UNITS AVAILABLE FOR SHIPPING |
|---|---|---|---|
| 02/04/21 | Deposit | $225,000 | - |
| 02/08/21 | Deposit | $300,000 | - |
| 02/11/21 | Deposit | $225,000 | - |
| 02/15/21 | Deposit | $300,000 | - |
| 02/18/21 | Balance | $225,000 | 150,000 |
| 02/22/21 | Balance | $300,000 | 200,000 |
| 02/25/21 | Balance | $225,000 | 150,000 |
| 03/01/21 | Balance | $300,000 | 200,000 |

19.

Sensiva originally agreed to make deposit payments in the amount of $1,050,000 for the Test Kits by February 15, 2021. Sensiva made timely payments pursuant to the schedule on February 4, 2021 and February 8, 2021.

20.

However, on February 10, 2021, UMI was informed by Tarun Jolly: "The FDA [EUA] application is not moving forward, so the investor wants to make sure we get the product and sell it before he wants to put in more money." Mr. Jolly's representations and refusal to timely pay were in contradiction to Sensiva's obligations under the Purchase Order.

21.

Due to what Sensiva later defined as "interim and temporary unforeseen commercial circumstances" Sensiva stopped making payments and was forced to renege on its original agreement as evidenced in its March 4, 2021 correspondence. Rec. Doc. 1-2.

22.

Rather than hold Sensiva in breach of contract, in the spirit of cooperation, UMI attempted to give Sensiva the opportunity to rectify its breach by extending the time period for payment, which Sensiva has still failed to comply with.

23.

Following Sensiva's March 4, 2021 correspondence, on March 12, 2021 a Sensiva representative, Mr. Donavan Blakney, conducted a quality control inspection of the Test Kits and confirmed after the testing was completed that the testing went as planned and he could not and did not point to any areas of concern or flaws with UMI's Test Kits.

24.

Thus, UMI was surprised to later receive a series of correspondence from Sensiva and its counsel refusing to make its long overdue payment on the basis that the Test Kits were not in compliance with the specifications after Mr. Donavan Blakney had conducted the quality control inspection and indicated the Test Kits were in compliance.

25.

Upon information and belief and pursuant to the FDA's website, to date, neither Cormeum nor Sensiva have been issued an EUA by the FDA for the SARS-Cov-2-Antigen Testing Kits as Mr. Jolly guaranteed would happen during the negotiations prior to UMI entering into the exclusive agreement with Sensiva.

26.

Further, despite the prior representations by Mr. Jolly and/or Cormeum/Sensiva that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva UMI has become aware that Cormeum/Sensiva has retained one or more other suppliers to manufacture the Testing Kits and/or are currently manufacturing the Testing Kits. In other words, despite the representations of Mr. Jolly and/or Cormeum/Sensiva, Defendants-in-Counterclaim went behind UMI's back and without UMI's knowledge or consent and contacted other suppliers to manufacture Test Kits and/or began manufacturing the Testing Kits while attempting to restrict UMI by only permitting UMI to sell its Test Kits in the USA to Cormeum/Sensiva.

**The Cormeum Sensiva Relationship/Single Business Enterprise**

27.

Upon information and belief, Cormeum is a wholly owned subsidiary of Sensiva Health, LLC.

28.

Upon information and belief, Cormeum and Sensiva share common officers and members. For example, Jim Silliman signed the Development Agreement on behalf of Cormeum, and Jim Silliman also is the President and CEO of Sensiva and a member of Sensiva.

29.

Upon information and belief, the corporate separateness of Cormeum and Sensiva was ignored. For example, the negotiations leading up to the Development Agreement were mainly undertaken by Tarun Jolly using a Sensiva email address, but the Development Agreement was entered between UMI and Cormeum. This was further exemplified when Cormeum originally made the purchase and payment for the first 80,000 Test Kits under the Development Agreement and the subsequent order for 700,000 Test Kits was made by Sensiva, not Cormeum.

30.

Upon information and belief, Cormeum and Sensiva have the same registered domicile, mailing address, and office address: 935 Gravier Street, Suite 2020, New Orleans, 70112.

31.

Upon information and belief, Cormeum and Sensiva share common employees. For example, Mike Jolly signed the annual report filed by Sensiva in 2021 in his capacity as the operations manager for Sensiva and Mike Jolly also signed the annual report filed by Cormeum in 2021 in his capacity as the operations manager for Cormeum.

32.

Both Cormeum and Sensiva share the same registered agent: Cogency Global Inc.

33.

Employees and/or agents of Sensiva performed work on behalf of Cormeum and vice versa. For example, for reasons unbeknownst to UMI, Tarun Jolly requested that the January 28, 2021 order be placed by Sensiva Health LLC (instead of Cormeum) who ultimately issued the Purchase

Order. The circumstances surrounding the transactions at issue also illustrate that Sensiva and Cormeum represent the fragmentation of a single enterprise.

