**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SENSIVA HEALTH, LLC and CORMEUM LAB SERVICES, LLC**<br><br>**VERSUS**<br><br>**UNIVERSAL MEDITECH, INC. and KAREKIN KHATCHADOORIAN** | **CIVIL ACTION NO. 21-00598**<br><br>**JUDGE GREG GERARD GUIDRY**<br><br>**MAGISTRATE JUDGE MICHAEL NORTH**<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiffs Sensiva Health, LLC and Cormeum Lab Services, LLC file this Second Amended Complaint against Defendants Universal Meditech, Inc. and Karekin Khatchadoorian and allege the following:

## PARTIES

1. Plaintiffs herein are Sensiva Health, LLC ("Sensiva"), a Louisiana Limited Liability Company with the members thereof being citizens of Florida and South Carolina, and with its headquarters in New Orleans, Louisiana; and Cormeum Lab Services, LLC ("Cormeum"), a Louisiana Limited Liability Company with the members thereof being citizens of Florida and South Carolina, and with its headquarters in St. Rose, Louisiana. Cormeum is a wholly owned subsidiary of Sensiva.

2. Defendant herein is Universal Meditech, Inc. ("UMI"), a California Corporation with, on information and belief, its principal place of business in Fresno, California.

3. Also named as a Defendant herein is Karekin Khatchadoorian ("Khatchadoorian"), an individual of the full age of majority, who, on information and belief, is a citizen of and is domiciled in the State of California.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction is proper under 28 U.S.C. § 1332 because this dispute is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

5. This Court has personal jurisdiction over UMI because the contractual relationship between UMI and Sensiva that is the subject of this lawsuit arises out of contacts that UMI created with the forum state of Louisiana, and this dispute arises directly from those contacts. Further, UMI negotiated a contract with persons located in Louisiana when it transmitted numerous emails and made numerous phone calls into Louisiana, all in connection with the subject matter of this litigation. Moreover, the terms of the agreement at issue contemplated delivery to Sensiva in Louisiana, and UMI received $525,000.00 in payments from the Louisiana bank account of Sensiva.

6. UMI does not dispute that this Court has personal jurisdiction over it, and has waived any challenge to personal jurisdiction by previously filing Rule 12(b) motions (R. Docs. 4, 17) that did not include any challenge to personal jurisdiction.

7. This Court has personal jurisdiction over Khatchadoorian because Khatchadoorian intentionally directed tortious conduct into the State of Louisiana. Specifically, as set forth in detail below, Khatchadoorian directed communications containing fraudulent misrepresentations to Sensiva and Cormeum (which he knew to be Louisiana companies) through Sensiva's and Cormeum's representatives (whom Khatchadoorian knew to be located and live in the State of

Louisiana) and through another Louisiana company (CovidScan LLC), in connection with the subject matter of this litigation.

8. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claims brought in this action occurred in this district and/or constituted actions directed towards this district.

## BACKGROUND

9. Khatchadoorian is the General Manager of UMI. R. Doc. 4-1, at 1. In that role, Khatchadoorian acted as the face of UMI, spearheaded the company's efforts to market UMI's products to potential buyers, and led all negotiations to that end.

10. Khatchadoorian had a business relationship with Jeff Johnson, located in Covington, Louisiana. Jeff Johnston is affiliated with CovidScan LLC, a Louisiana Limited Liability Company based in Mandeville that distributes and markets advanced Covid-19 testing. Khatchadoorian and Johnson had engaged in prior business and have specifically had multiple communications regarding UMI's products.

11. Sensiva and UMI were introduced through Johnston. Specifically, on or around August 31, 2020, Khatchadoorian had a phone conversation with Johnston regarding a potential business relationship between UMI and Sensiva. The next day, Khatchadoorian emailed a completed non-disclosure agreement to Sensiva executive Tarun Jolly and Johnston. Tarun Jolly is also an executive at Cormeum.

