UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SENSIVA HEALTH, LLC | * CIVIL ACTION NO. 21-00598 |
| | * |
| V. | * JUDGE GREG GERARD GUIDRY |
| | * |
| UNIVERSAL MEDITECH, INC | * MAGISTRATE JUDGE MICHAEL NORTH |
| And KAREKIN KHATCHADOORIAN | * |
| | * |

*************************************

**<u>OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE*</u>**

Defendant, Universal Meditech, Inc. ("UMI"), opposes Plaintiff's, Sensiva Health, LLC ("Sensiva"), Motion in Limine to limit or exclude at trial any testimony, evidence, or argument regarding any claims, disputes, settlements, or litigation involving Sensiva, Corneum Lab Services, LLC ("Corneum"), and/or their principals.

## I. RELEVANT FACTUAL BACKGROUND

### A. Sensiva Breached the Purchase Order with UMI

To better understand the transmission of COVID-19 and quickly identify individuals that may be infected with COVID-19, the medical community raced to develop a large-scale, accurate, affordable, and rapid diagnostic testing method specifically tailored to COVID-19. Lateral flow devises (LFDs) became the primary source for this rapid diagnostic testing. LFDs are diagnostic devices that confirm the presence or absence of a particular medical condition—to wit, the viral protein markers or analytes for COVID-19. LFDs themselves are not a new technology. The most known type of LFD would be a pregnancy test.

As the COVID-19 pandemic continued, Sensiva, spearheaded by its employee or agent, Tarun Jolly, desperately wanted to jump into the world of COVID-19 LFDs because substantial profits were possible. Sensiva and Jolly needed to find a manufacturer of medical devices capable

of producing the COVID-19 LFDs. Since 2015, UMI has manufactured LFDs used for pregnancy tests, ovulation tests, menopause tests, and illicit drug tests for its customers. In September 2020, Sensiva and its affiliate Cormeum Lab Services, LLC ("Cormeum") were introduced to UMI and began to work on a partnership to manufacture COVID-19 antigen LFDs.

In November 2020, Jolly pursued a partnership with UMI for its COVID-19 antigen LFDs. To that end, Jolly guaranteed UMI that Sensiva (and/or its affiliate Cormeum), would apply for and receive an Emergency Use Authorization ("EUA") from the U.S. Food and Drug Administration ("FDA"). As this Court knows, during a public health emergency, the FDA can use its EUA authority to allow the use of unapproved medical products to diagnose, treat, or prevent serious or life-threatening diseases when certain criteria are met. In February and March 2020, the FDA declared that EUAs would be granted for diagnostics for the detection and/or diagnosis of COVID-19. Jolly and Sensiva promised UMI that it would apply for and obtain a EUA for UMI's COVID-19 LFDs.

In November and December 2020, Sensiva and UMI spent a great deal of time developing the COVID-19 LFDs. UMI provided roughly 80,000 LFDs to Sensiva/Cormeum to further develop, inspect, and reach agreement on the specifications for the ultimate product. Ultimately, on January 28, 2021, Sensiva signed a purchase order with UMI for 700,000 LFDs with the following general specifications:

1. COMPLETED LATERAL FLOW DEVICES
2. UPDATED CARTRIDGE WITH CT LINES CLEARLY MARKED
3. PROPRER CHROMATOGRAPHY PAPER (NO CONTROL LINE DROP OUTS)
4. BULK SHIPPED & VACUUM SEALED WITH DESICCANT IN BAG
5. BUFFER SOLUTION IN BULK
6. PROVIDE POSITIVE CONTROLS SUFFICIENT TO TEST 25 LFD'S PER 5,000 TESTS

[R.D. 1-1.]

The Purchase Order says absolutely nothing about the LFDs being "made in America" nor did it impose any requirements regarding where the LFDs and/or their component parts had to be made.

The $2,100,000 purchase price was to be paid across eight installments between February 4 and March 1, 2021. The units were to be shipped in four batches from February 18 to March 1, 2021.

