FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J
Section 15

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER DIVISION " "

SENSIVA HEALTH, LLC

VERSUS

BKK SOLUTIONS, LLC

FILED: ______________________ ______________________
DEPUTY CLERK

## VERIFIED PETITION FOR DECLARATORY JUDGMENT AND DAMAGES

NOW INTO COURT, through undersigned counsel, comes Sensiva Health, LLC ("Sensiva"), and brings this Verified Petition for Declaratory Judgement and Damages against BKK Solutions, LLC ("BKK," or "Distributor"), representing as follows:

### THE PARTIES

1.

Sensiva Health LLC is a limited liability company organized under the laws of Louisiana.

2.

BKK Solutions, LLC is a limited liability company organized under the laws of Florida.

### VENUE

3.

Venue is proper in the Civil District Court for the Parish of Orleans pursuant to Article 42 of the Louisiana Code of Civil Procedure. Venue is also proper because it was selected by the parties in the agreement giving rise to this dispute.

### FACTUAL BACKGROUND

4.

Since the outset of the COVID-19 pandemic, global demand for rapid testing kits that detect the presence of SARS-CoV-2 (the virus that causes COVID-19) have significantly outpaced production. These shortages have exacerbated government efforts to control and track the virus.

5.

In the fall of 2020, Sensiva developed the capacity to source and assemble accurate diagnostic testing kits for the detection of SARS-CoV-2.

VERIFIED
Debbie Ciaccio
2022 MAY 06 A 09:24

Ex. 2 to UMI Opp. to Sensiva MIL

E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

6.

Sensiva purchased the chemical diagnostic components of the tests they assembled from a third-party biotechnology company.

7.

While Sensiva has the ability to source and assemble SARS-CoV-2 diagnostic tests, Sensiva is not in the business of selling or marketing such tests. Accordingly, Sensiva sought a distributor to assist it in selling its highly valuable tests.

8.

Sensiva entertained numerous offers from distributors, but ultimately decided to contract with BKK because BKK claimed to have numerous "confirmed buyers" in place that were ready to immediately purchase large quantities of SARS-CoV-2 diagnostic tests in 2021.

9.

Accordingly, Sensiva and BKK entered into a Distribution and Reseller Agreement on December 24, 2020, which agreement was amended twice (the "DRA," attached hereto as Exhibit "A").

10.

Under the DRA, BKK was required to fund the production of SARS-CoV-2 diagnostic test kits that were procured and assembled by Sensiva ("Test Kits") at a set price, which was the "price paid to a Production Line manufacturer to source components and manufacture Test Kits by Sensiva." *See* DRA at Schedule 1, n.1. BKK was then then obligated to resell those Test Kits to BKK's customers at any commercially reasonable rate BKK selected in its sole discretion. DRA §§ 4.1, 5.1, 8.

11.

Sensiva did not profit from the sale of Test Kits to BKK for distribution. Rather, the DRA was set up to facilitate profit sharing between Sensiva and BKK on BKK's sales to its customers. Specifically, following the sale of Test Kits by BKK to its customers, the profits of those sales were to be split between Sensiva and BKK 60/40 respectively.

12.

The DRA's structure tied Sensiva's success to BKK's ability to successfully market and sell the Test Kits that Sensiva invested considerable time and effort in developing and assembling.

13.

The DRA obligated BKK to "market, advertise, promote, and sell the [T]est [K]its to Customers in a manner that reflects favorably at all times on [T]est [K]its and the good name, goodwill, and reputation of Sensiva and its affiliates and consistent with good business practice, in each case *using its best efforts to maximize the sales volume of the [T]est [K]its*." (emphasis added). DRA § 3.1(a)

14.

The DRA also required BKK to "promptly notify Sensiva of any complaint or adverse claim about any Test Kit or its use of which Distributor becomes aware."

15.

Sensiva, which merely assembled the Test Kits, had limited obligations to BKK related to the Test Kits. Those obligations primarily concerned ensuring an adequate supply of Test Kits and guaranteeing BKK a right of first refusal to distribute the Tests Kits that Sensiva assembled.

16.

Because Sensiva did not manufacture the chemical diagnostic components of the Test Kits and BKK was not the ultimate consumer of the Test Kits, Sensiva did not undertake any special obligations to BKK relating to the efficacy of Test Kits unless they were subsequently sold to BKK's customers.

17.

Rather, for the reasons set forth above and because BKK was able to obtain the Test Kits from Sensiva effectively "at cost," Sensiva's only warranties regarding the tests arose after the tests were sold to BKK's customers. The warranty provides as follows:

> 12. Limited Product Warranty; Disclaimer. Sensiva warrants that the Test Kits are free from material defects in material and workmanship under normal use and service with proper maintenance for the time of the intended use following manufacturing. *The term for such warranties shall begin upon Customer's receipt of the Test Kit.* Distributor or any customer shall promptly notify Sensiva of any known warranty claims and shall cooperate in the investigation of such claims. If any Test Kit is proven to not conform with this warranty during the applicable warranty period, Sensiva and

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

> Distributor shall work to enforce any rights Sensiva may have against the Production Line manufacturer to recover the purchase price paid for such nonconforming goods and/or secure confirming [sic] replacement product.

DRA § 12 (emphasis added).

18.

The DRA further provides that Sensiva will have "no obligation under the warranty set forth above if Distributor or Customer . . . (b) uses, misuses, or neglects the Test Kit in a manner inconsistent with the Test Kit specifications or use or maintenance directions, modifies the Test Kit or improperly installs, handles, or maintains the Test Kit." DRA § 13.

19.

Sensiva applied for emergency use authorization from the FDA for their Test Kits and has diligently worked with the FDA to secure approval, which remains pending.

20.

While Sensiva has taken all necessary action to secure approval, FDA approval is not necessary for the sale of Sensiva's Test Kits in the United States. Moreover, BKK was also authorized to sell the Test Kits in international markets, which clearly do not require FDA approval. Notably, Sensiva obtained authorization to from regulators in Europe to sell the Test Kits in the EU.

21.

At all times between the execution of the DRA and January of 2022, global demand for rapid COVID tests, like Sensiva's, was high.

22.

Based upon BKK's assurances that, as its sole distributor, it had "confirmed buyers" in place who were ready to purchase large quantities of Sensiva's Test Kits, Sensiva sourced and assembled approximately 1.6 million Test Kits that were made available to BKK at cost.

23.

However, upon information and belief, contrary to BKK's direct assurances and the terms of the DRA, BKK did not have "confirmed buyers," and it did not use its best efforts to market Sensiva's products. Sensiva upheld its end of the deal by sourcing and assembling all of the Test Kits requested by BKK. However, BKK did not uphold its end of the deal to market and sell the


E-Filed

J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

Test Kits. Of the approximately 1,600,000 Test Kits assembled by Sensiva, only about 700,000 were collected for sale by BKK. Sensiva was forced to purchase storage space to house approximately 900,000 remaining Test Kits. At the time Sensiva was storing BKK's unsold product, global demand was peaking, and there was a shortage of similar products in the market.

24.

In January of 2022, Sensiva received notice from BKK that a small portion of the Test Kits that BKK sold contained allegedly defective chemical diagnostic components and that BKK had reimbursed its customers for this problem. Prior to this point, Sensiva had not received any negative feedback regarding the efficacy of the chemical diagnostic components of its Test Kits and Sensiva's own testing of these components confirmed their efficacy in detecting the presence of SARS-CoV-2.

25.

Under the DRA, BKK was obligated to work with Sensiva to investigate the problems with its Test Kits and, if necessary, to assist Sensiva in seeking appropriate relief from the manufacturer of the chemical diagnostic component.

26.

BKK did not do either of these things. Consequently, Sensiva has been unable to determine the source of the purported problems with the allegedly defective chemical diagnostic components or to ascertain if further action needs to be taken against the manufacturer of that component.

27.

Based on Sensiva's own testing, Sensiva believes that, to the extent that any Test Kits were actually defective (a claim that Sensiva denies), the product was compromised after BKK took possession of the product—likely due to BKK's improper storage and/or shipping practices.

