N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

**NO.** **DIVISION:**

**BKK SOLUTIONS, LLC f/k/a BCK MEDICAL HOLDINGS, LLC**

**VS.**

**SENSIVA HEALTH, LLC; TARUN JOLLY; BEN WILLIAMSON**

**FILED:**________________________ ______________________________
**DEPUTY CLERK**

**PETITION FOR DAMAGES**

Plaintiff, BKK Solutions, LLC f/k/a BCK Medical Holdings, LLC ("BKK"), for its petition against defendants, alleges as follows:

**PARTIES**

**1.**

Plaintiff, BKK, is a Florida limited liability company.

**2.**

Defendant, Sensiva Health, LLC, is a Louisiana limited liability company.

**3.**

Defendant, Tarun Jolly, is a person of full age and majority and a resident of Orleans Parish. Jolly is, on information and belief, a member and/or agent of, or is otherwise financially interested in, Sensiva.

**4.**

Defendant, Ben Williamson, is a person of full age and majority and a resident of Orleans Parish. Williamson is, on information and belief, a member and/or agent of, or is otherwise financially interested in, Sensiva.

VERIFIED
Jovan Gibson
2022 MAY 09 P 12:22

Ex. 3 to UMI Opp. to Sensiva MIL

E-Filed

N
Section 8
FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

## VENUE

**5.**

Venue is proper in this Court as the contract at issue was executed in Orleans Parish, representations were made in and directed to this parish, and this is the parish where work or services were to be performed under the contract. In addition, the distribution and reseller agreement between BKK and Sensiva provides that Orleans Parish is the proper forum for any action relating to the agreement.

## JURISDICTION

**6.**

The Court has personal jurisdiction over the defendants, each of which transacted business in the state and judicial district and caused injury or damage by an offense committed in the state. This petition alleges claims arising exclusively under state law.

## FACTUAL BACKGROUND

### Sensiva—which develops and manufactures Covid tests—seeks to enlist a distributor for its reAct tests.

**7.**

Sensiva develops, manufactures, offers, and sells test kits and other diagnostic products and services, including products and services used to detect Covid-19.

**8.**

In early December 2020, BCK Investments, LLC was introduced to Sensiva. Sensiva was looking for a party to finance the start up manufacturing and sourcing costs to commence business and to market its saliva-based test kit for Covid-19 (called a "reAct" test) for sale.

**9.**

The reAct test was a dual test. It allowed subjects to (a) take a saliva-based rapid antigen test and (b) take a saliva sample for PCR laboratory testing.



E-Filed

2022-04083
N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**Sensiva and its agents represent that there is a route to obtain automatic approval for the reAct tests.**

**10.**

During one of the initial meetings, Sensiva represented that its counsel was handling its domestic regulatory work and an FDA application for the reAct test kits. Jolly confirmed that Sensiva's FDA application for the reAct test kits was pending. Sensiva's counsel, who was present for the meeting, did not dispute or contradict that representation.

**11.**

At the same meeting, Jolly stated that there was an alternative route to obtain approval for its test kits through the Department of Health and Human Services ("HHS") in the event of any complication or delay with the FDA application. According to Sensiva and Jolly, this route was separate and apart from FDA approval and provided automatic approval within two weeks of making a submission to the HHS. Sensiva's counsel did not dispute or contradict that representation.

**12.**

That same day, Jolly stated by email that the reAct test kits could be marketed and sold "immediately." Sensiva's attorney was included in the email and did not dispute or contradict that representation.

**13.**

Jolly and Sensiva also represented that the reAct test kits could be sold in the United States because the tests were developed in a Clinical Laboratory Improvement Amendments ("CLIA")-approved laboratory.

**14.**

Based on the foregoing representations, BCK Investments agreed to enter into a distribution and re-seller agreement with Sensiva.



E-Filed

N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**15.**

BCK Investments agreed to the terms offered by Sensiva based on the reasonable understanding that the reAct tests faced no uncertainty as to the outcome or timing of approval to be legally marketed throughout the United States.