34.

Corporate separateness between Sensiva and Cormeum should be disregarded because the two entities actively operate as a single business enterprise and/or are the alter egos of one another and as members of the single business enterprise can be held liable for the actions of one another.

**COUNT I FRAUD/INTENTIONAL MISREPRESENTATION**

35.

UMI incorporates by reference all facts and allegations in the preceding paragraphs as if fully set forth herein.

36.

Cormeum/Sensiva and Mr. Jolly fraudulently/intentionally misrepresented during telephone conversations on multiple occasion including, but not limited to, on or about November 5, 2020, that that they could 100% guarantee that Cormeum/Sensiva would be granted an EUA from the FDA for the Test Kits UMI was to manufacture. Even after the Development Agreement was entered, but before Cormeum/Sensiva placed the additional order of 700,000 Test Kits, Cormeum/Sensiva and Mr. Jolly continued to assure UMI that the EUA would be granted. For example, on December 27, 2020 Mr. Jolly informed UMI, "Honestly as soon as we get the EUA, I'm pretty sure we have sold out." He went on to state on the same day; "50k/day is sold out the day we get the EUA. In fact, 5 million strips are 98% sold out day one we get the EUA."

37.

UMI relied on these representations to its detriment because it would not have entered into the Development Agreement if there was not a guarantee that Cormeum/Sensiva would be able to get an EUA from the FDA. UMI also continued to rely on subsequent statements made by Mr. Jolly that the EUA would be granted in connection with ramping up its manufacturing capacity for the Test Kits. At the time, other individuals and companies were reaching out to UMI in connection with hiring UMI to manufacture Test Kits. As a result, UMI would not have granted Cormeum "the exclusive sales and distribution for the domestic market in the USA" absent Tarun Jolly's statements given the numerous other vendors in the marketplace seeking UMI's manufacturing services.[4] UMI would have instead not committed to an exclusive agreement but would have only agreed to sell Test Kits to Sensiva/Cormeum while still leaving the door open to sell the Test Kits to other suppliers in the USA.

38.

Upon information and belief, Mr. Jolly and/or Cormeum/Sensiva knew that as a result of the COVID-19 global pandemic and the dearth of available test kits in the market that there were other vendors seeking to obtain UMI's services as a test kit manufacturer and he could gain an unjust advantage in obtaining an exclusive rights contract and/or cause a loss or inconvenience to UMI (prohibiting it from entering into agreements with other sellers in the USA) if he intentionally misrepresented to UMI that there was a 100% guarantee that an EUA would be authorized. Mr. Jolly and/or Cormeum Sensiva made the misrepresentations with the intent to induce UMI to enter the Development Agreement. Tarun Jolly knew or had reason to believe such statements were false

[4] Exhibit A, p.1.

as a result of his education and training in the medical field and his experience as principal of Cormeum, Sensiva, and other medical entities he has been associated with. To date, neither Cormeum nor Sensiva have been issued an EUA from the FDA for the SARS-Cov-2-Antigen Testing Kits making Mr. Jolly's statements fraudulent and under the Development Agreements UMI was barred from selling the Test Kits to other vendors who would sell the product in the USA.

39.

Also, during the negotiations Cormeum/Sensiva and Mr. Jolly fraudulently/intentionally misrepresented to Mr. Khatchadoorian during a telephone conversation on November 5, 2020 that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva. On November 5, 2020, Mr. Jolly even represented to UMI that "we will partner with you for everything."

40.

UMI relied on these representations to its detriment because it would not have entered into the Development Agreement if there was not a guarantee that it would be the exclusive supplier for Cormeum/Sensiva. At the time, other individuals and companies were reaching out to UMI in connection with hiring UMI to manufacture Test Kits. As a result, UMI would not have granted Cormeum "the exclusive sales and distribution for the domestic market in the USA" absent Tarun Jolly's statements given the numerous other vendors in the marketplace seeking UMI's manufacturing services.[5] UMI would have instead not committed to an exclusive agreement but

---

[5] Exhibit A, p.1.

would have only agreed to sell Test Kits to Sensiva/Cormeum while still leaving the door open to sell the Test Kits to other suppliers in the USA.

41.

Upon information and belief, Mr. Jolly and/or Cormeum/Sensiva knew that as a result of the COVID-19 global pandemic and the dearth of available test kits in the market that there were other vendors seeking to obtain UMI's services as a test kit manufacturer and he could gain an unjust advantage in obtaining an exclusive rights contract and/or cause a loss or inconvenience to UMI (prohibiting it from entering into agreements with other sellers in the USA) if he misrepresented that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva. Mr. Jolly and/or Cormeum Sensiva made the misrepresentations with the intent to induce UMI to enter the Development Agreement. Tarun Jolly knew or had reason to believe such statements were false as evidenced by Cormeum/Sensiva's retention of one or more other suppliers to manufacture the Testing Kits and/or its own manufacture of the Test Kits. Despite the prior representations by Mr. Jolly and/or Cormeum/Sensiva that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva, UMI has become aware that Cormeum/Sensiva retained one or more other suppliers to manufacture the Testing Kits and/or began manufacturing the Testing Kits making Mr. Jolly's statement fraudulent.