12. Khatchadoorian then undertook aggressive—and ultimately fraudulent—efforts to induce Sensiva and Cormeum to purchase UMI's Covid-19 Lateral Flow Devices (equipment used in laboratory testing) (hereinafter "LFDs" or "test kits"). During these discussions, Sensiva repeatedly informed Khatchadoorian and UMI that Sensiva was headquartered in New Orleans, Louisiana, and Khatchadoorian and UMI were well aware that the contemplated shipments of UMI

test kits would be made to Louisiana. On September 2, 2020, Khatchadoorian emailed Johnston a UMI Clinical Agreement Study Report touting the "excellent performance" of UMI's test kits, which Johnston forwarded on to Sensiva. The same day, Khatchadoorian emailed Tarun Jolly, another Sensiva executive, and Johnston that, although the FDA had recently delisted UMI's test kit due to faulty instructions for use, UMI's "Test itself had no issues." The FDA requires medical products to be certified and listed with the FDA; it violates federal regulations to market and sell a medical product that is not properly listed.

13. Khatchadoorian proceeded to push for a deal. On September 9, 2020, he emailed Tarun Jolly, another Sensiva employee, and Johnston to connect them with a UMI chemist, asking Sensiva to "take the time to introduce and explain to him in detail on [sic] our relationship together."

14. On or around September 11, 2020, Khatchadoorian had a phone conversation with a Sensiva executive regarding a potential business relationship between UMI and Sensiva and Cormeum, and separately emailed Johnston once again noting that the FDA had delisted UMI's LFD.

15. In early November 2020, Khatchadoorian began regularly and frequently (almost daily) communicating with Tarun Jolly on the messaging platform WhatsApp to build and discuss UMI's budding relationship with Sensiva and Cormeum.

16. On November 5, 2020, Khatchadoorian sent Cormeum two $5,000 invoices for 1,000 sample test kits (with the "Country of Origin" described as "USA") and a development fee. Via WhatsApp, Khatchadoorian confirmed with Tarun Jolly that the address for this shipment was in Louisiana. Khatchadoorian contemporaneously mailed physical sample LFDs to Cormeum in

Louisiana (arriving on or around November 9, 2020), for the purpose of showing Cormeum and Sensiva what type of product they would receive should they choose to order LFDs from UMI.

17. The physical samples Khatchadoorian sent to Cormeum in Louisiana on or around November 9, 2020 were LFDs with solid, opaque, and high-quality plastic cassettes (and not flimsy, low-grade, translucent Chinese-made cassettes which were ultimately provided). On or around the date of this mailing, Khatchadoorian orally represented to Cormeum and Sensiva by telephone that should they move forward with ordering LFDs from UMI, the LFDs would be of the like, quality, color, and solidity of the exemplar LFDs that Khatchadoorian mailed to Louisiana.

18. On or around November 10, 2020, Khatchadoorian emailed Sensiva executives asking how he could "help this test function the way we intend to."

19. On or around November 27, 2020, Khatchadoorian mailed some additional sample equipment to Cormeum at its Louisiana location.

20. In early December 2020, Khatchadoorian mailed additional sample test kits to Sensiva and Cormeum. Once again, these sample test kits were LFDs with solid, opaque, and high-quality plastic cassettes (and not flimsy, low-grade, translucent Chinese-made cassettes which were ultimately provided).

21. On December 4, 2020—the same day the additional UMI sample test kits arrived at Plaintiffs' facility in Louisiana—Khatchadoorian represented to Tarun Jolly via WhatsApp that Khatchadoorian had "decided to have only our facility [in the United States] produce 100% of the tests so to make sure we ever have any user error," noting "[i]t is best for us and you." Khatchadoorian reiterated the next day that, while UMI had a "[s]ister company in China," Khatchadoorian "trust[ed] [UMI's] hands only and d[idn]'t want any errors." Accordingly,

Khatchadoorian represented that he could "hire more qualified individuals [he] trust[ed] to perform production and be comfortable" and would "keep the business running 24/7[,] no stopping."

22. On December 8, 2020, Khatchadoorian emailed Tarun Jolly a proposed Development Agreement for Sensiva's purchase of UMI test kits.

23. On December 9, 2020, Khatchadoorian emailed Sensiva executives a document with detailed information regarding the UMI test kits for use in an FDA EUA application. This document specifically represented that the test kits and their components would "be manufactured" in the United States "at Universal Meditech Inc, . . . by Universal Meditech's personnel."