On February 4 and 8, 2021, Sensiva paid the first two installments for a total of $525,000.

On February 10, 2021, Jolly and Sensiva informed UMI that they would not make any further payments until 300,000 of the units were delivered; this was a direct breach of the purchase agreement. Sensiva's ultimatum came nearly eight to twelve days before that amount of product was scheduled to be available for shipping per the purchase order. UMI pushed Jolly for an answer about what had changed. Jolly responded with "The FDA [EUA] application is not moving forward, so the investor wants to make sure we get the product and sell it before he wants to put in more money." [R.D. 18.] This was the first time UMI learned that Sensiva's EUA was denied and that its deal with Sensiva was somehow controlled by an unknown, behind the scenes "investor."

Due to what Sensiva later defined as "interim and temporary unforeseen commercial circumstances" Sensiva stopped making payments and reneged on all of its obligations under the purchase order. [R.D. 12-4.]

UMI pushed Sensiva to fulfill its obligations with no success.

In early March 2021, Sensiva's lawyer sent to UMI a letter that amended and restated the January 28, 2021 purchase order. This letter indicated that Sensiva would pay $700,000 three business days after 350,000 units were ready to be shipped and $875,000 three business days after the remaining 350,000 units were ready to be shipped. Hidden in a footnote to the letter, Sensiva

conditioned its payment on "clearance of Sensiva Quality Control ("QC") inspection that shall be performed at UMI's facility." [R.D. 1-2.] On March 4, 2021, in the spirit of cooperation, UMI (unfortunately) signed Sensiva's letter. UMI now knows that the conditional payment obligations in the letter's footnote would be abused by Sensiva to justify its bad faith breach of its contract and obligations to purchase UMI's LFDs.

As of March 3, 2021, UMI had completed making the 700,000 LFDs Sensiva agreed to purchase. Despite this fact, no payment was made to UMI.

On March 12, 2021, Sensiva finally sent a representative out to UMI's facility in Fresno, California, to inspect the LFDs. Emails between Sensiva employees shortly before the inspection took place reveal that it was nothing more than a sham event intended solely for Sensiva to fabricate a basis to use as justification its breach of the contract. During the inspection, Sensiva was given access to the product and the representative chose to perform the QC inspection on only a portion of the completed product. However, UMI did conduct quality control and quality assurance testing and certified that the LFD tests were valid and properly working. At the conclusion of the inspection, absolutely no issues were reported or documented by Sensiva's representative to UMI.

After the representative left, Sensiva blindsided UMI with an email claiming a number of QC issues that it said came up during the inspection. Each of these alleged QC issues were addressed by UMI or turned out to be non-issues. Ultimately, it became clear that Sensiva fabricated these QC issues in order to justify its breaching the contract.

After the inspection, UMI sent multiple emails asking Sensiva to let UMI know where and when to ship the product. UMI also asked Sensiva to remit the remaining payments for the 700,000 LFDs made for Sensiva. UMI received no response.

On March 25, 2021, Sensiva raced to the courthouse to file this lawsuit.

Through discovery, UMI has uncovered documents and evidence to show that Sensiva decided as early as January 2021 to seek out cheaper options for LFDs made in China. Even as Sensiva negotiated and developed the LFDs with UMI, it was pursuing deals behind the scenes with other entities in China searching for cheaper options.

**B. Sensiva's Other Lawsuits Arising out of these COVID Antigen React Test Kits**

In a *Qui Tam* action, Dr. Tarun Jolly recently settled with the United States Department of Justice and paid a fine of $1 million in connection with a Medicare fraud investigation. Dr. Jolly is a principal of Sensiva and Corneum. Dr. Jolly's scheme involved kickbacks in exchange for referrals for medical testing conducted by a company co-owned by Dr. Jolly. Also, Dr. Jolly's laboratory agreed to forego a collection of over $41 million of billing to Medicare that was associated with the kickback scheme and received a 25-year ban excluding the lab from doing business with the Centers for Medicare and Medicaid Services.