28.

Not only did BKK breach the DRA by failing to assist Sensiva in investigating the cause of the alleged defects with the small portion of allegedly defective Test Kits, but BKK also made the unilateral decision to halt its marketing and sales of Sensiva's Test Kits leaving Sensiva with approximately 900,000 units of product in its warehouse.


E-Filed

2022-03987
J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

29.

Because the resale value of this unsold product was as high as $25.00 per unit, Sensiva suffered as much as $10,000,000 in lost profits from BKK's failure to sell the product in its warehouse.

30.

Despite Sensiva's best efforts to mitigate its damages, the vast majority of the product in its warehouse was unable to be sold before its expiration.

31.

Sensiva has also not received an accounting from BKK as to the remaining 700,000 Test Kits, and Sensiva has not received its 60% share of profits for any sales as required by the DRA. Accordingly, Sensiva has been deprived of millions of additional dollars in additional revenue.

32.

Apparently unsatisfied with depriving Sensiva of its rights under the DRA, BKK has also sought to enforce non-existent rights under the DRA by demanding that Sensiva reimburse BKK for the money it paid to source and assemble the Test Kits.

33.

BKK's allegations of issues with a minority of the tests is a pretext to coerce Sensiva to cover the cost of its failure to fulfill its obligation as Sensiva's distributor.

34.

BKK's decision to unilaterally halt marketing and distribution of Sensiva's Test Kits during a time of high global demand has caused irreparable harm to Sensiva, which has suffered lost profits, direct losses, and a damaged reputation.

## COUNT I
## BREACH OF CONTRACT

35.

Sensiva re-alleges and incorporates paragraphs 1 through 34 as if set forth fully herein.

36.

The DRA is a valid and binding contract between Sensiva and BKK.


E-Filed

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

37.

BKK failed to comply with its obligations under section 3.1 of the DRA to use its best efforts to maximize the sales volume of the Test Kits, and, in fact, unilaterally halted all efforts to market or sell the Test Kits based on unverified allegations that some of the chemical diagnostic components of the Test Kits failed.

38.

BKK further failed to comply with its contractual obligation under Section 12 of the DRA to assist Sensiva in the investigation of consumer complaints regarding the Test Kits.

39.

BKK also breached the DRA by failing to remit payment to Sensiva for 60% of the profits that BKK earned on its sales of Test Kits.

40.

BKK is liable for its breach of the DRA in an amount to be determined at trial.

**COUNT II**
**BAD FAITH BREACH OF CONTRACT**

41.

Sensiva re-alleges and incorporates paragraphs 1 through 40 as if set forth fully herein.

42.

Sensiva is entitled for damages for BKK's bad faith breach of contract.

43.

In the DRA, BKK agreed to use its best efforts to market and sell Sensiva's Test Kits.

44.

BKK did not use its best efforts to maximize the sales volume of the Test Kits, and, in fact, unilaterally halted all efforts to market or sell the Test Kits.

45.

Sensiva is entitled to an order form this Court awarding any and all damages arising from BKK's bad faith breach of contract. *See* La. Civ. Code art. 1997.


E-Filed

J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

**COUNT III**
**FRAUD/DETRIMENTAL RELIANCE**

46.

Sensiva re-alleges and incorporates paragraphs 1 through 45 as if set forth fully herein.

47.

BKK represented to Sensiva that it had "confirmed buyers" in place who were ready to immediately purchase large quantities of Sensiva's Test Kits and requested assembly of 1,600,000 Test Kits.

48.

Sensiva relied on BKK's representations when it entered into an exclusive distributor agreement with BKK and expended millions of dollars in acquiring the Test Kits.

49.

Because BKK was in the business of marketing and selling similar products and because the market for rapid COVID tests like the Test Kits were in high demand at all times relevant to this dispute, BKK was justified in relying on BKK's representation.

50.

BKK's representation was false.

51.

As a direct result of BKK's false representations, Sensiva lost in excess of $10,000,000 in potential sales of its Test Kits and it has been saddled with considerable costs in storing unsold product that BKK had fraudulently claimed it was in a position to sell at the time of contracting.

52.

Sensiva would not have entered into the DRA with BKK if it had known that BKK's representations were false. Additionally, Sensiva would also not have acquired so many Test Kits if it had known that BKK would not sell or take possession of them.

**COUNT IV**
**VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT**

53.

Sensiva re-alleges and incorporates paragraphs 1 through 52 as if set forth fully herein.


E-Filed

J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

54.

BKK's fraudulent misrepresentations to Sensiva regarding its customer base and demand for Sensiva's tests constitute deceptive acts or practices in the conduct of trade or commerce.

55.

Sensiva suffered an ascertainable loss as a result of BKK's deceptive acts that exceeds $10,000,000.00.

**COUNT IV**
**DECLARATORY JUDGMENT**

56.

Sensiva re-alleges and incorporates paragraphs 1 through 55 as if set forth fully herein.

57.

An actual controversy exists between Sensiva and BKK regarding Sensiva's obligations under the DRA to refund BKK's initial investment in the Test Kits.

58.

BKK claims that the chemical diagnostic component of Test Kits that Sensiva incorporated into its Test Kits are defective and that Sensiva is obligated to refund BKK's initial investment of $10,000,000 to source and assemble the Test Kits.

59.

Sensiva disputes this claim on the grounds that (i) the Test Kits were not defective when they were assembled or transferred to BKK, (ii) BKK has not established that all 1,600,000 Test Kits (or even a material fraction of such Test Kits) were defective in January 2022, (iii) the only remedy authorized by the DRA for the breach of Sensiva's Limited Product Warranty is a joint action by BKK and Sensiva against the manufacturer of the chemical diagnostic component for recovery of the purchase price or replacement of the nonconforming component, (iv) BKK is not entitled to reimbursement for Test Kits that it sold at a profit, and (v) the Limited Product Warranty only applies to Test Kits that were purchased by consumers from BKK—not Test Kits held by BKK or stored in Sensiva's warehouse.

60.

Sensiva is entitled to declaratory judgment that it is not obligated to reimburse BKK any money for the Test Kits.


E-Filed PD.37432613.3

2022-03987
J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

**WHEREFORE**, Plaintiff Sensiva respectfully prays that Defendant BKK be duly served with this Verified Petition for Declaratory Judgment and Damages and summoned to appear and answer herein, and that after due proceedings, there be judgment rendered in favor of Plaintiff and against Defendant finding that Defendant is not entitled to recover its initial investment to source and assemble the Test Kits, Defendant breached its contract with Plaintiff, Defendant committed fraud, and Defendant engaged in deceptive trade practices; finding Defendant liable for all damages incurred by Plaintiff; and that the judgment be in an amount that will fully compensate Plaintiff for all damages pursuant to the evidence and in accordance with Louisiana law and for all attorney's fees, and for all general and equitable relief to which Plaintiff is entitled.



E-Filed

J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

**VERIFICATION**

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned Notary Public, personally came and appeared:

**Ben Williamson**

who, after being first duly sworn, did depose and say that he is an individual of the full age of majority, that he is personally familiar with the facts contained in the Verified Petition for Declaratory Judgment and Damages and upon information and belief, that all statements therein are true and correct.

SWORN TO AND SUBSCRIBED BEFORE ME THIS 4th DAY OF MAY, 2022

NOTARY PUBLIC

My commission expires 10/13/25

PRAHLAD VADAPALLY NOTARY PUBLIC STATE OF WISCONSIN



E-Filed

2022-03987
J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY: Allen C. Miller

Allen C. Miller (Bar #26423)
Ashley J. Heilprin (Bar #34928)
Harris Golden (Bar #38468)
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email: allen.miller@phelps.com
ashley.heilprin@phelps.com
harris.golden@phelps.com

**ATTORNEYS FOR PLAINTIFF SENSIVA HEALTH, LLC**

**Please serve:**
BKK Solutions, LLC
c/o Allen Frederic and Ben Kazenmaier
5707 Magazine Street
New Orleans, LA 70115



E-Filed PD.37432613.3

2022-03987
J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

EXHIBIT
A

# Distribution and Reseller Agreement

This Distribution and Reseller Agreement (this "**Agreement**"), dated and made effective as of December 24, 2020 (the "**Effective Date**"), is entered into between Sensiva Health, LLC, a Louisiana limited liability company ("**Sensiva**") and BCK Investments, LLC, a Florida limited liability company ("**Distributor**" and together with Sensiva, the "**Parties**," and each, a "**Party**").