**Sensiva and BCK Investments enter into a distribution and re-seller agreement.**

**16.**

The distribution and re-seller agreement, effective December 24, 2020, was initially between Sensiva and BCK Investments.

**17.**

Through an assignment and assumption agreement, also effective December 24, 2020, BCK Investments assigned the distribution and re-seller agreement to BCK Medical Holdings, LLC. Sensiva gave its consent and signed the assignment and assumption agreement.

**18.**

BCK Medical Holdings later changed its name to BKK Solutions, LLC ("BKK").

**19.**

The distribution and re-seller agreement required BKK to finance the manufacture of Sensiva's reAct test kits at cost and to pay Sensiva 60% of the profits from any resale of the reAct test kits. The agreement restricted BKK's ability to distribute the reAct test kits to the United States. The agreement required BKK to obtain Sensiva's written approval to sell the tests internationally.

**20.**

In the distribution and re-seller agreement, Sensiva warranted that the test kits were free from material defects in material and workmanship under normal use and service with proper maintenance for the time of their intended use following manufacturing.



E-Filed

2022-04083
N
Section 8
FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**21.**

BKK received its initial notice of availability of manufacturing lines from Sensiva on or about January 10, 2021. The notice required BKK to fund $1.8 million within 48 hours. Otherwise, BKK would lose its exclusive right to sell reAct test kits.

**22.**

BKK complied with its obligations under the agreement and funded Sensiva $1.8 million for the initial quantity of 300,000 units of reAct.

**23.**

Funding was based on reasonable reliance on the representation to BKK's representatives that Sensiva would either obtain FDA approval in the near term or submit through the HHS for the two-week automatic approval to permit the reAct tests to be legally marketed and sold in the United States.

**24.**

The parties amended the distribution and re-seller agreement. Among other things, the parties amended the definition of "reAct test kit" and agreed that, upon FDA approval, BKK would finance a minimum weekly amount of capacity.

**25.**

At a meeting on or around January 20, 2021, attended by BKK, Jolly, and Sensiva's counsel, Jolly represented that Sensiva needed to source and finance the purchase of certain components used in the reAct test kits in order to avoid Sensiva's primary component manufacturer from shutting its facility down for approximately one month for the Chinese New Year. At this meeting, Jolly again represented that Sensiva had the ability (and intent if necessary) to gain automatic approval to legally market and sell the reAct tests in the United States through the HHS.

**26.**

One day following this meeting, on a telephone call between BKK, Sensiva, and Sensiva's attorney, BKK asked Sensiva when it would pursue the immediate, two-week approval from the HHS that Sensiva had represented was a path to automatic approval to market reAct tests in the



E-Filed

N
Section 8
FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

United States. BKK asked if March 15 was a reasonable date in the absence of communication from the FDA. Jolly replied that Sensiva would pursue that option around mid-March but might delay if FDA approval seemed imminent.

**27.**

On January 27, 2021, the parties executed a second amendment to the distribution and reseller agreement. Under the second amendment, BKK paid Sensiva $8 million as an advance ostensibly to enable Sensiva to obtain certain components used in the reAct test kits.

**28.**

BKK made the $8 million advance to secure exclusivity under its contract with Sensiva upon United States regulatory approval. The advance was premised on the representation that the reAct test kits assembled utilizing proceeds from the advance would be approved for marketing and sale in the United States on or about March 15, 2021.

**29.**

In total, BKK invested $9.8 million in the manufacture of reAct test kits, ultimately acquiring roughly 1.6 million kits for intended resale by BKK in the United States.

**The FDA denies approval for the reAct test kits; BKK later learns that no alternative route for approval exists.**

**30.**

Sensiva represented in its FDA application (and represented to BKK) that the reAct test kits had a certain shelf life. Upon information and belief, the test kits actually had a shorter shelf life than what was being represented by Sensiva and Sensiva had no data to support its representation.