42.

In additional to Cormeum/Sensiva's liability for the fraudulent misrepresentations, Mr. Jolly is liable in his personal capacity as a member, manager, employee or agent of Cormeum and Sensiva pursuant to La. R.S. 12:1320(D) because of his fraudulent misrepresentations practiced upon UMI.

**COUNT II NEGLIGENT MISREPRESENTATION**

43.

UMI incorporates by reference all facts and allegations in the preceding paragraphs as if fully set forth herein.

44.

In the alternative, Cormeum/Sensiva and Mr. Jolly negligently misrepresented that that they could 100% guarantee that Cormeum/Sensiva would be granted an EUA from the FDA for the Test Kits UMI was to manufacture and that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva.

45.

Cormeum/Sensiva and Mr. Jolly had a legal duty to supply correct information to UMI in connection with its negotiations to enter the Development Agreement. Cormeum/Sensiva and Mr. Jolly breached its duty as evidenced by the EUA not being granted by the FDA and as evidenced by the fact that Cormeum/Sensiva retained one or more other suppliers to manufacture the Testing Kits and/or began manufacturing the Testing Kits.

46.

UMI has suffered damages as a result of its reliance on the negligent misrepresentations.

**COUNT III DETRIMENTAL RELIANCE**

47.

UMI incorporates by reference all facts and allegations in the preceding paragraphs as if fully set forth herein.

48.

To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. *Louisiana Office of Risk Mgmt. v. Richard*, 13-0890, p.5 (La. 10/15/13); 125 So.3d 398, 402.

49.

Cormeum/Sensiva and Mr. Jolly represented that that they could 100% guarantee that Cormeum/Sensiva would be granted an EUA from the FDA for the Test Kits UMI was to manufacture and that UMI would be the exclusive supplier for the Covid Testing Kits for Cormeum/Sensiva.

50.

UMI justifiably relied on the representations as detailed herein.

51.

UMI relied on these representations to its detriment because it would not have entered into the Development Agreement if there was not a guarantee that Cormeum/Sensiva would be able to get an EUA from the FDA and that it would be the exclusive supplier for Cormeum/Sensiva.

52.

UMI has suffered damages as a result of its detrimental reliance as detailed herein.

**COUNT IV BAD FAITH BREACH OF CONTRACT**

53.

**A. Cormeum**

UMI incorporates by reference all facts and allegations in the preceding paragraphs as if fully set forth herein.

54.

UMI and Cormeum entered into a valid and enforceable agreement, the Development Agreement, and UMI has performed all of its contractual obligations.

55.

Cormeum breached the Development Agreement by failing to purchase and pay for the Test Kits as required under the Development Agreement. Specifically, Cormeum failed to pay for and purchase all of the 100,000 Test Kits it was required to purchase in January 2021 and failed to pay for and purchase 200,000 or more Test Kits in February 2021.

56.

Cormeum's bad faith contract breaches have resulted in monetary damages to UMI and UMI is entitled to all other damages, foreseeable or not, that have resulted from Sensiva's breach.

57.

**B. Sensiva**

UMI incorporates by reference all facts and allegations in the preceding paragraphs as if fully set forth herein.

58.

On January 28, 2021, Sensiva and UMI entered into a Purchase Order whereby Sensiva agreed to purchase 700,000 Test Kits from UMI for the price of $2,100,000. Rec. Doc. 1-1, p.1.

59.

Sensiva originally agreed to make deposit payments in the amount of $1,050,000 for the Test Kits by February 15, 2021. Sensiva made timely payments pursuant to the schedule on February 4, 2021 and February 8, 2021.

60.

However, on February 10, 2021, UMI was informed by Tarun Jolly: "The FDA application is not moving forward, so the investor wants to make sure we get the product and sell it before he wants to put in more money." Mr. Jolly's representations were in contradiction to Sensiva's obligations to make timely payments under the Purchase Order.

61.

Due to what Sensiva later defined as "interim and temporary unforeseen commercial circumstances" Sensiva stopped making payments and was forced to renege on its original agreement as evidenced in its March 4, 2021 correspondence. Rec. Doc. 1-2.

62.

Rather than hold Sensiva in breach of contract, in the spirit of cooperation, UMI attempted to give Sensiva the opportunity to rectify its breach by extending the time period for payment as evidenced in the March 4, 2021 correspondence, which Sensiva has still failed to comply with in breach of both the Purchase Order and March 4, 2021 correspondence.