24. Khatchadoorian knew that his representations that the test kits to be sold to Plaintiffs would be manufactured at UMI's facility in the United States were false at the time he made them. Unbeknownst to Plaintiffs, on November 23, 2020, a different CovidScan employee than the one who had introduced UMI to Sensiva emailed Khatchadoorian asking "Are the tests still US made?" Khatchadoorian responded with the truth he withheld from Plaintiffs: "We help assemble the tests but they have to be made in CHINA after we were delisted due to our IFU [instructions for use]."

25. Khatchadoorian was also aware that the country of origin for the test kits was material to customers, acknowledging in the same email withheld from Plaintiffs: "I know some customers might question the fact that the product is made from China, but I can assure you the quality is just as amazing and to be frank identical in performance as if it was made in the USA." Indeed, Tarun Jolly even explicitly expressed to Khatchadoorian on December 20, 2020, that Sensiva's customers were "expecting a US product."

26. On December 27, 2020, in anticipation of a Sensiva representative's site visit to UMI's California factory, Tarun Jolly messaged Khatchadoorian asking that he "please make sure

it is operational" and that the Sensiva representative "can observe the process of production." In response, Khatchadoorian—knowing that the test kits would be manufactured in China and not at UMI's factory—falsely represented that the Sensiva representative would only be permitted access to a UMI conference room due to "[t]echnical secrets of operation." Khatchadoorian stood by this pretextual and fraudulent excuse even after Tarun Jolly offered to sign a non-disclosure agreement.

27. In late December 2020, pursuant to a December 2020 Purchase Agreement as evidenced by the commercial invoice attached hereto as **Ex. A**, Khatchadoorian sent 50,000 UMI test kits to Cormeum. Khatchadoorian had represented that these test kits would be of like quality with the sample test kits that had earlier been provided. Cormeum paid approximately $200,000 for the test kits, but they were defective: the "control line" to help distinguish between positive and negative results was not marked on any of the LFDs, rendering the test kits useless and not compliant with any LFD on the market. This was despite Khatchadoorian's prior promise that he would be responsible for ensuring quality control. Khatchadoorian and UMI failed to reimburse Cormeum for the $200,000 Cormeum paid for the 50,000 faulty and useless test kits.

28. On January 3, 2021, Khatchadoorian sent an email to Tarun Jolly and Ben Williamson of Sensiva. In the January 3, 2021 email, Khatchadoorian represented to Sensiva's representatives that, should Sensiva move forward with the contemplated purchase of LFDs from UMI, the LFD cassettes would be of a certain color, quality and grade (as depicted in a photograph attached to the email) and the accompanying diluent solution would be packaged in a specific sterile fashion (also as depicted in the photograph attached to the email):

> "I have attached the pictures below on how it will look for the print cassette CT and the diluent."

*See* Khatchadoorian's January 3, 2021 email and photographs of sample cassette and diluent attached thereto, attached hereto as **Ex. B.**

29. At the time Khatchadoorian made these representations to Sensiva, Khatchadoorian knew that they were false, and knew that the LFDs that Sensiva would ultimately be getting would be made with flimsy, low-grade, translucent Chinese-made cassettes, and not with the solid, opaque, and high-quality plastic that was depicted in the photograph contained in the January 3, 2021 email. He also knew that the diluent would not be prepared and packaged in a sterile fashion as depicted in the photograph contained in the January 3, 2021 email. And, he knew that the test kits would be manufactured in China—not at UMI's facility in the United States.

30. Khatchadoorian's intent in misrepresenting these facts to Plaintiffs was to increase the amount of money he made on the deal, at Plaintiffs' expense, by employing a "bait and switch" technique: he aimed to "bait" Plaintiffs in with the promise of high-quality materials, and then after Plaintiffs had already paid for the materials, "switch" by providing Plaintiffs with flimsy, low-grade, translucent Chinese-made cassettes and diluent that was neither prepared nor packaged in a sterile fashion.