What Sensiva did to UMI in this case, it did to nearly every one of its other contracting partners for the COVID-19 test kits. In June 2021, Sensiva sued the packaging company, Steuart Contract Packaging ("Steuart"), that it contracted with to wrap and pack up the test kits. [Exhibit "1," Pet., *Sensiva v. Steuart*, Orleans Parish Civil District Court, No. 21-05075 (6/15/21).] The documents and Steuart witnesses, which were timely listed on UMI's witness list [R.D. 82.], will explain that Sensiva falsely accused Steuart of improperly packing and sealing the test kits and thus, breaching the contract with Sensiva. Steuart contends that Sensiva was secretly working with third parties and/or developing its own manufacturing and packaging facility in Minnesota, which they brazenly advertised on their website.[1] Due to these activities and in an effort to get out of its

---

[1] *See* https://www.sensivahealth.com/about.

contract with Steuart, Sensiva came up with the theory that Steuart's work was faulty. Sensiva then raced to the courthouse and blind-sided Steuart with the lawsuit.

In May 2022, Sensiva filed suit against BKK Solutions, LLC ("BKK"), the entity Sensiva contracted with to distribute and sell Sensiva's COVID-19 test kits on the open market. [Exhibit "2," Pet., *Sensiva v. BKK*, Orleans Parish Civil District Court, No. 22-003987 (5/5/22); Exhibit "3," Pet., *BKK v. Sensiva*, Orleans Parish Civil District Court, No. 22-04083 (5/6/22).] Sensiva contracted with BKK to sell the 1.6 million test kits that it made using the Chinese products and LFDs it was procuring behind UMI's back in the early part of 2021. As the allegations unfolded, Sensiva again falsely accused BKK of failing to market and sell the test kits per the distribution agreement between the parties. It turns out that the real problem that prevented BKK from selling Sensiva's test kits was that Sensiva failed to secure the proper regulatory approval for its product, which is one of the same issues that exists in this case. Sensiva's failure to secure regulatory approval plus significant quality problems with the test kits it provided to BKK meant that the test kits could not be sold to anyone anywhere.

To recap, in relation to its COVID-19 diagnostic test kits, Sensiva sued the medical device manufacturer (UMI), the packager (Steuart), and the distributor/reseller (BKK) claiming it was all their faults that Sensiva's product was not profitable.

In August 2020, Dr. Jolly, Sensiva, and Cormeum were also sued by Coastal Laboratories, Inc. in the U.S. District Court for the District of Maryland regarding the breach of another contract related to COVID-19 testing. [*See* Exhibit "4," *Coastal Laboratories v. Jolly, M.D, et al*, U.S. Dist. Maryland, No. 1:20-cv-2227; *see also* Exhibit "5", *Jolly v. Coastal*, U.S. EDLA, No. 1:21-cv-137.] Coastal was formed to purchase laboratories in Arizona from Dr. Tarun Jolly to provide laboratory services in support of infection control and prevention programs at nursing homes. Coastal

recognized that the COVID-19 Pandemic would substantially impact nursing homes and would require an increase in testing. Jolly and other co-defendants in the suit, advised Coastal that the Arizona labs would need upgrading to the facilities and additional regulatory approvals to conduct COVID-19 testing.

ZDX, a company owned by James Silliman, agreed to come in and assist Coastal in completing regulatory compliance procedures and secure the FDA EUA needed for the labs to conduct COVID-19 testing. In the interim, Jolly, Silliman, and others formed Sensiva/Corneum for the purpose of administering COVID-19 tests. Then, ZDX instituted its plan to obtain Coastal's EUAs. ZDX then redirected its personnel from the Arizona labs and enlisted them in obtaining an EUA for Corneum while Coastal was paying for the same personnel to be working at the Arizona labs to obtain their EUA. The FDA approved Corneum's EUA application thanks to ZDX's work. But ZDX failed to make any further attempt to gain an EUA for Coastal as promised.