**WHEREAS**, Sensiva has procured and assembled, and has the capacity to continue to procure and assemble, certain test kits and related diagnostic products, including without limitation, products used for the detection of novel coronavirus (COVID-19) as set forth more fully on Schedule 1 hereto (each a "**Test Kit**" and collectively, the "**Test Kits**"); and

**WHEREAS**, Distributor is in the business of marketing and reselling products similar to the Test Kits and related goods and services;

**WHEREAS**, Sensiva desires to sell the Test Kits to Distributor and appoint Distributor as a distributor of the Test Kits, subject to the terms and conditions of this Agreement; and

**WHEREAS**, Distributor desires to purchase the Test Kits from Sensiva and resell the Test Kits to Customers (as defined below), subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set out herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. Definitions.

"**Customer**" means a purchaser that has acquired a Test Kit from Distributor.

"**Person**" means a natural person, firm, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

"**Production Line**" means sequential operations designed by or on behalf of Sensiva or its affiliates established in a licensed manufacturing facility where components sourced for or on behalf of Sensiva or its affiliates are assembled to produce finished Test Kits.

"**reACT Test Kit**" means that certain reACT Rapid Covid Combo Assay Test Kit (FDA EUA Submission No. EUA203123), a laboratory developed Salivary Lateral Flow Immuno assay intended for the qualitative detection of Nucleocapsid antigen from SARS-CoV2 in saliva collected in normal saline from individuals who are suspected of COVID-19.

"**Test Kit**" means any Test Kit that is identified in Schedule 1, as it may be revised pursuant to Section 4.4 from time to time.

2. Manufacturing Capacity Right of First Refusal; Appointment.

{N4146215.1}

E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

2.1 Distributor Minimum reACT Production Right of First Refusal. The Parties acknowledge and agree that:

(a) As of the Effective Date, the anticipated available manufacturing capacity for the production of reACT Test Kits on Production Lines for anticipated distribution in the United States is approximately fifty thousand (50,000) reACT Test Kits on a recurring weekly basis, and immediately following the Effective Date, the Parties intend to use their respective commercially reasonable efforts to collaborate and effect an increase in the available manufacturing capacity for the production of reACT Test Kits on Production Lines such that, as promptly as reasonably practicable following the Effective Date, the recurring weekly capacity for the production of reACT Test Kits on Production Lines for anticipated distribution in the United States is at least two million three hundred fifty thousand (2,350,000) reACT Test Kits (the "**Minimum Weekly ROFR reACT Capacity Amount**").

(b) From the Effective Date and continuing until the date when the available manufacturing capacity for the production of reACT Test Kits on Production Lines for anticipated distribution in the United States is equal to the Minimum Weekly ROFR reACT Capacity Amount (the "**reACT Exclusivity Period**"), Distributor shall have the exclusive right to acquire all or any portion of the reACT Test Kits produced on Production Lines for anticipated distribution in the United States.

(c) At and upon achievement of the Minimum Weekly ROFR reACT Capacity Amount, in the event Sensiva receives a bona fide offer from a Person other than Distributor (a "**Third Party Offer**") to acquire all or any portion of the capacity of reACT Test Kits included in the Minimum Weekly ROFR reACT Capacity Amount (the "**Requested reACT Capacity**"), Sensiva shall provide written of the Third Party Offer to Distributor in accordance with Section 23, specifying those Requested reACT Capacity requested to be acquired by such other Person (the "**ROFR Notice**").

(d) During the forty-eight (48) hour period following Distributor's receipt of the ROFR Notice (the "**ROFR Option Period**"), Distributor will have the exclusive right to purchase all, but not less than all, of the Requested reACT Capacity included in the Third Party Offer (the "**reACT Capacity ROFR Option**"). Distributor may exercise its reACT Capacity ROFR Option and purchase all, but not less than all, of the Requested reACT Capacity included in the Third Party Offer by providing written notice of exercise to Sensiva in accordance with Section 23 prior to the expiration of the ROFR Option Period. If Distributor does not purchase all of the Requested reACT Capacity by exercising its reACT Capacity ROFR Option in accordance with this Section 2.1(d) (the "**Distributor ROFR Rejection**"), (i) the Requested reACT Capacity included in the Third Party Offer may be sold such other Person by Sensiva in its sole discretion, and (ii) in the event of additional Third Party Offers are received by or on behalf of Sensiva subsequent to the Distributor ROFR Rejection, Sensiva may in all cases during the Term sell all or any portion of Requested reACT Capacity to such other Person(s) without the necessity of compliance with Section 2.1(c) or this Section 2.1(d), either in whole or in part, including without limitation, the provision of any ROFR Notice to Distributor nor ability of Distributor to the reACT Capacity ROFR Option.


E-Filed

2022-03987
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

2.2 Distributor Excess reACT Production Lines. The Parties acknowledge and agree that:

(a) In the event that Sensiva is primarily responsible for the coordination, initiation, commencement and creation of an increase in the available manufacturing capacity for the production of reACT Test Kits on Production Lines for anticipated distribution in the United States in excess of the Minimum Weekly ROFR reACT Capacity Amount (the "**Excess reACT Production Capacity**") , and the Excess reACT Production Capacity is achieved through the utilization of one or more Production Lines *other than* the Production Lines then constituting the Minimum Weekly ROFR reACT Capacity Amount (each, an "**Additional Sensiva Production Line**"), Sensiva shall provide written of the Excess reACT Production Capacity and reasonably detailed information regarding such Additional Sensiva Production Line(s) to Distributor in accordance with Section 23 (the "**Excess reACT Production Line Notice**"). Distributor shall promptly, but in no event later than forty-eight (48) hours following Distributor's receipt of the Excess reACT Production Line Notice (the "**reACT Additional Production Line Option Period**"), Distributor will have the exclusive right to purchase all, but not less than all, of the Excess reACT Production Capacity from each such Additional Sensiva Production Line (the "**reACT Additional Production Line Option**"). Distributor may exercise its reACT Additional Production Line Option and purchase all, but not less than all, of the Excess reACT Production Capacity from such Additional Sensiva Production Line by providing written notice of exercise to Sensiva in accordance with Section 23 prior to the expiration of the reACT Additional Production Line Option Period. If Distributor does not purchase all of the Excess reACT Production Capacity from such Additional Sensiva Production Line by exercising its reACT Additional Production Line Option in accordance with this Section 2.2(a) (the "**Distributor Production Line Rejection**"), (i) all or any portion of Excess reACT Production Capacity from such Additional Sensiva Production Line may be offered or sold to any other Person, and (ii) Sensiva may in all cases during the Term continue to sell all or any portion of Excess reACT Production Capacity from such Additional Sensiva Production Line to other Person(s) without the necessity of compliance of with this Section 2.2(a), either in whole or in part, including without limitation, the provision of any Excess reACT Production Line Notice for such Additional Sensiva Production Line to Distributor nor ability of Distributor to the reACT Additional Production Line Option.