**31.**

In April 2021, the FDA asked Sensiva to submit more information within 48 hours to evaluate its application. Sensiva failed to provide the requested information.



E-Filed

2022-04083
N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**32.**

On or about April 23, 2021, the FDA denied Sensiva's application.

**33.**

Sensiva told BKK it would promptly resubmit the application for the reAct test kits.

**34.**

From April until the end of August 2021, BKK requested updates from Sensiva on the status of its re-submission of its application to the FDA. Sensiva provided no updates until June 2021, when its attorney stated to BKK that the application was forthcoming.

**35.**

BKK tried to mitigate its damages. BKK prepared and funded applications for regulatory approval in other countries. For example, BKK managed the approval process in Germany, where the reAct tests were approved.

**36.**

Sensiva allowed BKK to attempt to market and sell the reAct test kits internationally.

**37.**

Because Sensiva did not have an active application on file with the FDA at this time, BKK could not provide a certificate of free sale (or its equivalent) or an FDA Emergency Use Authorization ("EUA") number to the countries in which it had applied for approval and hoped to sell the reAct tests, rendering each of the foreign applications and efforts deficient, costing BKK hundreds of hours and thousands of dollars.

**38.**

BKK also coordinated the testing of reAct kits by the government of India in the summer of 2021. The results from the testing were below the minimum acceptance criteria set by the government. The tests therefore failed the first round of sample testing by the Indian government.



E-Filed

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT


**39.**

Williamson represented that there was an "obvious issue" with the reAct kits used in the testing by the Indian government. He stated that the poor results were likely due to a faulty seal and that Sensiva would send a new shipment of tests with a different, four-sided seal.

**40.**

BKK's contact, who heard the representation, informed the Indian government of the purported seal issue. The Indian government agreed to retest a new batch of kits. The reAct test kits failed the second round of testing.

**41.**

Upon information and belief, Williamson had no basis to believe there was an issue with the seal. Rather, Williamson blamed the poor results on the alleged seal to convince BKK that the reAct tests worked and that the only issue was with the specific batch of tests sent to India. Williamson did this so that BKK would not demand a refund, would continue funding Sensiva, and would continue making efforts to market and distribute Sensiva's product.

**42.**

In late August or early September 2021, Sensiva submitted another FDA application. Upon its receipt of the submission, BKK learned that, despite what it had been led to believe, the application did not include the reAct test kits. The FDA application was for approval for a different product with a new name and packaging (called "Spectrum").

**43.**

Upon information and belief, Sensiva represented in its FDA application that the Spectrum tests had a shorter shelf life than the reAct kits.

**44.**

BKK has learned in the second half of 2021 that no avenue to obtain automatic approval through the HHS exists. Sensiva's representations to the contrary were false.



E-Filed

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**45.**

BKK was left with millions in inventory for a product that was not FDA approved, had no active EUA submission, and were defective.

**46.**

BKK was not the manufacturer of the tests and lacked the authority to submit the reAct tests for FDA approval on its own, even assuming that the reAct kits worked.

**BKK tries to mitigate its damages, but the reAct test kits do not work.**

**47.**

Lacking FDA approval (or even a pending FDA application), BKK could not market its 1.6 million reAct test kits for sale in the United States.

**48.**

As for Germany (the sole country where the product was approved), BKK worked to generate sales before it knew that the kits did not work. The prices were below cost due to the highly competitive market. This, coupled with the absence of a pending FDA application for the reAct tests, made selling the tests impractical. Moreover, BKK also had no infrastructure, operations, or expertise in foreign markets for the sale of medical devices and supplies.

**49.**

In early December 2021, BKK was able to secure sales commitments for 500,000 of its 1.6 million units from two customers in the United States. BKK sent them samples in advance. Both customers reported problems with the accuracy of the tests.

**50.**

BKK received complaints that the reAct test kits were defective. The tests either (1) failed to detect Covid-19 in several subjects confirmed positive by other tests or (2) reported no results at all. The tests at issue were not expired, according to the expiration date printed on the packaging of the tests.