63.

As a result of the bad faith breach, UMI is still owed $1,575,000 and is also entitled to all other damages, foreseeable or not, that have resulted from Sensiva's bad faith breach.

64.

All conditions precedent to UMI's claims for relief have been performed or have occurred. On March 12, 2021, a Sensiva representative, Mr. Donavan Blakney, conducted a quality control inspection of the Test Kits and confirmed after the testing was completed that the testing went as planned and he could not and did not point to any areas of concern or flaws with UMI's Test Kits. Further, all Test Kits were within specification and all 700,000 Test Kits have been available to be shipped prior to March 12, 2021.

## **COUNT V VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT**

65.

UMI incorporates by reference all facts and allegations in the preceding paragraphs as if fully set forth herein.

66.

The actions of Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly as set forth above in connection with the false representations made by Tarun Jolly as an agent of Cormeum/Sensiva were undertaken in the conduct of trade or commerce and are unethical, oppressive, unscrupulous, and substantially injurious, and constitute violations of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq*. (the "LUPTA").

67.

UMI has been injured in its business or property by reasons of the actions of Cormeum, Sensiva, and Mr. Jolly in violation of the LUPTA, which actions included intentional misrepresentation by commission or omission, fraud, and/or other deceitful and unethical conduct.

68.

UMI is entitled to recover from Cormeum and Sensiva all damages, including but not limited to lost sales as set forth herein, including treble damages and attorney's fees as provided under La. R.S. 51:1409(A).

**DEMAND FOR JURY TRIAL AND REQUEST FOR RELIEF**

LNC requests a jury trial as to all issues upon which it is entitled to a jury trial.

WHEREFORE, Defendant and Plaintiff-in-Counterclaim, Universal Meditech Inc., prays that its Answer be deemed good and sufficient and that, after due proceedings, there be judgment in its favor and against Defendants-in-Counterclaim, Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly, as follows:

A. An Order declaring that Sensiva Health, LLC and Cormeum Lab Services, LLC operate as a single business enterprise and/or are the alter egos of one another and that they are bound by the Development Agreement and Purchase Order such that both Sensiva Health, LLC and Cormeum Lab Services, LLC are liable for either parties' breach of the two agreements;

B. An Order declaring that Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly committed fraud and/or made intentional misrepresentations to UMI, and UMI is entitled to actual damages for the fraud/intentional misrepresentations as proven at trial of this matter.

C. An Order declaring that Tarun Jolly is liable in his personal capacity as a member, manager, employee, or agent of Cormeum and/or Sensiva pursuant to La. R.S. 12:1320(D) because of his fraudulent misrepresentations practiced upon UMI.

D. An Order declaring that Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly made negligent misrepresentations to UMI and UMI is entitled to actual damages for the negligent misrepresentations as proven at trial of this matter.

E. An Order declaring that UMI detrimentally relied on Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly's representations and UMI is accordingly entitled to actual damages in connection therewith as proven at trial of this matter.

F. An Order declaring that Sensiva Health, LLC and Cormeum Lab Services, LLC are in bad faith breach of the Development Agreement and Purchase Order and as a result of the bad faith breach, UMI is owed $1,575,000 and is also entitled to all other damages, foreseeable or not, that have resulted from the bad faith breach.

G. An Order declaring that the unfair and deceptive actions of Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly constitute ongoing unfair and deceptive trade practices in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law.

H. At the conclusion of a full jury trial, an Order permanently enjoining the Defendants-in-Counterclaim from further acts of unfair and deceptive trade practice in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law.

I. An Order awarding actual damages and attorneys' fees to UMI for the bad faith breach of the Development Agreement and violations of the Louisiana Unfair Trade Practices and Consumer Protection Law as proven at the trial of this action.

J. An Order awarding UMI treble damages in connection with Defendants-in-Counterclaim's continuing and ongoing violations of the Louisiana Unfair Trade Practices and Consumer Protection Law based on their continued actions following notification of the Louisiana Attorney General.

K. An Order holding each of the Defendants-in-Counterclaim liable *in solido* for all damages and attorneys' fees awarded in favor of UMI.

L. All such other and further relief as the Court may deem just and proper.

Respectfully Submitted:

*/s/ Tyler D. Trew*
Tyler D. Trew (Bar #34125)
Alec N. Andrade (La. Bar #38659)
LISKOW & LEWIS
One Shell Square, 50th Floor
701 Poydras Street
New Orleans, LA 70139-5099
Telephone: (504) 581-7979
Fax: (504) 556-4108
Email: ttrew@liskow.com
aandrade@liskow.com

*Attorneys for Universal Meditech Inc.*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 9, 2021, the foregoing was filed electronically using the CM/ECF system which will send notice of electronic filing to all counsel of record.

*/s/ Tyler D. Trew*