31. Khatchadoorian successfully induced Plaintiffs into purchasing the LFDs and diluent based on the foregoing fraudulent misrepresentations, and is therefore personally liable to Plaintiffs under California and Louisiana law. *See Brister v. Schlinger Found.*, No. 04-3247, 2005 U.S. Dist. LEXIS 17815, at *14–17 (E.D. La. July 27, 2005) (Louisiana courts apply the law of the state of incorporation "to determine the scope of personal liability" for corporate agents) (collecting authorities); *Thomas v. Bridges*, 2013-1855 ( La. 05/07/14); 144 So. 3d 1001, 1007–08 (same); *Smith v. Allstate Ins. Co.*, No. 10-cv-0407, 2010 U.S. Dist. LEXIS 68464, at *9 (N.D. Cal. June 17, 2010) ("[A]n agent or employee is always liable for his own torts, whether his employer is liable or not. Under this framework, even if a tortious act has been committed by an agent acting under authority of his principal, the fact that the principal thus becomes liable does not, of course,

exonerate the agent from liability." (internal citations and quotation marks omitted)); *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 131 Cal. Rptr. 2d 777, 788 (2003) ("In other words, when the agent commits a tort, such as . . . fraud . . . , then . . . the agent [is] subject to liability in a civil suit for such wrongful conduct. . . . The fact that the tortious act arises during the performance of a duty created by contract does not negate the agent's liability."); *Viewsonic Corp. v. Electrograph Sys.*, No. 09-cv-04093, 2010 U.S. Dist. LEXIS 152299, at *13–14, 26–29 (C.D. Cal. July 8, 2010) (holding that corporate representative was not shielded from personal liability under California law where he "personally and directly participated in the allegedly fraudulent activity when he directly communicated with [plaintiff's] employees several times" and where complaint alleged facts that individual defendant's "statements were knowingly and willfully false"); *B. Aronson, Inc. v. Bradshaw Int'l, Inc.*, No. 11-cv-531, 2011 U.S. Dist. LEXIS 73811, at *15 (C.D. Cal. July 7, 2011) (holding that "plaintiffs allege[d] a legally viable claim against [corporate employee] in his individual capacity, as they allege that [employee] made affirmatively fraudulent statements to plaintiffs in the course of the negotiations at issue"); *cf. Trotter v. Charles M. Fife*, 09-860 (La. App. 3 Cir. 04/28/10); 36 So. 3d 426, 433 ("Our law does not allow an individual guilty of fraud to hide behind any mantle of protection from personal liability ordinarily accorded LLCs and corporations.").

32. All told, Khatchadoorian's extensive contacts with Louisiana in connection with inducing Sensiva into purchasing LFDs from UMI include, but are not limited to, the following:

| **Date** | **Contact** |
|---|---|
| | Khachadoorian engaged in prior business dealings with Johnston and CovidScan in Louisiana. |
| August 31, 2020 | Khatchadoorian has a phone conversation with Johnston (UMI and Sensiva's CovidScan contact) in Louisiana regarding a potential business relationship between UMI and Sensiva. |

| | |
|---|---|
| September 1, 2020 | Khatchadoorian sends completed non-disclosure agreement to Tarun Jolly and Johnston, both in Louisiana. |
| September 2, 2020 | Khatchadoorian emails Johnston in Louisiana a UMI Clinical Agreement Study Report touting the "excellent performance" of UMI's test kits, which Johnston forwarded to Sensiva in Louisiana. |
| September 2, 2020 | Khatchadoorian emails Tarun Jolly, another Sensiva executive, and Johnston, all in Louisiana, that UMI's "Test itself had no issues." |
| September 9, 2020 | Khatchadoorian emails Tarun Jolly, another Sensiva employee, and Johnston, all in Louisiana, to connect them with a UMI chemist and asks Sensiva to "take the time to introduce and explain to him in detail on [sic] our relationship together." |
| September 11, 2020 | Khatchadoorian has a phone conversation with a Sensiva executive in Louisiana regarding a potential business relationship between UMI and Sensiva. |
| September 11, 2020 | Khatchadoorian emails Johnston in Louisiana to report that that the FDA had delisted UMI's test-kit product due to faulty instructions for use. |
| November 5, 2020 | Khatchadoorian sends Cormeum in Louisiana two $5,000 invoices for 1,000 sample test kits (with the "Country of Origin" described as "USA") and a development fee. |
| November 5, 2020 | Khatchadoorian mails physical sample LFDs to Cormeum in Louisiana (arriving on or around November 9, 2020), for the purpose of showing Cormeum and Sensiva what type of product they would receive should they choose to order LFDs from UMI. |
| November 10, 2020 | Khatchadoorian emails Sensiva executives in Louisiana asking how he could "help this test function the way we intend to." |
| November 23, 2020 | Khatchadoorian discloses in an email to a different Louisiana-based CovidScan employee that UMI "help[s] assemble the tests but they have to be made in CHINA after we were delisted due to our IFU." |
| December 1–3, 2020 | Khatchadoorian mails additional sample test kits to Sensiva and Cormeum in Louisiana. |
| December 4, 2020 | Khatchadoorian falsely represents to Tarun Jolly in Louisiana via WhatsApp that Khatchadoorian had "decided to have only our facility [in the United States] produce 100% of the tests so to make sure we ever have any user error," noting "[i]t is best for us and you." |