Relying on advice from Silliman, Coastal engaged with Corneum to perform their COVID-19 testing temporarily while they attempted to obtain their EUA. Suddenly, Jolly relayed to Coastal that Corneum was requiring a higher production price and demanded payment. Days later, Jolly began improperly claiming that Coastal was behind on its payments when it was in fact up-to-date. Cormeum and/or Sensiva at the direction of Jolly and Silliman suddenly ceased shipments of test kits. Corneum promptly presented Coastal with a settlement agreement regarding their alleged past due payments. When Coastal refused to accept, Defendants blocked Coastal's access from web portals and then cut off customers' access to the portals. As a final act, Corneum broadcast incorrectly on its website that Coastal was refusing to pay its bills and that Sensiva was ready and able to restore service.

In sum, Coastal negotiated the purchase of laboratories from Jolly with the intention to

produce COVID-19 tests. Jolly, seeing the opportunity provided by the pandemic, created his own company, Sensiva/Corneum to conduct similar tests. He then used ZDX to "assist" Coastal in obtaining their required EUA, meanwhile he was stealing workers to instead obtain his own EUA for Corneum. This forced Coastal to rely on Corneum to maintain their ability to produce COVID-19 tests which benefitted Jolly. Then, Jolly and Corneum made false claims regarding Coastal's payments, defamed the company, and used the opportunity to act as hero.

## II. LAW AND ARGUMENT

### A. The Federal Rules of Evidence and Louisiana Jurisprudence Support Admission of Evidence of Sensiva's Prior Lawsuits.

The Federal Rules of Evidence provide that relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant when it has the tendency to make a fact more or less probable and the fact is of consequence in determining the action. Fed. R. Evid. 401. Relevant evidence may be excluded if its probative value is substantially outweighed by its potential for unfair prejudice, confusing the issues, misleading the jury, wasting time, or present cumulative evidence. Fed. R. Evid. 403. Districts courts are given wide discretion when determining the admissibility of evidence under Federal Rules. *Spring/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting *U.S. v. Abel*, 469 U.S. 45, 54 (1970)). Moreover, unfair prejudice is not to be equated with testimony that is merely adverse to the opposing party. *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977).

Here, evidence of prior lawsuits filed by Sensiva is relevant to show that Sensiva intentionally and fraudulently breached their contracts with UMI, and that similar behavior is Sensiva's common business practice. In fact, Sensiva's pattern and similar conduct in how it dealt with UMI in bad faith and breached the contract with UMI played out in Sensiva's contracts with the packaging company, Steuart, and the distributor/reseller, BKK, for these teste kits. Sensiva

will attempt to avoid responsibility and liability for its actions by placing UMI in bad light and attacking its credibility. Sensiva cannot hide from the jury just how bad of a contracting partner Sensiva is and the credibility issues that stem from its suing numerous business partners in this COVID-19 test kits deal when its own failures were the cause of the breaches of the respective contracts.

Other than cursory string cites, Sensiva has not provided the court with any cases supporting their desired outcome. However, the following two cases support UMI's desired outcome.

The Eastern District in *In Re Xarelto Products Liability Litigation*, 2017 WL 2780760 (E.D. La. May 26, 2017), denied the plaintiff's motion *in limine* to exclude prior lawsuits. The plaintiff argued that evidence of her prior lawsuits was irrelevant and unduly prejudicial because they involved a different cause of action. The defendants intended to use evidence of the prior lawsuits to show that the plaintiff's alleged injuries had manifested prior to the instant suit. The court found that evidence of the prior lawsuits goes toward the plaintiff's credibility and thus was admissible. "Every time a plaintiff files a suit, they place their credibility at issue." *Id.* at *3.