(b) In the event that a Person other than Sensiva or its affiliates (each, a "**Third Party Distributor**") is primarily responsible for the coordination, initiation, commencement and creation of Excess reACT Production Capacity to Customers of such Third Party Distributor, and the Excess reACT Production Capacity utilizes one or more Production Lines *other than* the Production Lines then constituting the Minimum Weekly ROFR reACT Capacity Amount (a "**Third Party Distributor Production Line**"), Sensiva shall provide written notice of the Third Party Distributor Production Line to Distributor in accordance with Section 23 (the "**Excess reACT Production Line Notice**"), and during the Term, shall pay Distributor, within a reasonable time following the actual receipt thereof by Sensiva, five percent (5%) of Sensiva's net profit associated with the commercial transaction(s) for the reACT Test Kits with such Third Party Distributor manufactured and produced on the applicable Third Party Distributor Production Line. Sensiva agrees to provide notice of its transfer to a third party of any of its rights to coordinate, initiate, commence or create production lines to Distributor within forty-eight (48) hours of the effectiveness of such transfer.



E-Filed

2022-03987
J
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT
Section 15

2.3 Appointment. Sensiva hereby appoints Distributor, and Distributor hereby accepts the appointment, to act as a distributor and reseller of Test Kits to Customers during the Term (as defined in Section 10.1) in accordance with the terms and conditions of this Agreement. Except as otherwise specified herein, Sensiva may in its sole discretion sell the Test Kits to any other Person, including without limitation, other distributors, resellers, retailers, and customers in and outside of the United States. By accepting this appointment, Distributor agrees to conform to all quality standards established from time to time by Sensiva for its distributors and Persons acting in similar capacities. These quality standards are subject to change by Sensiva in its sole discretion.

3. Facilities, Inventory, and Marketing Obligations.

3.1 Distributor Obligations. Distributor shall:

(a) market, advertise, promote, and sell the Test Kits to Customers in a manner that reflects favorably at all times on Test Kits and the good name, goodwill and reputation of Sensiva and its affiliates and consistent with good business practice, in each case using its best efforts to maximize the sales volume of the Test Kits;

(b) maintain adequate office, storage, and warehouse facilities and all other facilities as required for Distributor to perform its duties under this Agreement in a location or locations approved by Sensiva;

(c) have sufficient knowledge of the industry and products competitive with each Test Kit (including specifications, features, and benefits) so as to be able to explain in detail to Customers:

(i) the differences between the Test Kit and competing products; and

(ii) information on standard protocols, features and applicable law associated with the sale and utility of each Test Kit;

(d) observe all directions and instructions given to it by Sensiva in relation to the marketing, advertisement, and promotion of the Test Kits, including Sensiva's sales, marketing, and merchandising policies as they currently exist or as they may hereafter be changed by Sensiva;

(e) not use any promotional and marketing materials, whether prepared by Distributor or others, without the prior written consent of Sensiva;

(f) establish and maintain a sales and marketing organization sufficient to develop to the satisfaction of Sensiva the market potential for the sale of the Test Kits, and independent sales representatives, facilities, and a distribution organization sufficient to make the Test Kits available for shipment by Distributor to each Customer immediately on receipt of order;


E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J
Section 15

(g) not make any materially misleading or untrue statements concerning Sensiva or the Test Kits, including without limitation, any statements, directly or indirectly, disparaging Sensiva, its products or services, or any of its affiliates or representatives, or "bait-and-switch" practices;

(h) promptly notify Sensiva of any complaint or adverse claim about any Test Kit or its use of which Distributor becomes aware;

(i) submit to Sensiva complete and accurate monthly reports regarding inventory, marketing, and sales of the Test Kits in a computer-readable format and containing the scope of information acceptable to Sensiva, maintain books, records, and accounts of all transactions and permit full examination thereof by Sensiva in accordance with Section 9;

(j) not resell Test Kits to any Customer outside the United States, without express written approval from Sensiva; and

(k) on request, provide Sensiva with a written survey of the current and three (3)-month forecast of demand for the Test Kits, especially in relation to similar or competing products; and

(l) only resell, license or sub-license any software or accessories sold, bundled, or packaged with any Test Kit on those terms and conditions as Sensiva may, from time to time, require.

3.2 Sensiva Obligations. Sensiva shall:

(a) provide any information and support that may be reasonably requested by Distributor regarding the marketing, advertising, promotion, and sale of Test Kits;

(b) allow Distributor to participate, at its own expense, in any marketing, advertising, promotion and sales programs or events that Sensiva may make generally available to its authorized distributors of Test Kits, provided that Sensiva may alter or eliminate any program at any time;

(c) approve or reject, in its discretion, any promotional information or material submitted by Distributor for Sensiva's approval; and

(d) in Sensiva's discretion provide promotional information and material at Distributor's sole cost and expense for use by Distributor in accordance with this Agreement.

4. Agreement to Purchase and Sell Test Kits.

4.1 Terms of Sale; Orders. Sensiva shall make available and sell Test Kits to Distributor at the prices under Section 4.2 and on the terms and conditions set out in this Agreement. Distributor will work with Sensiva at its request to review manufacturing costs with respect to the reACT Test Kits and negotiate discounts with Production Line manufacturers, it being understood that Distributor shall not engage in any direct discussions with any Production



E-Filed

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

Line manufacturer without the prior written consent of Sensiva in accordance with Section 25 hereof.

4.2 Price. The prices for Test Kits sold under this Agreement shall be as set forth on Schedule 1 hereto, and may be amended or supplemented by the Parties (the "**Kit Prices**"). Subject to Section 6:

(a) all prices are exclusive of all sales, use and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any Person on any amounts payable by Distributor under this Agreement;

(b) Distributor is responsible for all charges, costs (including costs related or incidental to the shipping or other transportation and delivery of the Kits to Customers), and taxes, provided that Distributor is not responsible for any taxes imposed on, or regarding, Sensiva's income, revenues, gross receipts, personnel, or real or personal property or other assets; and

(c) Distributor shall pay interest on all late payments, calculated daily and compounded monthly, at the highest rate permissible under applicable law.

4.3 Payment Terms. During each calendar week during the Term, no later than prior to the close of business on the Thursday following the end of the immediately preceding week, Distributor shall furnish Sensiva with (a) a detailed accounting of all purchases and sales of Test Kits to Customers made during the immediately preceding week (each, a "**Weekly Sales Report**"), and (b) payment of all amounts due to Sensiva pursuant to Section 4.4, by wire transfer of immediately available funds in accordance with this Section 4.3. In the event of any objection to any of the information set forth in such Weekly Sales Report, the Parties will work in good faith to resolve any dispute resulting therefrom; *provided, however,* that the acceptance by Sensiva payment by Distributor for such week to which the dispute relates shall in no way be deemed a waiver by Sensiva of any objections to the calculations set forth in such Weekly Sales Report.

Distributor shall make all payments in US dollars by wire transfer or automated clearing house, in accordance with the following wire instructions (or such other instructions as Sensiva may provide in writing to Distributor from time to time during the Term):

| | | |
|---|---|---|
| Receiving Bank Name: | Hancock Whitney Bank<br>701 Poydras St.<br>New Orleans, LA 70139 | ABA / Routing Number<br>065400153 |
| Beneficiary Bank Name: | Hancock Whitney Bank | Beneficiary Account Number<br>0062886367 |
| Beneficiary Account Name: | Sensiva Health LLC | |



E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT
J
Section 15

4.4 Sensiva Payments. Distributor shall pay to Sensiva, by wire transfer of immediately available funds to the account(s) reflected in Section 4.3, sixty-percent (60%) of (a) the gross payment received by Distributor from a Customer for Test Kits at such price(s) established by Distributor pursuant to Section 8 hereof (each, a "**Test Kit Payment**"), *less* the Kit Prices for such Test Kits; *provided, however*, that the Parties acknowledge and agree that upon issuance of a purchase order by Distributor pursuant to Section 5, Distributor shall within twenty-four (24) hours thereof furnish to Sensiva (or, if and as directed by Sensiva to Distributor in writing pursuant to Section 23, any one or more Production Line manufacturer), a wire transfer of cash in immediately available funds equal to the product of (x) the aggregate Test Kits reflected in the applicable purchase order, *multiplied by* (y) the Kit Prices for such Test Kits.