E-Filed

2022-04083
N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**51.**

BKK promptly notified Sensiva of the deficiencies. Sensiva responded that some tests were "about a year old" and told BKK that the tests could not be sold in the United States.

**52.**

Following this exchange, BKK had some of its inventory tested by an independent lab in Germany. The German lab reported that the kits did not work.

**53.**

BKK spent thousands of dollars to store the large inventory of tests it had financed but could not sell.

**54.**

Following the customer complaints, Jolly told BKK that Sensiva had changed the antigen strip in its subsequent Covid testing products from the strip used in the reAct test kits.

**55.**

BKK offered to return the tests to Sensiva and demanded the return of its money.

**56.**

Tacitly conceding that the test kits are defective, Sensiva offered to repurpose the reAct tests with a new antigen strip, but only if BKK funded the costs to do so. BKK did not agree.

**57.**

The parties entered a tolling agreement, effective February 1, 2022, by which they agreed to toll any prescriptive or limitation period for a one-year period subject to an opt-out. Under the agreement, either party could terminate the agreement by providing a 45-day notice.

**58.**

On March 21, 2022, BKK sent notice of termination of the tolling agreement. Accordingly, the tolling agreement terminated on May 5, 2022.



E-Filed

N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

### BREACH OF CONTRACT—SENSIVA

**59.**

BKK realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**60.**

In the distribution and re-seller agreement, Sensiva warranted that the test kits were free from material defects in material and workmanship under normal use and service with proper maintenance for the time of their intended use following manufacturing.

**61.**

The reAct test kits, however, were not free from material defect. The reAct test kits did not work as intended.

**62.**

The reAct test kits failed to detect Covid-19 in known cases. In some cases, the test kits also reported no results at all.

**63.**

The reAct test kits did not yield accurate results and could therefore not be sold.

**64.**

Upon information and belief, this breach by Sensiva was in bad faith.

### RESCISSION FOR FAILURE OF CAUSE AND REDHIBITORY DEFECT—SENSIVA

**65.**

BKK realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**66.**

"Error vitiates consent when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949.



E-Filed

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

**67.**

La. Civ. Code art. 1967 defines cause as "the reason why a party obligates himself."

**68.**

When error vitiates consent, the parties are to be put in the same position as if there were no contract.

**69.**

BKK's purpose for entering into the distribution and re-seller agreement was so that it could sell test kits in the United States. In fact, BKK was allowed to sell only in the United States unless it had written approval from Sensiva.

**70.**

Sensiva knew or should have known that BKK would not have incurred the obligation to pay Sensiva millions of dollars for test kits if BKK could not sell the test kits in the United States, the only jurisdiction that the contract allowed BKK to sell in.

**71.**

In a December 2021 email, Sensiva expressly instructed BKK that it could not sell the reAct test kits in the United States.

**72.**

The cause of BKK's agreement with Sensiva—the reason without which BKK never would have entered into the distribution and re-seller agreement—failed.

**73.**

The reAct test kits contained a redhibitory defect at the time of the sale. The tests did not work and were unfit for the use intended. Had BKK known that the test kits did not work, BKK would never have purchased the product. Sensiva, as the manufacturing seller of the kits, is presumed to know of their defects.

**74.**

BKK is entitled to be restored to the position it was in before it entered the distribution and re-seller agreement.



E-Filed

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

## FRAUD AND/OR NEGLIGENT MISREPRESENTATION—SENSIVA, JOLLY, WILLIAMSON

**75.**

BKK realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**76.**

Sensiva and its agents made various misrepresentations and omissions in an attempt to obtain an unjust advantage in their relationship with BKK.

**77.**

Defendants represented to the plaintiffs that there was an automatic, two-week approval process through the HHS for the reAct test kits to induce BKK to assume the distribution and re-seller agreement, fund the initial $1.8 million, and later fund another $8 million.