| | |
|---|---|
| December 5, 2020 | Khatchadoorian falsely represents to Tarun Jolly in Louisiana via WhatsApp that, while UMI has a "[s]ister company in China," Khatchadoorian "trust[ed] [UMI's] hands only and d[idn]'t want any errors." Khatchadoorian further represents that he could "hire more qualified individuals [he] trust[ed] to perform production and be comfortable" and would "keep the business running 24/7[,] no stopping." |
| December 8, 2020 | Khatchadoorian emails proposed Development Agreement to Tarun Jolly in Louisiana. |
| December 9, 2020 | Khatchadoorian emails Sensiva executives in Louisiana a document with detailed information regarding the test kits for use in an FDA EUA application, which falsely represented that the test kits and their components would "be manufactured" in the United States "at Universal Meditech Inc, . . . by Universal Meditech's personnel." |
| December 11, 2020 | Khatchadoorian emails Development Agreement executed by Khatchadoorian to Tarun Jolly in Louisiana. |
| December 15–24, 2020 | Khatchadoorian ships 50,000 faulty UMI test kits to Cormeum in Louisiana. |
| December 27, 2020 | Khatchadoorian—knowing that the test kits would be manufactured in China and not at UMI's factory—messages Tarun Jolly in Louisiana via WhatsApp falsely representing that the Sensiva representative planning to visit UMI's manufacturing facility would only be permitted access to a UMI conference room due to "[t]echnical secrets of operation." |
| December 28, 2020 | Khatchadoorian emails Tarun Jolly in Louisiana instructions for use of UMI's test kits. |
| December 31, 2020 | Khatchadoorian emails Sensiva executives in Louisiana a proposed payment plan for UMI test kits. |
| January 3, 2021 | Khatchadoorian emails Sensiva executives in Louisiana falsely representing that, should Sensiva move forward with the contemplated purchase of LFDs from UMI, the LFD cassettes would be of a certain color, quality and grade (as depicted in a photograph attached to the email) and the accompanying diluent solution would be packaged in a specific sterile fashion (also as depicted in the photograph attached to the email). |

| | |
|---|---|
| January 5, 2021 | Khatchadoorian emails Sensiva executives in Louisiana acknowledging quality-control issues with UMI's test kits and announcing that UMI would halt production to address them. |

33. Based on Khatchadoorian's fraudulent misrepresentations, Sensiva entered into Purchase Order No. PO-0128 (the "January 2021 Purchase Order") with UMI, attached hereto as **Ex. C**, whereby Sensiva agreed to purchase 700,000 LFDs from UMI for $2,100,000.00.

34. In accordance with the January 2021 Purchase Order, Sensiva made multiple prepaid deposits, totaling $525,000.00, to UMI before UMI provided any materials to Sensiva.

35. Sensiva placed the order for UMI test kits based on the functionality, quality, and aesthetics of the prototype test kits that UMI had represented to Cormeum and Sensiva. Cormeum and Sensiva provided customers with samples of the test kits that UMI ultimately delivered and received complaints that the test kits did not work. Cormeum and Sensiva forwarded the customer complaints to UMI, and UMI admitted that it had changed the chemistry of the test kits. Plaintiffs would not have placed an order for UMI test kits had UMI informed them that they had changed the chemistry of the test kits from the chemistry of the prototypes.