Similarly in *Brown v. Sports Clips* 2013 WL 27625, (E.D. La. Jan. 2, 2013), the Eastern District permitted admission of evidence of the plaintiff's prior lawsuits. In this employment discrimination case, the plaintiff filed a motion *in limine* to exclude evidence of her prior Title VII lawsuits arguing that their prejudicial effect outweighed their probative value. However, the prior lawsuits showed evidence of potentially fraudulent behavior and a pattern of the plaintiff repeatedly filing identical lawsuits against other former employers. Thus, the court found that the entire trial rested on the plaintiff's credibility and that the evidence of her prior suits was highly relevant to her credibility. Thus, the court held that evidence of the previous lawsuits was "essential

for consideration" and allowed their admission. *Id.* at *3.

The aforementioned cases are vastly similar to this case. If UMI presents evidence of Sensiva's involvement in past litigation, the evidence will be relevant to establish a pattern of Sensiva's fraudulent behavior. As in *In re Xarelto* and *Brown*, Sensiva has been involved in numerous lawsuits where its credibility has been at issue. More important, Sensiva has been involved in numerous lawsuits arising out of its failed COVID-19 test kits that all speak directly to its credibility and rebut the idea that UMI's actions were the cause for Sensiva's allegations that its test kit business venture fell apart. If presented to the trier of fact, these lawsuits will show that Sensiva has a common business practice of breaching contracts and quickly filing suit before the other party. Its credibility as a plaintiff is in question here as it has been in prior litigation.

**B. Sensiva's Prior Litigation is Relevant to Show that it Engages in Routine Fraudulent Behavior and Should be Admitted as Evidence of Sensiva's Credibility.**

Sensiva argues that the *Qui Tam* proceeding involving Dr. Jolly has no relevance to the instant case. What Sensiva fails to mention is that the *Quit Tam* proceeding arose out of a Medicare fraud investigation that resulted in Dr. Jolly paying a hefty fine and receiving a 25-year ban from conducting business with Centers for Medicare and Medicaid Services. This suit clearly evidences that Dr. Jolly, a principal of Sensiva and Corneum, can commit fraudulent acts and is therefore clearly relevant to UMI's claims.

Similarly, Sensiva fails to acknowledge that the prior suits involving Steuart, Coastal, and AMSOnsite as well as BKK involve claims of tortious interference with contractual relations, tortious interference with prospective business advantages and conspiracy. The fact that these suits involve different facts, circumstances, and parties has no impact on their relevance to this suit and to Sensiva's credibility.

The mere existence of these suits establishes a pattern of behavior exhibited by Sensiva

and its principals. The prior suits involving Sensiva show that breaching contracts, making promises it has no intention of fulfilling, and conducting backdoor deals is the common business practice at Sensiva, and is the exact same practice it used against UMI. It further lends credence toward the claims of fraud alleged by UMI in this suit. Thus, these suits are clearly relevant evidence that must be presented to the trier of fact to establish the full "story" regarding Sensiva's credibility.

### C. Considering Sensiva's allegations that it suffered financial losses due to quality control issues with UMI's product, Sensiva's allegations in these other lawsuits regarding the negligence of others that led to its financial losses are relevant.

Sensiva has alleged and provided an expert report suggesting it suffered financial losses due to the quality control problems it allegedly discovered in the 700,000 LFDs UMI manufactured for Sensiva. These claims are vastly similar to the claims for financial losses Sensiva made in its suits against BKK and Steuart arising out of the COVID-19 test kits. Even though Sensiva was a bad actor in all of these relationships, at the very least, the financial loss allegations made against BKK and Steuart show that it is through those parties' fault that Sensiva's suffered financial losses, and not through any fault of UMI. As such, UMI vehemently denies all aspects of Sensiva's allegations. Its lawsuits against Steuart and BKK clearly show that Sensiva's losses had absolutely nothing to do with UMI's LFDs.