5. Orders Procedure.

5.1 Orders. Distributor shall issue all purchase orders to Sensiva in written form via facsimile, e-mail, or US mail in accordance with Section 23 of this Agreement. By placing an order, Distributor makes an offer to purchase Test Kits under the following commercial terms listed in the purchase order and the terms and conditions of this Agreement, and on no other terms:

(a) the listed Test Kits to be purchased, inclusive of any and all applicable identifiers with respect thereto;

(b) the quantities ordered; and

(c) the requested delivery date.

Any variations made to the terms and conditions of this Agreement by Distributor in any order are void and have no effect. Distributor shall, under no circumstances, communicate with or submit a purchase order to a Production Line manufacturer without the prior written approval of Sensiva; *provided that*, except with respect to Universal Meditech, Inc, or any of its affiliates or representatives, upon a Sensiva Communication Failure (as defined below) Distributor shall have the right to interface with a Production Line manufacturer directly on ordinary course of business matters (i.e., timing, logistics etc.) for then existing Distributor purchase orders (a "**Distributor Communication**"); *provided further, that* prior to the initiation of any Distributor Communication, Distributor shall provide Sensiva notice of an intended Distributor Communication in accordance with Section 23, and Sensiva shall have the right, in its sole and absolute discretion to, within one (1) hour of the notice by Distributor to Sensiva of an intended Distributor Communication (x) independently initiate or facilitate such communications without Distributor and report the results of such communications with Distributor to its reasonable satisfaction (failure of which, a "**Sensiva Communication Failure**"), or (z) participate in such discussions with Distributor and such Production Line manufacturer.

6. Shipment and Delivery.

6.1 Shipment and Delivery. Distributor shall be solely responsible and have risk of loss for delivery of Test Kits subject to purchase orders furnished in accordance with Section 5, as well as ensuring delivery of such Test Kits to Distributor's Customers. All shipments


E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT
J
Section 15

delivered by Distributor to its Customers shall use Sensiva's or manufacturer's standard methods for packaging and shipping.

6.2 Title and Risk of Loss. As between Distributor and Sensiva, title and risk of loss passes to Distributor upon placement of a purchase order pursuant to Section 5. Sensiva agrees to use its commercially reasonable efforts in enforce any rights it may have against a Production Line manufacturer to the extent any product does not conform to specifications or is otherwise does not comply with the terms of any manufacturing agreement as may exist between Sensiva and such Production Line manufacturer.

7. Sensiva's Trademark License Grant. Subject to the terms and conditions of this Agreement, Sensiva hereby grants to Distributor a non-exclusive, non-transferable, and non-sublicensable license during the Term solely on or in connection with the promotion, advertising, and resale of the Test Kits in accordance with the terms and conditions of this Agreement to use all Sensiva's trademarks, whether registered or unregistered, including the listed registrations and applications and any registrations, which may be granted pursuant to such applications. On expiration or earlier termination of this Agreement or upon Sensiva request, Distributor shall promptly discontinue the display or use of any trademark or change the manner in which it is displayed or used with regard to the Test Kits. Upon expiration or earlier termination of this Agreement, Distributor's rights under this Section 7 shall cease immediately. Other than the express licenses granted by this Section 7, Sensiva grants no right or license to Distributor, by implication, estoppels, or otherwise, to the Test Kits or any intellectual property rights of Sensiva or its affiliates.

8. Pricing. Distributor may unilaterally establish its own commercially reasonable resale prices and terms regarding products it sells, including Test Kits; *provided, however*, that notwithstanding anything contained in this Agreement to the contrary, Distributor shall in all cases comply with Section 4.4 hereof. Notwithstanding the forgoing, Distributor will work in good faith to collaborate with and involve Sensiva in its pricing and buyer strategies throughout the Term.

9. Audit and Inspection Rights. During and after the Term, Distributor shall keep, maintain and preserve complete and accurate records and accounts, including all invoices, correspondence, ledgers, financial and other records pertaining to the Test Kits (including without limitation, any commercial transactions thereof with its Customers), and on request and during regular business hours, Sensiva or its representatives may at its own expense reasonably inspect Distributor's facilities and audit Distributor's books, records, and other documents as necessary to verify compliance with the terms and conditions of this Agreement.

10. Term; Termination.

10.1 Term. The term of this Agreement commences on the Effective Date and terminates on the twelve (12) month anniversary thereof (the "**Initial Term**"), and unless the Initial Term is earlier terminated by the Parties in accordance with this Agreement, shall thereafter renew for additional successive twelve (12) month terms subject to the terms of this Agreement (each, a "**Renewal Term**" and together with the Initial Term, the "**Term**"). Either


E-Filed

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

Party may terminate this Agreement by providing written notice to the other Party of termination of the Initial Term or any Renewal Term upon at least sixty (60) days prior written notice.

10.2 Termination Rights. Notwithstanding anything to the contrary in this Agreement, including Section 10.1, in addition to any remedies that may be provided in this Agreement, Sensiva may immediately terminate this Agreement (including all related purchase orders pursuant to Section 10.3(a)), upon notice to Distributor if Distributor:

(a) fails to pay any amount when due under this Agreement and upon written notice thereof, fails to cure within three (3) business days;

(b) is in material breach of this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured within ten (10) days following Sensiva's receipt of notice of such breach;

(c) if Distributor:

(i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due;

(ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law;

(iii) seeks reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts;

(iv) makes or seeks to make a general assignment for the benefit of its creditors; or

(v) applies for or has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

10.3 Effect of Expiration or Termination. Upon the expiration of the applicable Term or earlier termination of this Agreement:

(a) All related purchase orders are automatically terminated; and

(b) Distributor shall cease to represent itself as Sensiva's authorized distributor or reseller regarding the Test Kits, and shall otherwise desist from all conduct or representations that might lead the public to believe that Distributor is authorized by Sensiva to sell the Test Kits;

(c) Distributor shall promptly return or destroy (pursuant to Sensiva's instructions) all:

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

(i) documents and tangible materials (and any copies) containing, reflecting, incorporating or based on Confidential Information (as defined in Section 11); and

(ii) products that Sensiva provided to Distributor that are not intended for resale.

10.4 Option to Repurchase. Within five (5) business days after the effective date of expiration or earlier termination of this Agreement, Distributor shall submit to Sensiva a written schedule reflecting all Test Kits then owned by Distributor or in the Distributor's possession. Upon notice within fifteen (15) days following its receipt of such schedule from Distributor, Sensiva shall have the right, but not the obligation, to buy back all or a portion of such Test Kits, free of all liens, claims or encumbrances, at a price equal to the lower of Distributor's cost therefor and the then-prevailing price, minus a fifteen-percent (15%) restocking fee, pursuant to the following procedures:

(a) Distributor shall promptly deliver, at Sensiva's reasonable expense, the repurchased Test Kits in their original packaging (unopened and undamaged) to Sensiva's designated carrier for delivery to Sensiva.

(b) Sensiva has the right to set off or recoup any liability it owes to Distributor under this Section 10.4 against any liability for which Distributor is liable to Sensiva, whether either liability is matured or unmatured, is liquidated or unliquidated or arises under this Agreement.

11. Confidential Information. All non-public, confidential or proprietary information of Sensiva, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, pricing, discounts or rebates, disclosed by Sensiva to Distributor, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," in connection with this Agreement (the "Confidential Information") is confidential, solely for the use of performing this Agreement and may not be disclosed or copied by or on behalf of Distributor, whether directly or indirectly, unless authorized by Sensiva in writing. Upon Sensiva's request, Distributor shall promptly return all documents and other materials received from Sensiva. Sensiva shall be entitled to injunctive relief for any violation of this Section. This Section shall not apply to information that is:

(a) in the public domain;

(b) known to Distributor at the time of disclosure; or

(c) rightfully obtained by Distributor on a non-confidential basis from a third party and with whom the Distributor had not actual or constructive knowledge was under a duty of confidentiality with Sensiva or its affiliates.