**78.**

Upon information and belief, Sensiva, Jolly, and Williamson knew or should have known that the reAct test kits did not work (or, at a minimum, knew or should have known that the reAct test kits had a shorter shelf life than what Sensiva represented on the packaging, to the FDA, and to BKK) yet failed to disclose this fact to BKK.

**79.**

Sensiva, Jolly, and Williamson misled BKK because they knew that if BKK had known that there was no guarantee of FDA or HHS approval of the reAct test kits, BKK would not have contracted with Sensiva under the terms to which it agreed or have provided any financing.

**80.**

More than once, Jolly represented to BKK that Sensiva had the ability to submit the reAct test kits for automatic approval through the HHS.

**81.**

Williamson represented to BKK that there was likely a faulty seal on the reAct test kits sent to the Indian government. Upon information and belief, Williamson did so to convince BKK that



E-Filed

2022-04083
N
Section 8

FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

the product worked and was not faulty so that BKK would not demand a refund, would continue funding Sensiva, and would continue making efforts to market and distribute Sensiva's product.

**82.**

BKK entered into the assignment and assumption agreement for the distribution and reseller agreement and subsequently funded Sensiva $9.8 million based on the representation that Sensiva could obtain automatic approval for the reAct test kits in the United States through the HHS.

**83.**

Each of these misrepresentations, if not made intentionally, at a minimum constitutes negligent misrepresentation.

**84.**

Each defendant participated in—or at a minimum, acquiesced in—each of these misrepresentations and omissions.

**85.**

Jolly and Williamson are personally liable for any damages caused by their tortious conduct and other wrongful acts.

**LUTPA—SENSIVA, JOLLY, WILLIAMSON**

**86.**

BKK realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**87.**

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. R.S. § 51:1405.

**88.**

Fraud, deceit, or misrepresentation are deceptive trade practices prohibited by LUTPA.



E-Filed

**89.**

Sensiva, Jolly, and Williamson made misrepresentations and omissions to obtain an unjust advantage in their relationship with BKK and induce BKK to pay Sensiva millions of dollars for reAct test kits.

**90.**

Sensiva, Jolly, and Williamson violated LUTPA through the fraudulent conduct alleged throughout the petition.

**91.**

The defendants' conduct in violation of LUTPA is continuing.

**CIVIL CODE ARTICLE 2315—SENSIVA, JOLLY, WILLIAMSON**

**92.**

BKK realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**93.**

Under Civil Code article 2315, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

**94.**

Sensiva, Jolly, and Williamson caused BKK damage by misrepresenting material facts, including that automatic HHS approval was possible, that the reAct tests had a certain shelf life, and that the tests worked as intended.

**95.**

As a result of all these wrongs, BKK has suffered damages, which include but are not limited to all amounts paid to Sensiva, out-of-pocket costs incurred to mitigate damages, and lost profits.

WHEREFORE, BKK requests that there be judgment in its favor awarding damages as set forth above, including all payments to Sensiva, foreseeable and unforeseeable damages, legal

2022-04083
N
Section 8
FILED
2022 MAY 06 P 05:40
CIVIL
DISTRICT COURT

interest, court costs, attorney's fees and expenses, and all other legal or equitable relief to which it may be entitled under any theory, whether pled or not.

Respectfully submitted,

/s/ Thomas M. Flanagan
Thomas M. Flanagan (#19569)
Camille E. Gauthier (#34558)
Alixe L. Duplechain (#39167)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: 504-569-0235
Facsimile: 504-592-0251
tflanagan@flanaganpartners.com
cgauthier@flanaganpartners.com
aduplechain@flanaganpartners.com

Attorneys for BKK Solutions, LLC

**PLEASE SERVE:**

Sensiva Health, LLC
Through their registered agent:
COGENCY GLOBAL INC.
9800 Airline Highway, Suite 105
Baton Rouge, LA 70816

Tarun Jolly
3 Audubon Place
New Orleans, LA 70118

Ben Williamson
1820 S Norman C Francis Pkwy
New Orleans, LA 70125



E-Filed