36. UMI was required to abide by certain specifications pertaining to the LFDs and positive controls under the terms of its contract with Sensiva.

37. Sensiva's payment was conditioned on the LFDs' conformance to certain listed specifications and the satisfactory completion of a Quality Control inspection of the LFDs by Sensiva's personnel.

38. On March 4, 2021, Sensiva and UMI executed a Letter Agreement, attached hereto as **Ex. D**, which amended the January 2021 Purchase Order to provide a schedule for the remaining payments due by Sensiva to UMI for the LFDs to be provided pursuant to the January 2021 Purchase Order.

39. All payments referenced in and required by the January 2021 Purchase Order were expressly "[s]ubject to clearance of Sensiva Quality Control ("QC") inspection that shall be performed at UMI's facility." *See* **Ex. D**, at nn. 1–2.

40. After the Letter Agreement was executed by the parties, on March 12, 2021, Donovan Blakney, the Vice President of Operations for Sensiva, arrived at UMI's facility to conduct the QC inspection of the LFDs prior to UMI's shipment and Sensiva's payment of the remaining contract balance.

41. Upon Blakney's arrival at UMI, he was greeted by Khatchadoorian.

42. Immediately after his arrival, Blakney found the limited number of LFDs he was actually permitted to inspect to be substantially out of compliance with the specifications set forth in the January 2021 Purchase Order.

43. Blakney also discovered the diluent solution stored in several large non-sterile water jugs on the floor.

44. Diluent solutions have strict quality control standards that require strict sterilization measures to be followed during manufacturing, transport, storage and usage.

45. Blakney was told by Khatchadoorian that it was not possible for Blakney to enter any portion of UMI's facility except for one conference room in which only a subset of the LFDs would be provided for inspection.

46. Blakney inquired as to where Sensiva's remaining Lateral Flow Devices were being stored.

47. Khatchadoorian informed Blakney that some Lateral Flow Devices were stored in the boxes in the lobby (which would be made available for Blakney's inspection in the adjacent conference room) while the rest were being stored in a separate storage area of UMI's facility.

48. Blakney requested to see the inside of this storage area, but Khatchadoorian denied him access, citing UMI's "sensitive and secret" business practices surrounding the LFDs.

49. Blakney clarified that he only needed access to the storage area itself, to confirm whether the entirety of Sensiva's order was complete and on-site, but Blakney's request was again denied and he was told by Khatchadoorian that UMI could not make this accommodation.

50. Mr. Blakney then inquired whether he could receive a picture of the finished Lateral Flow Devices within the storage area which he was denied access to. Khatchadoorian also denied that request.

51. Blakney therefore proceeded with his inspection of the limited subset of the LFDs that were made available for him in the conference room.

52. Of the LFDs he was permitted to inspect, none of them were in compliance with the specifications set forth in the January 2021 Purchase Order.

53. Under the January 2021 Purchase Order, Sensiva specified that the LFDs be "**BULK SHIPPED & VACUUM SEALED WITH DESICCANT IN BAG**." *See* **Ex. C.** However, the LFDs were not shipped and sealed with any desiccant.

54. When Mr. Blakney voiced his concern over the lack of desiccant, Khatchadoorian provided no cognizable explanation.

55. Additionally, Blakney noticed that the LFDs were missing the required positive control liquid—another condition required under the specifications.

56. Most significantly, Blakney noticed that the plastic cassettes housing the LFDs did not at all conform to the sample cassette that UMI had sent to Sensiva for approval—the cassettes were made with flimsy, low-grade, translucent Chinese-made material, and not with the solid, opaque, and high-quality plastic that was shown to Sensiva in the exemplar LFD.

57. Finally, the diluent that was shown to Blakney for inspection was not prepared and packaged in a sterile fashion as promised by UMI, but was instead housed in non-sterile water jugs.

58. When Blakney brought these deficiencies to Khatchadoorian's attention, Khatchadoorian dismissed Blakney's concerns.

59. After the inspection of the limited subset of materials that Blakney was given access to was complete, Khatchadoorian asked Blakney to sign a document stating that UMI has passed Sensiva's inspection, but Blakney declined to sign the document

60. In the days following the failed inspection, Khatchadoorian informed Sensiva that UMI no longer wished to hold on to the inventory as it was ready to ship it.