According to Sensiva's own allegations and claims in the lawsuits, Steuart's faulty wrapping and packaging of the test kits is the reason Sensiva was unable "to provide kits to their customers." [Ex. "1," *Sensiva v. Steuart* at ¶¶ 12-20.] Sensiva also blamed its financial losses on BKK's faulty storage and/or shipment of the test kits under the distribution agreement. [Ex. "2" *Sensiva v. BKK* at ¶ 27.] Sensiva also blamed BKK for its failure to maximize the sales volume of Sensiva's test kits as the reason Sensiva suffered financial losses. [*Id.* at ¶¶ 31, 37, 51.] Additionally, the allegations in these lawsuits offer more evidence to the defense that Sensiva's

losses were not caused by UMI or Steuart or BKK; rather, the losses stem from Sensiva's failure to secure the necessary regulatory permitting and approval to sell the test kits.

Sensiva cannot blame three separate entities for its alleged financial losses in three separate lawsuits and then use the separate lawsuits as a shield in the hopes of earning a windfall double, possibly triple, recovery. If Sensiva has financial losses caused by third parties emanating from the exact same business deal at issue in this case, then all evidence of what caused or contributed to those financial losses is relevant in this case to reduce what Sensiva alleges UMI owes. If the losses Sensiva is claiming in these other lawsuits arising out of the same business deal are hidden from the jury, there is a significant and very real threat of Sensiva gaining a windfall and recovering more than its actual losses across these lawsuits. At the very least, evidence of Sensiva's other lawsuits is extremely relevant to UMI's defense that any financial losses alleged by Sensiva were not caused by UMI.

### D. Plaintiff's Motion *in Limine* is Premature and Evidentiary Rulings Should be Reserved for Trial.

Not only does the evidence of Sensiva's prior litigation have extreme probative value, but a motion in limine on this matter is inappropriate at this time. In their motion, Sensiva assumes that UMI plans to present evidence of particular lawsuits that Sensiva has been involved in. However, UMI does not and cannot predict which lawsuits will become relevant over the course of trial. All, some, or even none of these prior suits may need to be presented to the trier of fact. Which evidence will become necessary in trial is dependent on the presentation of testimony, arguments, and other evidence during the course of trial.

Thus, exclusion of all prior litigation is overbroad and premature. UMI cannot say for certain which prior lawsuits, if any, will become relevant over the course of the trial. Nor can Sensiva predict what the trier of fact will need to rely on to reach their ultimate conclusion.

## III. Conclusion

Evidence of Sensiva's lawsuits involving Steuart, BKK, and Coastal are extremely relevant to establish Sensiva's lack of credibility as a plaintiff in this suit. It establishes a pattern of fraudulent behavior to breach contracts and blame the other parties. These suits further establish Sensiva's attempt to gain a windfall by claiming that financial losses from one transaction occurred because of three different companies for three different reasons. When in fact, the only real reason was its inability to get the requisite regulatory permitting as promised. Thus, the extreme relevancy of these suits outweighs any potentially prejudicial effect they may have. They are necessary for the jury to be aware of so that the full picture can be seen. Finally, this type of motion in limine is premature. As argued herein these suits are relevant but particular ones may become more or less relevant over the course of trial. As such, admissibility rulings regarding these suits should be saved for trial.

Respectfully submitted,

*/s/ Raymond C. Lewis*
ROBERT E. KERRIGAN (#07350)
rek@deutschkerrigan.com
RAYMOND C. LEWIS (#31236)
rlewis@dkslaw.com
DEVIN J. BARNETT (#33001)
dbarnett@deutschkerrigan.com
**DEUTSCH KERRIGAN, L.L.P.**
755 Magazine Street
New Orleans, LA 70130
Telephone: (504) 581-5141
Facsimile: (504) 566-1201
Attorneys for Defendant, Universal Meditech, Inc.

Certificate of Service

I HEREBY CERTIFY that on October 18, 2022, the foregoing was filed electronically using the CM/ECF system which will send notice of electronic filing to all counsel of record.

*/s/ Raymond C. Lewis*
Raymond C. Lewis