12. Limited Product Warranty; Disclaimer. Sensiva warrants that the Test Kits are free from material defects in material and workmanship under normal use and service with proper maintenance for the time of their intended use following manufacturing. The term for such warranties shall begin upon Customer's receipt of the Test Kit. Distributor or any Customer shall

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT
J
Section 15

promptly notify Sensiva of any known warranty claims and shall cooperate in the investigation of such claims. If any Test Kit is proven to not conform with this warranty during the applicable warranty period, Sensiva and Distributor shall work to enforce any rights Sensiva may have against the Production Line manufacturer to recover the purchase price paid for such nonconforming goods and/or secure confirming replacement product.

13. Sensiva shall have no obligation under the warranty set forth above if Distributor or Customer:

(a) fails to notify Sensiva in writing during the warranty period of a non-conformity; or

(b) uses, misuses, or neglects the Test Kit in a manner inconsistent with the Test Kit's specifications or use or maintenance directions, modifies the Test Kit or improperly installs, handles or maintains the Test Kit.

14. Except as explicitly authorized in this Agreement or in a separate written agreement with Sensiva, Distributor shall not service, repair, modify, alter, replace, reverse engineer, or otherwise change the Test Kits it sells to Customers. Distributor shall not provide its own warranty regarding any Test Kit.

15. EXCEPT FOR THE WARRANTIES SET OUT UNDER SECTION 12, NEITHER SENSIVA NOR ANY PERSON ON SENSIVA'S BEHALF HAS MADE OR MAKES FOR DISTRIBUTOR'S BENEFIT ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WHATSOEVER, INCLUDING ANY WARRANTIES OF: (i) MERCHANTABILITY; (ii) FITNESS FOR A PARTICULAR PURPOSE; (iii) TITLE; OR (iv) NON-INFRINGEMENT; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. DISTRIBUTOR ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY SENSIVA, OR ANY OTHER PERSON ON SENSIVA'S BEHALF.

16. <u>Compliance With laws</u>. Distributor shall at all times comply with all federal, state and local laws, ordinances, regulations and orders that are applicable to the operation of its business, and this Agreement and its performance hereunder. Without limiting the generality of the foregoing, Distributor shall at all times, at its own expense, obtain and maintain all certifications, credentials, authorizations, licenses, and permits necessary to conduct its business relating to the exercise of its rights and the performance of its obligations under this Agreement.

17. <u>Indemnification</u>.

17.1 <u>Indemnification by Distributor</u>. Subject to the terms and conditions of this Agreement, Distributor shall indemnify, hold harmless, and defend Sensiva and its parent, officers, directors, managers, partners, members, shareholders, employees, advisors, agents, affiliates, successors, and permitted assigns (collectively, "**Sensiva Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees, and the costs of enforcing any right to indemnification under this Agreement and the cost of

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

pursuing any insurance providers, relating to any claim of a third party or Sensiva arising out of or occurring in connection with:

(a) Distributor's acts or omissions as Distributor of the Test Kits, including breach of representation, warranty, covenant or other obligation set forth in this Agreement;

(b) Distributor's advertising or representations that warrant performance of Test Kits beyond that provided by Sensiva's written warranty or based upon Distributor's business or trade practices;

(c) any failure by Distributor or its personnel to comply with any applicable laws; or

(d) allegations that Distributor breached its agreement with a third party as a result of or in connection with entering into, performing under or terminating this Agreement.

17.2 Indemnification by Sensiva. Subject to the terms and conditions of this Agreement, Sensiva shall indemnify, hold harmless, and defend Distributor and its parent, officers, directors, managers, partners, members, shareholders, employees, advisors, agents, affiliates, successors, and permitted assigns (collectively, "**Distributor Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees, and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers, relating to any claim of a third party or Distributor arising out of or occurring in connection with:

(a) Sensiva's breach of representation, warranty, covenant or other obligation set forth in this Agreement;

(b) any failure by Sensiva or its personnel to comply with any applicable laws; or

(c) allegations that Sensiva breached its agreement with a third party as a result of or in connection with entering into, performing under or terminating this Agreement

18. Limitation of Liability. EXCEPT FOR OBLIGATIONS TO MAKE PAYMENT UNDER THIS AGREEMENT, LIABILITY FOR INDEMNIFICATION, LIABILITY FOR BREACH OF CONFIDENTIALITY, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT:

(a) IS EITHER PARTY OR ANY SENSIVA INDEMNIFIED PARTY OR DISTRIBUTOR INDEMNIFIED PARTY LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES, OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF:

(i) WHETHER THE DAMAGES WERE FORESEEABLE;


E-Filed

2022-03987
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

(ii) WHETHER OR NOT SENSIVA OR ANY INDEMNIFIED PARTY WAS ADVISED OF THE POSSIBILITY OF THE DAMAGES; AND

(iii) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) ON WHICH THE CLAIM IS BASED.

(b) SHALL SENSIVA'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO SENSIVA UNDER THIS AGREEMENT IN THE ONE (1) YEAR PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

19. THE FOREGOING LIMITATIONS APPLY EVEN IF THE DISTRIBUTOR'S REMEDIES UNDER THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE.

20. Insurance. Distributor shall, at its own expense, maintain and carry insurance in full force and effect that includes, but is not limited to, commercial general liability (including product liability) with limits no less than $1,000,000 for each occurrence and $2,000,000 in the aggregate with financially sound and reputable insurers. Upon Sensiva's request, Distributor shall provide Sensiva with a certificate of insurance and policy endorsements for all insurance coverage required by this Section 20, and shall not do anything to invalidate such insurance. The certificate of insurance shall name Sensiva as an additional insured. Distributor shall provide Sensiva with thirty (30) days' advance written notice in the event of a cancellation or material change in Distributor's insurance policy. Except where prohibited by law, Distributor shall require its insurer to waive all rights of subrogation against Sensiva's insurers, Sensiva and the other Indemnified Parties. Distributor and Sensiva will work in good faith to agree on increases on the limits of such insurance policies based on volume of product sold from time to time.

21. Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter. The terms of this Agreement prevail over any terms or conditions contained in any other documentation related to the subject matter of this Agreement and expressly exclude any of Distributor's general terms and conditions contained in any purchase order or other document issued by Distributor (excluding the information set out in Section 5.1(a) - Section 5.1(c)).

22. Survival. Subject to the limitations and other provisions of this Agreement, the representations, warranties, covenants and other agreements of the Parties contained herein shall survive the expiration or earlier termination of this Agreement.

23. Notices. Any notice, request or communication given, made or sent pursuant to the terms of this Agreement shall be made in writing and shall be deemed duly given: (i) on the day delivered personally, (ii) three (3) days after being sent registered or certified mail, return receipt requested, (iii) email, or other commercially recognized method of electronic communication



E-Filed

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

(with confirmed read receipt of the other party) or (iv) one day after the date communicated via facsimile (with the original being sent the same day by registered or certified mail, return receipt requested) to the other Party at the following addresses and numbers (or to such other addresses and numbers as either Party hereto may hereafter designate in writing):

Sensiva: Ben Williamson
Chief Technology & Operating Officer
Phone: (239) 920-6637
E-mail: bwilliamson@sensivahealth.com

Copy to: Jones Walker LLP
c/o Asher J. Friend, Partner
201 St. Charles Ave., Suite 5100
New Orleans, LA 70170
Phone: (504) 582-8362
E-mail: afriend@joneswalker.com

Distributor: c/o Allen Frederic and Ben Kazenmaier
5707 Magazine Street
New Orleans, LA 70115
Phone: 504-613-8352 (Frederic)
504-329-2690 (Kazenmaier)
E-mail: allen@windyhillsolutions.us
bkazenmaier@gmail.com

24. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, such term or provision shall be deemed modified to the fullest extent permitted by applicable law to give effect to the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

25. Amendments. No amendment to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party.

26. Waiver. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

27. Cumulative Remedies. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise. Notwithstanding the previous sentence, the Parties intend that Distributor's rights under **Error! Bookmark not defined.Error! Reference source not found.** and Section 12 are Distributor's exclusive remedies for the events specified therein.