61. Ben Williamson, in turn, voiced his concerns with the products following Blakney's inspection and informed Khatchadoorian that Sensiva would not be making any further payments to UMI until the LFD's specifications were met in accordance with the January 2021 Purchase Order.

62. UMI has since (1) refused to cure the LFD's deficiencies, (2) refused to provide replacement LFDs to Sensiva, (3) refused to allow Sensiva access to inspect the LFDs that Blakney was denied access to at the initial inspection, and (4) refused to refund Sensiva the prepaid deposits that it made totaling $525,000.00.

**COUNT ONE: BREACH OF CONTRACT (AGAINST UMI)**

63. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 62 of this Complaint as if the same were restated herein.

64. UMI breached its obligations owed to Plaintiffs under (1) the December 2020 Purchase Agreement to provide 50,000 LFDs in exchange for the $200,000 "development fee" paid by Cormeum; and (2) the January 2021 Purchase Order and the Letter Agreement (which

breaches caused and continue to cause Plaintiffs to incur substantial direct and consequential damages), and is indebted to Plaintiffs for Plaintiffs' damages incurred thereunder, by failing to provide adequate LFDs owed to Plaintiffs under the foregoing agreements.

65. In addition to UMI's failure to provide adequate LFDs owed to Plaintiffs under the under (1) the December 2020 Purchase Agreement and (2) the January 2021 Purchase Order and the Letter Agreement that conform to the promised quality and specifications, UMI has failed to reimburse (1) Cormeum's payment of $200,000 for 50,000 faulty and useless test kits and (2) Sensiva's substantial deposit in the amount of $525,000.00 that Sensiva paid to UMI under the January 2021 Purchase Order.

66. UMI's breach of contract was in bad faith and Plaintiffs are entitled to all damages and relief as a result of such breach.

**COUNT TWO: FRAUD (AGAINST UMI AND KHATCHADOORIAN)**

67. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 66 of this Complaint as if the same were restated herein.

68. Defendants Khatchadoorian and UMI made the misrepresentations detailed above to Plaintiffs with the intention to obtain an unjust advantage and to cause a loss or inconvenience to Plaintiffs.

69. Plaintiffs relied on Khatchadoorian's and UMI's misrepresentations (detailed above) to their detriment, and Khatchadoorian and UMI successfully induced Plaintiffs to enter into contracts to purchase the LFDs by making these misrepresentations.

70. Plaintiffs have incurred substantial damages due to these misrepresentations, including but not limited to the amounts that Cormeum and Sensiva paid to UMI (which UMI refuses to return), the value of business opportunities that Plaintiffs lost due to not having the LFDs

that UMI contracted to provide, the increased costs that Plaintiffs have incurred or will incur to acquire replacement materials, and attorneys' fees.

71. As set forth above, under Louisiana and California law, both Khatchadoorian and UMI are liable to Plaintiffs.

**COUNT THREE: DETRIMENTAL RELIANCE (AGAINST UMI AND KHATCHADOORIAN)**

72. Plaintiffs re-allege the allegations contained in Paragraphs 1 through 71 of this Complaint as if the same were restated herein.

73. Plaintiffs assert the claim of detrimental reliance in the alternative to Counts 1–2 asserted above.

74. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. *Louisiana Office of Risk Mgmt. v. Richard*, 13-0890, p. 5 (La. 10/15/13); 125 So.3d 398, 402.

75. Plaintiffs relied on the representations of Khatchadoorian and UMI to enter into (1) the December 2020 Purchase Agreement and (2) the January 2021 Purchase Order and the Letter Agreement.

76. Plaintiffs' reliance was reasonable and justified.

77. Since entering into (1) the December 2020 Purchase Agreement and (2) the January 2021 Purchase Order and the Letter Agreement, Defendants have changed their position by both failing to produce the product to Plaintiffs as promised and specified, and also not agreeing to alter their product to fit the needs and specifications of Plaintiffs under (1) the December 2020 Purchase Agreement and (2) the January 2021 Purchase Order and the Letter Agreement.