28. Assignment. Distributor shall not assign, transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of Sensiva. Notwithstanding the foregoing, Distributor intends to transfer its rights under this agreement to a newly formed affiliate of Distributor that will be managed and controlled (in terms of member voting power) by Benjamin Kazenmaier and Kevin Griffin to ensure the operations of this enterprise are segregated in a single entity (such that 100% of its operations and financials relate solely to the transactions contemplated in this Agreement). Distributor shall provide Sensiva copies of any LLC or operating agreement of its assignee for approval prior to effecting such transfer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve Distributor of any of its obligations hereunder. Sensiva may at any time assign, transfer, or subcontract any or all of its rights or obligations under this Agreement to another Person without Distributor's prior written consent.

29. Successors and Assigns. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

30. No Third-Party Beneficiaries. Subject to the next paragraph, this Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other Person (including any Customer) any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement. The Parties hereby designate Indemnified Parties as third-party beneficiaries of Section 17 with the right to enforce this provision.

31. Choice of law. This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Louisiana, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Louisiana.

32. Choice of Forum. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement, and all contemplated transactions, including contract, equity, tort, fraud and statutory claims, in any forum other than in the State or Federal Courts in Orleans Parish, Louisiana, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation, or proceeding only in such courts. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.


E-Filed

2022-03987
J
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT
Section 15

33. WAIVER OF JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, INCLUDING EXHIBITS, SCHEDULES, ATTACHMENTS, AND APPENDICES ATTACHED TO THIS AGREEMENT, IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, ATTACHMENTS, OR APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

34. Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in Section 22, a signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

35. Force Majeure. No Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations to make payments to the other Party under this Agreement), when and to the extent the failure or delay is caused by or results from acts beyond the impacted Party's ("**Impacted Party**") reasonable control (which events may include natural disasters, embargoes, explosions, riots, wars or acts of invasion or terrorism, requirements of law, national or regional emergency (each, a "**Force Majeure Event**"). A Party shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. An affected Party shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized, and resume full performance under this Agreement.

36. No Franchise or Business Opportunity Agreement. The Parties to this Agreement are independent contractors and nothing in this Agreement shall be deemed or construed as creating a joint venture, partnership, agency relationship, franchise, or business opportunity between Sensiva and Distributor. Neither Party, by virtue of this Agreement, will have any right, power, or authority to act or create an obligation, express or implied, on behalf of the other Party. Each Party assumes responsibility for the actions of their personnel under this Agreement and will be solely responsible for their supervision, daily direction and control, wage rates, withholding income taxes, disability benefits, or the manner and means through which the work under this Agreement will be accomplished. Except as provided otherwise in this Agreement, Distributor has the sole discretion to determine Distributor's methods of operation, Distributor's accounting practices, the types and amounts of insurance Distributor carries, Distributor's personnel practices, Distributor's advertising and promotion, its Customers, and Distributor's service areas and methods. The relationship created hereby between the parties is solely that of seller and distributor. If any provision of this Agreement is deemed to create a franchise relationship between the parties, then Sensiva may immediately terminate this Agreement.

[SIGNATURE PAGE FOLLOWS]


E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT



IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

**SENSIVA**

Sensiva Health, LLC

By: ______________________
Name: Ben Williamson
Title: Authorized Person

**DISTRIBUTOR**

BCK Investments, LLC

By: ______________________
Name:
Title:



E-Filed

2022-03987

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

## Schedule 1

## Test Kits and Price List

- Description of Test Kits:
  - C19 Rapid PCR Testing Kit (NP Swab or Saliva);
  - reACT Test Kit
- Kit Prices:

| PRODUCT NAME | PRODUCT DESCRIPTION | COST TO DISTRIBUTOR[1] |
|---|---|---|
| C19 | Rapid PCR Testing Kit (NP Swab or Saliva) | $2.50 |
| reACT Test Kit | reACT Rapid Covid Combo Assay Test Kit | $6.00 |

[1] Cost to Distributor shall be as set forth on this Schedule 1, or as this Schedule 1 is otherwise amended and restated by the Parties in writing upon the application of discounts to Test Kits by Production Line manufacturers in accordance with Section 4.1 hereof. Cost to Distributor means the price paid to a Production Line manufacturer to source components and manufacture Test Kits by Sensiva or Distributor under this Agreement.



E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

**AMENDMENT**
**TO**
**DISTRIBUTION AND RESELLER AGREEMENT**

This Amendment to Distribution and Reseller Agreement (this "Amendment") is made and entered into as of January 27, 2021 (the "Effective Date"), by and between Sensiva Health LLC, a Louisiana limited liability company ("Sensiva"), and BKK Solutions, LLC (formerly BCK Medical Holdings, LLC), a Florida limited liability company ("Distributor").

**RECITALS**

**WHEREAS**, Sensiva and Distributor (pursuant to that certain Assignment and Assumption Agreement, made effective as December 24, 2020, among Sensiva and Distributor and BCK Investments, LLC, a Florida limited liability company) are parties to that certain Distribution and Reseller Agreement, dated and made effective as of December 24, 2020, as amended, a copy of which is attached hereto as Appendix A (the "Distribution Agreement"); and

**WHEREAS**, Sensiva and Distributor desire to amend certain portions of the Distribution Agreement in the manner reflected in this Amendment.

**NOW THEREFORE**, in consideration of the premises, the mutual covenants and agreements herein contained, and other valuable consideration, the receipt, adequacy, and sufficiency whereof are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows.

1. Advance. Distributor agrees to advance to Sensiva, and Sensiva agrees to accept from Distributor, cash in an amount equal to $8,000,000 on or around January 27, 2021 (such $8,000,000 cash payment, the "Advance") to enable Sensiva to source certain components utilized in the reACT Test Kits pursuant to the current production and inventory schedule. The Advance will constitute the payment of purchase price for reACT Test Kits that will be produced using the components sourced from the Advance. Distributor shall be entitled to such number of reACT Test Kits equal to the Advance divided by six. The Advance shall carry a flat finance fee (the "Finance Fee") equal to twenty percent (20%) of the principal amount of the Advance, which shall be deducted from the Sensiva Payment described in Section 2 below.

2. Weekly Payment Withholding. Notwithstanding anything contained in the Agreement to the contrary, Distributor shall have the limited right to withhold Sensiva Payments under the Distribution Agreement from and after the date of the Advance until the fifth day following such time that the reACT Test Kits assembled with the Advance (as well as subsequent advances in the amounts of approximately $6.0 million, $5.3 million, $5.3 million and $5.3 million in the four subsequent weeks from the date hereof that are funded by Distributor, as contemplated by the current production schedule) conforming with the terms of the Distribution Agreement have been furnished to Distributor for resale, which is expected to occur by March 15, 2021.

3. Finance Fee. Prior to remitting the Sensiva payment accrued under Item 2 above, Distributor shall withhold the Finance Fee from such capital and transfer it to Distributor's Class A members at the time the accrued Sensiva Payment is transferred to Sensiva. Distributor shall furnish evidence of the Sensiva Payment to Sensiva at the time the Sensiva Payment described in Section 2 is advanced.

4. Effect of Amendment. Except as specifically amended hereby, the Distribution Agreement shall remain unchanged and in full force and effect and is hereby ratified and confirmed. The

E-Filed

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT
J
Section 15

execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the parties under the Distribution Agreement, nor constitute a waiver of any provision of the Distribution Agreement, except as specifically set forth herein.

5. Governing law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of Louisiana, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Louisiana.

6. Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of this Amendment may be made by facsimile or electronic mail or by .pdf delivery to the parties.

**[Remainder of Page Intentionally Left Blank]**

E-Filed

2022-03
J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

IN WITNESS WHEREOF, Sensiva and Distributor have executed this Amendment effective as of the Effective Date.