78. Despite deliberately not abiding by (1) the December 2020 Purchase Agreement and (2) the January 2021 Purchase Order and the Letter Agreement, Defendants have refused to reimburse payments made and still demand payment from Plaintiffs.

79. In doing so, Defendants have harmed Plaintiffs.

80. As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, including, but not limited to, the loss of $200,000 that Cormeum paid to UMI under the December 2020 Purchase Agreement and $525,000 that Sensiva paid to UMI under the January 2021 Purchase Order.

81. As set forth above, under Louisiana and California law, both Khatchadoorian and UMI are liable to Plaintiffs.

**COUNT FOUR: UNJUST ENRICHMENT (AGAINST UMI)**

82. Plaintiffs re-allege and incorporate all allegations set forth herein.

83. Plaintiffs assert the claim unjust enrichment in the alternative to Counts 1-3 asserted above.

84. Louisiana Civil Code art. 2298 provides, in pertinent part, that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person." The requisite elements of a claim for unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) no other available remedy at law. *Pinegrove Elec. Supply Co., Inc. v. Cat Key Const., Inc.*, 11-660, p. 5 (La.App. 5 Cir. 2/28/12), 88 So.3d 1097, 1100.

85. As set forth above, Defendants have neither complied with the December 2020 Purchase Agreement, nor the January 2021 Purchase Order, nor the Letter Agreement; however,

Plaintiffs made multiple payments to Defendants in hopes of obtaining the product that was promised to them.

86. As a result of Defendants' actions, Defendants have been enriched, without cause, at the expense of Plaintiffs.

87. As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, including, but not limited to, the loss of $200,000 that Cormeum paid to UMI under the December 2020 Purchase Agreement and the $525,000.00 that Sensiva paid to UMI under the January 2021 Purchase Order.

88. As set forth above, under Louisiana and California law, both Khatchadoorian and UMI are liable to Plaintiffs.

**JURY DEMAND**

89. Plaintiffs request a trial by jury on all claims so triable.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court. Additionally, Plaintiffs pray that after all due proceedings had, there be a judgment in favor of Plaintiffs Sensiva Health, LLC and Cormeum Lab Services, LLC, and against Defendants Universal Meditech, Inc. and Karekin Khatchadoorian for all sums due to the Plaintiffs, together with interest thereon at the legal rate, as well as all reasonable costs and attorneys' fees associated with this litigation and proceedings. Plaintiffs further pray for all other general and equitable relief in the premises.

Respectfully Submitted:

*/s/ Lauren C. Mastio*
TARAK ANADA (#31598)

LAUREN C. MASTIO (La. Bar #33077)
MICHAEL J. O'BRIEN (La. Bar #38852)
TREY K. BARTHOLOMEW (#39114)
JONES WALKER LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
and
445 North Blvd., Ste. 800
Baton Rouge, LA 70802
Telephone: (504) 582-8322
Facsimile: (504) 589-8322
E-Mail: tanada@joneswaker.com
lmastio@joneswalker.com
mobrien@joneswalker.com
tbartholomew@joneswalker.com

*Attorneys for Sensiva Health, LLC, Cormeum Lab Services, LLC, and Tarun Jolly, M.D.*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 22, 2022, the foregoing was filed electronically using the CM/ECF system which will send notice of electronic filing to all counsel of record.

*/s/ Lauren C. Mastio*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SENSIVA HEALTH, LLC**<br><br>**VERSUS**<br><br>**UNIVERSAL MEDITECH, INC. and KAREKIN KHATCHADOORIAN** | **CIVIL ACTION NO. 21-00598**<br><br>**JUDGE GREG GERARD GUIDRY**<br><br>**MAGISTRATE JUDGE MICAHEL NORTH**<br><br>**JURY TRIAL DEMANDED** |

**<u>VERIFICATION OF BEN WILLIAMSON</u>**

I, Ben Williamson, hereby declare as follows:

1. I am employed by Sensiva Health, LLC ("Sensiva") and have the authority to make this declaration on behalf of Sensiva and Cormeum Lab Services, LLC.

2. I have read the Second Amended Complaint, and after reading the facts therein, I believe the facts as stated in the Second Amended Complaint to be true and correct to the best of my belief and knowledge.

3. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 21st day of April, 2022.

Ben Williamson