**SENSIVA:**

**SENSIVA HEALTH LLC**

By: ______________________
Name: Ben Williamson
Title: Authorized Person

**DISTRIBUTOR:**

**BKK SOLUTIONS, LLC**

By: ______________________
Name: Ben Kazenmaier
Title: Manager

**SIGNATURE PAGE TO AMENDMENT TO DISTRIBUTION AGREEMENT**

E-Filed

2022-03987
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

**APPENDIX A**

**Distribution Agreement**

(Attached)

**SIGNATURE PAGE TO AMENDMENT TO DISTRIBUTION AGREEMENT**

E-Filed

2022-03987
DocuSign Envelope ID: 8A0FB64F-8C2E-4C7B-AF71-CC5AA915E0AE
J
Section 15
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

**AMENDMENT**
**TO**
**DISTRIBUTION AND RESELLER AGREEMENT**

This Amendment to Distribution and Reseller Agreement (this "Amendment") is made and entered into as of January 18, 2021 (the "Effective Date"), by and between Sensiva Health LLC, a Louisiana limited liability company ("Sensiva"), and BCK Medical Holdings, LLC, a Florida limited liability company ("Distributor").

**RECITALS**

**WHEREAS**, Sensiva and Distributor (pursuant to that certain Assignment and Assumption Agreement, made effective as December 24, 2020, among Sensiva, Distributor and BCK Investments, LLC, a Florida limited liability company) are parties to that certain Distribution and Reseller Agreement, dated and made effective as of December 24, 2020, a copy of which is attached hereto as Appendix A (the "Distribution Agreement"); and

**WHEREAS**, Sensiva and Distributor desire to amend certain portions of the Distribution Agreement in the manner reflected in this Amendment.

**NOW THEREFORE**, in consideration of the premises, the mutual covenants and agreements herein contained, and other valuable consideration, the receipt, adequacy, and sufficiency whereof are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows.

1. Amendment to Definition of "reACT Test Kit". The definition of "reACT Test Kit" included in Section 1 of the Distribution Agreement is hereby amended and restated in its entirety as follows:

**"reACT Test Kit"** means that certain reACT Rapid Covid Combo Assay Test Kit (FDA EUA Submission No. EUA210041 or any subsequent, revised and/or additional submissions filed by or on behalf of Sensiva or its affiliates with respect to the reACT Test Kits or material portion of the components thereof), a laboratory developed Salivary Lateral Flow Immuno assay intended for the qualitative detection of Nucleocapsid antigen from SARS-CoV2 in saliva collected in normal saline from individuals who are suspected of COVID-19.

2. Amendment to Section 2.1(b) of the Distribution Agreement. Section 2.1(b) of the Distribution Agreement is hereby amended and restated in its entirety as follows:

> (b) From the Effective Date and continuing until the date when the available manufacturing capacity for the production of reACT Test Kits on Production Lines for anticipated distribution in the United States is equal to the Minimum Weekly ROFR reACT Capacity Amount (the "**reACT Exclusivity Period**"), Distributor shall have the exclusive right to acquire all or any portion of the reACT Test Kits produced on Production Lines for anticipated distribution in the United States; *provided, however*, that Distributor acknowledges, agrees and covenants that from and after authorization by the U.S. Food and Drug Administration ("**FDA**") of that certain Emergency Use Authorization(s) submitted by or on behalf of Sensiva or its affiliates with respect to the reACT Test Kit (including without limitation, FDA EUA Submission No. EUA210041, or any subsequent, revised and/or additional submissions filed by or on behalf of Sensiva or its affiliates with respect to the reACT Test Kits or material portion of the components thereof) (the date of such authorization by or on behalf of the FDA, the "**EUA Trigger Date**"), Distributor shall purchase from Sensiva (including without limitation, by issuing


E-Filed

2022-03987
DocuSign Envelope ID: 8A0FB64F-8C2E-4C7B-AF71-CC5AA915E0AE
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

a purchase order in accordance with Section 5 with respect thereto), at and upon notice thereof by Sensiva to Distributor, all available weekly production capacity of reACT Test Kits up to at least the Minimum Weekly ROFR reACT Capacity Amount (with respect to each available weekly capacity of reACT Tests from and after the EUA Trigger Date, a "**Weekly Production Cycle Amount**", and together the "**Weekly Production Cycle Amounts**"); *provided further, however*, in the event that reACT Test Kits comprising a prior Weekly Production Cycle Amount purchased by Distributor have not been delivered to Distributor (or any designee specified in the purchase order pertaining to such Weekly Production Cycle Amount (if and as applicable, a "**Designee**")) (a "**Pending Weekly Production Cycle Amount**") at and upon notice to Distributor of Weekly Production Cycle Amounts subsequent to the Pending Weekly Production Cycle Amount, the obligation of Distributor to purchase subsequent Weekly Production Cycle Amounts may, at the discretion of Distributor, be stayed until (and only until) such time as the then Pending Weekly Production Cycle Amount is delivered to Distributor or any Designee, following which all previously noticed subsequent Weekly Production Cycle Amounts shall be purchased by Distributor.

3. Effect of Amendment. Except as specifically amended hereby, the Distribution Agreement shall remain unchanged and in full force and effect and is hereby ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the parties under the Distribution Agreement, nor constitute a waiver of any provision of the Distribution Agreement, except as specifically set forth herein.

4. Governing law. This Amendment shall be are governed by, and construed in accordance with, the laws of the State of Louisiana, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Louisiana.

5. Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of this Amendment may be made by facsimile or electronic mail or by .pdf delivery to the parties.

**[Remainder of Page Intentionally Left Blank]**



E-Filed

2022-03987
DocuSign Envelope ID: 8A0FB64F-8C2E-4C7B-AF71-CC5AA915E0AE
FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

J

Section 15

IN WITNESS WHEREOF, Sensiva and Distributor have executed this Amendment effective as of the Effective Date.

**SENSIVA:**

**SENSIVA HEALTH LLC**

DocuSigned by:
By: Benjamin Williamson
5302B19493CF40E...
Name: Ben Williamson
Title: Authorized Person

**DISTRIBUTOR:**

**BCK MEDICAL HOLDINGS, LLC**

DocuSigned by:
By: Benjamin Kazenmaier
23F92A585DAD4F6...
Name: Ben Kazenmaier
Title: Manager

**SIGNATURE PAGE TO AMENDMENT TO DISTRIBUTION AGREEMENT**

E-Filed

2022-03987
DocuSign Envelope ID: 8A0FB64F-8C2E-4C7B-AF71-CC5AA915E0AE

J

Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

**APPENDIX A**

**Distribution Agreement**

(Attached)



E-Filed

2022-03987
J
Section 15

FILED
2022 MAY 05 A 11:49
CIVIL
DISTRICT COURT

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
# STATE OF LOUISIANA

No.: Division:

Sensiva Health, LLC
versus
BKK Solutions, LLC

PARTY TO BE SERVED: BKK Solutions, LLC

THROUGH: Allen Frederic and Ben Kazenmaier

ADDRESS: 5707 Magazine Street

SUITE/ROOM: ______

CITY: New Orleans, LA 70115

SPECIAL SERVICE INSTRUCTIONS: ______

DOCUMENT TYPE: Verified Petition for Declaratory Judgment and Damages

FILED BY ATTORNEY: Allen C. Miller BAR NO. 26423

DATE OF FILING: 5/5/22

ATTACHMENTS/EXHIBITS: Exhibit A

**RETURN FOR PERSONAL SERVICE**

On the ______ day of __________ 19 ____ served a copy of the within ______________ On ______________ in person ______________

Return same day

______________
Deputy Sheriff of Orleans Parish

______ **ENTERED** ______
PAPER RETURN

______ / ______ / ______
SERIAL NO. DEPUTY PARISH

**DOMICILIARY SERVICE**

On this ______ day of __________ 19 __ served a copy of the within ______________ on ______________ by leaving same at __________ domicile or usual place of abode ______________ in the hand of ______________ a person of suitable age and discretion, residing therein as a member of __________ domiciliary establishment, whose name and other facts connected with this service I learned by interrogating the said ______________ the said ______________ being absent from ______ domicile at time of said service.

Returned same day

______________
Deputy Sheriff of Orleans Parish

**SHERIFF'S RETURN**

Form 95

E-Filed