**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Coastal Laboratories, Inc., *et al.*** <br> *Plaintiffs*, <br> v. <br> **Tarun Jolly, M.D.**, ***et al.*** <br> *Defendants*. | Civil No. 1:20-cv-02227-RDB <br> **JURY DEMAND** |

**AMENDED COMPLAINT**

Plaintiffs Coastal Laboratories, Inc., and AMSOnSite, Inc., by their attorneys Silverman|Thompson|Slutkin|White, LLC, file this Amended Complaint. In support, Plaintiffs state as follows:

**INTRODUCTION**

1. This is an action for tortious interference with prospective business relations, tortious interference with economic relations, civil conspiracy, conversion, unfair competition, and fraud.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the suit is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

3. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in Maryland. Specifically, Defendants or their agents intentionally directed their tortious conduct at Plaintiffs and their customers in Maryland, thereby

Ex. 4 to UMI Opp. to Sensiva MIL

causing substantial harm to Plaintiffs' businesses. Plaintiffs' directors are also Maryland residents.

4. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because there is no district in which this action may otherwise be brought under 28 U.S.C. § 1391(b) and the defendants are subject to personal jurisdiction in Maryland. Defendants are residents of Florida, Louisiana, South Carolina and Tennessee. The events giving rise to Plaintiffs' claims occurred in multiple judicial districts, but as pled above, a substantial amount of activity occurred in Maryland and was directed at Plaintiffs, which are located in Maryland.

5. This Court has personal jurisdiction over Defendants under Md. Code Ann., Cts. & Jud. Proc § 6-103(b)(1) because Defendants or their agents conspired to and purposefully solicited business from Plaintiffs' Maryland-based customers by directing their targeted advertising and solicitation activity at those customers, and thereby caused material harm to Plaintiffs. Defendants also negotiated and entered into contracts, and maintained commercial relationships with Plaintiffs' Maryland-based businesses.

6. This Court also has personal jurisdiction over Defendants under Md. Code Ann., Cts. & Jud. Proc § 6-103(b)(3) because Defendants or their agents conspired to and did cause tortious injury to Plaintiffs in Maryland by acts committed in that State. As detailed below, Defendants prevented Plaintiffs' customers in Maryland from accessing COVID-19 test results by maliciously blocking access to a web portal maintained by Defendants. Defendants then used that denial of access as means to coerce Plaintiffs' Maryland customers into terminating their relationships with Plaintiffs and contracting directly with Defendants.

## THE PARTIES

7. Plaintiff Coastal Laboratories, Inc. ("Coastal"), is a Delaware corporation with its principal place of business at 2 Compromise Street, Annapolis, Maryland 21401. Coastal uses a proprietary molecular technology platform that allows it to generate timely and accurate analyses of dozens of respiratory pathogens including COVID-19.

8. Plaintiff AMSOnSite, Inc. ("AMS"), is a Delaware corporation with its principal place of business at 2 Compromise Street, Annapolis, Maryland 21401. AMS provides clinical environmental infection prevention and control services to residential nursing and rehabilitation facilities in several states, including Maryland ("Nursing Homes").

9. Defendant Tarun Jolly, M.D. is an individual and principal of co-Defendant Cormeum Lab Services, LLC who resides and regularly conducts business in New Orleans, Louisiana. Dr. Jolly recently settled a *qui tam* action with the United States Department of Justice in which he and other defendants agreed to pay a $1 million fine in connection with a Medicare fraud investigation. Jolly's scheme involved kickbacks in exchange for referrals for medical testing conducted by a laboratory co-owned by Jolly. Also in connection with the fraud investigation, Jolly's laboratory agreed to forego collection of over $41 million of billing to Medicare that was associated with the kickback scheme and received a 25-year ban excluding the lab from doing business with the Centers for Medicare & Medicaid Services. Upon information and belief, Jolly's lab recently ceased operations entirely.

10. Defendant James Silliman, M.D., is an individual and principal of co-defendants Sensiva Health, LLC and Z DiagnostiX, LLC, and resides and regularly conducts business in South Carolina. Upon information and belief, Silliman was removed as chief executive officer of a company called Volente Health, LLC when it became involved in a large federal Medicare

fraud investigation in 2018. Volente operated in association with Provista Labs, LLC, which co-Defendant Jolly subsequently sold to Coastal as described below.

11. Defendant James "Bo" Bauder Silliman is an individual who resides and regularly conducts business in South Carolina. Bo Silliman, the son of co-Defendant James Silliman, holds himself out as an officer of co-Defendant Z DiagnostiX, LLC and an expert in Medicare, Medicaid and other healthcare payment mechanisms.

12. Defendant David F. Vigerust is an individual who resides and regularly conducts business in Tennessee. Vigerust is chief scientific and compliance officer for co-Defendant Sensiva Health, LLC, and also holds himself out as an officer of co-Defendant Z DiagnostiX, LLC.

13. Defendant Benjamin Williamson is an individual who holds himself out as a co-founder and principal of co-defendants Sensiva Health, LLC and Vita Health Systems, LLC, and resides and regularly conducts business in Florida. Williamson touts himself as an expert in laboratory and healthcare services practice management software applications and systems.

14. Defendant Cormeum Lab Services, LLC ("Cormeum"), is a Louisiana limited liability company formed on June 14, 2019, with a place of business at 4520 Wichers Drive, Suite 105, Marrero, Louisiana 70072. Upon information and belief, and according to its website and other materials, Cormeum holds itself out as a high volume, certified Clinical Laboratory Improvement Amendments ("CLIA") medical laboratory affiliated with co-Defendant Sensiva Health, LLC, and which provides laboratory testing services similar to Coastal.

15. Defendant Sensiva Health, LLC ("Sensiva") is a Louisiana limited liability company formed on March 23, 2020, with a place of business at 935 Gravier Street, Suite 2020, New Orleans, Louisiana 70112. Upon information and belief, and according to its website and

other materials, Sensiva holds itself out as a provider of COVID-19 virus and antibody testing and consulting services, and claims rapid, accurate results that set it apart from competitors. Sensiva utilizes co-Defendant Cormeum to provide laboratory services for its testing needs.

16. Defendant Z DiagnostiX, LLC ("ZDX") is, upon information and belief, a limited liability company formed in Delaware on November 5, 2019, and is owned and/or managed by co-defendants James Silliman and David Vigerust. ZDX holds itself out as a management company that assists diagnostic laboratories with their management and marketing efforts. ZDX's place of business at 10 Permit Court, Georgetown, South Carolina is co-Defendant Silliman's personal residence.

17. Defendant Vita Health Systems, LLC ("Vita"), is a Louisiana limited liability company formed on July 2, 2019, with a place of business at 3 Audubon Place, New Orleans, Louisiana 70118, which also is co-Defendant Jolly's residence. According to the Louisiana Secretary of State, Vita is not in good standing for failure to file an annual report. On its website, Vita states that "Sensiva Health is a company within our direct to consumer wing that provides at home lab testing kits with a twist; *we own the labs running the tests*." (Emphasis supplied.) Williamson's company Vita holds itself out as a healthcare technology provider of practice management applications such as Laboratory Information Management Systems ("LIMS") that are used by diagnostic laboratories to process and report test results, and to upload billing information to billing entities to invoice for testing services rendered.

18. Upon information and belief, co-defendants Cormeum, Sensiva, ZDX and Vita Health are affiliated and share common ownership and/or management by co-Defendants Jolly, James Silliman, Bo Silliman, Vigerust and Williamson, all of whom conspired and participated together in the matters set forth in this complaint. The co-defendants named in this paragraph are

referred to herein as the "Defendants," or "co-Defendants," and each individually a "Defendant" or "co-Defendant," according to the context required by the averment.

**FACTUAL BACKGROUND**

19. AMS administers a complete infection control management program called Sterisis that was designed specifically for Nursing Homes. The Sterisis program assists Nursing Homes to create processes, protocols, training and other measures to prevent and control infection, including quarterly and systemic non-invasive respiratory testing.

20. Beginning in 2017, the principals of AMS sought to partner with a laboratory that would allow AMS to test and analyze the samples it collected through the Sterisis program.

21. In Fall 2017, AMS's president Patrick Britton-Harr ("Britton-Harr"), was in discussions to partner with a lab in Tennessee. As a result of relationships developed during those discussions, Britton-Harr was introduced to Defendant James Silliman and his company Volente Health, LLC ("Volente"). The negotiations to partner with the Tennessee lab ultimately fell through, leading AMS' principals to search for other opportunities.

22. In December 2019, AMS' principals were still looking to partner with a testing lab. On or about December 19 and 20, 2019, Britton-Harr received text message and email correspondence from Defendant James Silliman who said he knew of labs that AMS might be interested in acquiring. Britton-Harr expressed interest and James Silliman offered to arrange an introduction to the lab's owner, co-Defendant Jolly. Britton-Harr agreed.

23. Britton-Harr and Defendant Jolly thereafter spoke on the telephone many times through February 2020. Just 4 months earlier, the United States Department of Justice announced, and news media reported, that Jolly and two partners agreed to pay a $1 million fine to the U.S. Department of Justice in connection with the settlement of a *qui tam* action

concerning a Medicare kickback scheme.

24. During their conversations, Jolly told Britton-Harr he was looking to get out of the laboratory business and that he had two labs for sale in Arizona, one in Phoenix and the other in Scottsdale. The Scottsdale lab was owned by a Delaware limited liability company, Provista Health, LLC ("Provista"), and the Phoenix lab was owned by a Louisiana limited liability company, Integra Molecular, LLC ("Integra"). Jolly was the sole member and 100% owner of both Provista and Integra (collectively, the "Arizona Labs").

25. The previous owner of Jolly's Provista lab was Volente, a company for which co-Defendant Silliman had served as chief executive officer. Upon information and belief, Silliman was removed from that position when the company became involved in a national federal criminal investigation for Medicare fraud in 2018-2019.

26. Britton-Harr formed Coastal to purchase the Arizona Labs, which, among other things, would provide laboratory services in support of AMS' Sterisis infection control and prevention program.

27. While Britton-Harr and Jolly negotiated the purchase and sale of the Arizona Labs, the deadly COVID-19 pandemic broke out and caused the immediate need for laboratories to test individuals for infection by the virus.

28. AMS had a substantial number of then-existing and valuable contractual relationships with Nursing Homes for which AMS provided the infection control and prevention services described above. Nursing Homes were, and remain, among the most in need of immediate COVID-19 testing because their residents are the highest risk population for serious illness or death if they contract the virus.

29. On February 29, 2020, the first United States death from COVID-19 was reported

at a nursing home facility in Kirkland, Washington. The announcement was accompanied by the declaration of a state of emergency by Washington Governor Jay Inslee. These (and related) events received widespread national publicity and quickly thereafter essentially shut down the United States.

30. Coastal and AMS immediately recognized that the COVID-19 pandemic could ravage Nursing Homes and thus began efforts to expand services to meet anticipated nationwide need to control the spread of the infection.

31. During the February 2020 telephone discussions between Britton-Harr and Defendant Jolly about acquisition of the Arizona Labs, Britton-Harr repeatedly informed Defendant Jolly that Coastal expected a surge in testing volume and therefore Coastal needed to equip the labs to meet the volume expected and obtain whatever regulatory authorization that would be required to permit COVID-19 testing.

32. Those discussions expanded to include co-defendants James Silliman, Bo Silliman, Vigerust and Williamson, each of whom along with co-Defendant Jolly repeatedly assured Coastal that the Arizona Labs were properly equipped to handle current non-COVID-19 testing volume. However, in response to plaintiffs' plans to perform high volume COVID-19 testing, and in anticipation of the expected imminent surge in COVID-19 testing volume, the co-defendants also advised Coastal on steps it needed to take to be able to perform such testing, including adding laboratory equipment, gaining regulatory approval, and improving practice management, reporting and billing systems and software.

33. The discussions included an in-person meeting in Charleston, South Carolina, on March 6, 2020, at which Coastal principals Britton-Harr and G. Ellsworth Harris V reiterated to ZDX that a material incentive for Coastal to acquire the Arizona Labs, and a key reason for

Coastal to engage ZDX, was for ZDX to assist Coastal to complete regulatory compliance procedures so the labs could perform COVID-19 testing. The ZDX representatives in attendance—defendants James Silliman, Bo Silliman, and David Vigerust—assured Coastal that ZDX could and would meet Coastal's needs and timeline.

34. With regard to those regulatory requirements, the U.S. Food & Drug Administration ("FDA") ultimately required that any lab that wanted to perform COVID-19 testing must obtain an Emergency Use Authorization ("EUA") prior to testing and as a prerequisite to billing for laboratory services.

35. Upon announcement of that requirement, ZDX assured Coastal it could obtain a COVID-19 EUA and, in fact, provided Coastal's representatives with a detailed timeline specifying the procedures ZDX would take to obtain EUAs for the Arizona Labs.

36. ZDX, through the individual co-Defendants, repeatedly assured Coastal and AMS at the March meeting and on telephone calls that the Arizona Labs would be validated, certified, credentialed, fully operational and up and running within 30 days from the date ZDX personnel arrived at the Arizona Labs to begin the EUA approval process.

37. Upon information and belief, at the same time as the Arizona Labs negotiations were ongoing, Jolly, Silliman, Vigerust and Williamson also recognized the acute need for COVID-19 testing and formed Sensiva (which was incorporated in March, 2020 while negotiations between Defendant Jolly and Coastal were substantially under way) for the purpose of administering COVID-19 tests. Sensiva would subsequently perform for Cormeum the same role that AMS performed for Coastal except that Sensiva did not offer a program similar to AMS' proprietary Sterisis infection prevention and control program.

38. On March 15, 2020, Coastal and ZDX entered into a "Management Services

Agreement" whereby ZDX agreed to provide laboratory management services and quickly obtain EUAs to enable Coastal to perform COVID-19 testing.

39. Also on March 15, 2020, Coastal and ZDX entered into a "Technology Transfer License Agreement" whereby ZDX agreed to provide, among other things, a "custom designed LABORATORY INFORMATION MANAGEMENT SYSTEM (LIMS)" (emphasis in original) that would enable Coastal to manage the large volume of medical tests Plaintiffs and Defendants expected the Arizona Labs to process.

40. Perhaps the most important and key features of the LIMS were that it would enable Coastal to process samples, promptly report results and bill for medical testing services to Coastal's customers, including its Maryland customers. Without a properly designed and functional LIMS Coastal was required to perform these tasks manually which, of course, takes much more time and effort than the powerful automated technology ZDX promised to deliver.

41. On March 18, 2020, with the ZDX Management Services Agreement executed and a plan in place to obtain the COVID-19 EUAs that would enable Coastal to fulfill its business plan, and with the Technology Transfer License Agreement in place to provide a LIMS to handle high volume testing and billing, Coastal as buyer and Jolly as seller executed a "Membership Interest Purchase Agreement" ("Purchase Agreement") in which Jolly sold to Coastal 100% of his interests in Provista and Integra for $3 million.

42. Coastal was based in Charleston, South Carolina when negotiations on the agreements began but prior to the time the agreements were finally negotiated and executed, both Coastal and AMS had relocated their primary offices to and were conducting their business operations out of their current address at 2 Compromise Street, Annapolis, Maryland.

43. Coastal's address for notices to be given by ZDX in the ZDX Management

Services Agreement and the Technology Transfer License Agreement is Coastal's principal office in Annapolis, Maryland.

44. Satisfied that it had a plan in place to address COVID-19 testing and high-volume medical testing, processing and billing, Plaintiffs immediately began contacting their Nursing Home customers to offer service. In the following weeks, Plaintiffs entered into contracts with dozens of Nursing Homes to perform testing, including approximately 30 Nursing Homes in Maryland.

45. Immediately after entering into the Management Services Agreement and Technology Transfer License Agreement with Coastal, ZDX sent personnel to the Arizona Labs for the purposes of, among other things, managing the Arizona Labs, scaling up the Arizona Labs' testing volume capability, and promptly obtaining EUA certifications.

46. ZDX never performed any of those services for Coastal, which still does not have the necessary EUAs or a functioning LIMS despite paying ZDX $90,000 per month before Coastal terminated the agreement with ZDX for nonperformance on May 17, 2020.

47. Unbeknownst to Coastal, ZDX redirected certain of its personnel from the Arizona Labs and sent them to New Orleans to obtain an EUA for co-Defendant Cormeum while charging Coastal for hotel rooms in New Orleans and using employees that Coastal was paying to do work for the Arizona Labs instead to obtain the EUA for Defendant Cormeum.

48. ZDX filed EUA paperwork for Cormeum on April 4, 2020.

49. The FDA received Cormeum's EUA application on April 6, 2020. Pursuant to FDA regulations, labs are permitted to begin COVID-19 testing 24 hours after FDA receives the application.

50. Because ZDX had failed to take any steps to obtain the EUA for or deliver a

properly functioning LIMS to the Arizona Labs, Coastal was unable to meet COVID-19 testing needs of its Nursing Home customers just as the demand for that testing was beginning to skyrocket.

51. *The very next day (i.e., just 24 hours after Cormeum received its EUA)*, Defendant James Silliman told Coastal he had a solution for Coastal's lack of an EUA for the Arizona Labs. That solution was to send all COVID-19 test samples to co-Defendant Jolly's lab, co-Defendant Cormeum.

52. Faced with the COVID-19 testing crisis, Coastal accepted Defendant James Silliman's advice to engage Defendant Cormeum to perform COVID-19 testing, supposedly on a temporary basis, until ZDX assisted Coastal to obtain EUAs for the Arizona Labs.

53. *Once again, on that same day, April 7,* within hours of suggesting Coastal engage co-Defendant and Silliman affiliate Cormeum, James Silliman coordinated delivery of a "Laboratory Services Agreement" and a "Laboratory Services Work Order" between Coastal and Cormeum. The work order stated the terms under which Cormeum would provide laboratory services to Coastal with respect to COVID-19 testing, including a cost to Coastal of $87 per test.

54. Coastal and Cormeum entered into the Laboratory Services Agreement and Laboratory Services Work Order while Coastal was located in its current offices in Annapolis, Maryland. The Laboratory Services Agreement specifies the Maryland office as the place where Cormeum was required to give notice whenever notice would be required.

55. AMS began sending COVID-19 test samples directly to Cormeum for processing, rather than to Coastal's Arizona Labs. Because many samples needed to be tested not only for COVID-19 but also for other respiratory pathogens, once Cormeum finished the COVID-19 testing, the remainder of each sample was forwarded to Coastal to complete the testing for which

a COVID-19 EUA was not required.

56. Defendants created this cumbersome, inefficient process for the purpose of cutting Coastal out of the COVID-19 testing business that the Defendants purportedly were assisting Coastal to equip and operate at the Arizona Labs.

57. In May 2020, Defendant Jolly contacted Britton-Harr and claimed that a government contract that Cormeum recently entered into required it to charge the government customer the lowest fee for COVID-19 testing that Cormeum charged its other customers, and claimed that the government contract paid Cormeum $120 per test.

58. Jolly claimed that the $87 per test fee Cormeum charged Coastal therefore had to be increased so that Cormeum would not be in violation of the "most favored nation" pricing treatment supposedly required by the government contract with co-Defendant Cormeum. Jolly generously agreed to charge Coastal "only" $110 per test, which of course was more than a 26% price increase.

59. Coastal, which was receiving a volume of COVID-19 samples for testing and still had no EUAs for the Arizona Labs being managed by Defendant ZDX, had no choice but to agree to the price increase so that testing would not be interrupted and thereby potentially put Nursing Home residents' lives at risk.

60. In addition to Cormeum's sudden price hike, and citing his own need for faster payment, Jolly also required that Coastal pay for Cormeum's COVID-19 testing services weekly despite that industry standard payments terms are in the range of net 15 to net 30 days after invoice date.

61. The industry standard payment terms reflect the time it typically takes for laboratories to invoice and receive payment from primary payor sources such as Medicare. At

that time, nothing in the companies' short history of working together would have justified such a request because Coastal had been timely to date in paying all invoices.

62. On June 17, 2020 in the late afternoon, Defendant Jolly again contacted Britton-Harr by telephone to request yet another change in the Cormeum-Coastal laboratory services relationship.

63. Just a few hours later, shortly after midnight on June 18, Defendant Jolly emailed Britton-Harr a draft letter agreement called "Limited Adjustment Period for Payment of Invoices for Goods & Services; Revised Pricing Terms for Guaranteed Minimums & Limited Exclusivity."

64. The June 18 letter agreement included a substantially reduced price for COVID-19 testing so long as Coastal met a minimum volume of testing samples, of which at least 75% of Coastal's samples were for both COVID-19 *and* non-COVID-19 testing.

65. The reduced COVID-19 price was $70, far lower than Cormeum supposedly required pursuant to the alleged government contract and also lower than Cormeum's original price of $87 per COVID-19 test.

66. Cormeum next informed Coastal that it needed to borrow additional laboratory equipment owned by Coastal and used in its Arizona Labs so that Cormeum could meet the testing volume coming from Plaintiffs. Cormeum required that Coastal overnight ship its equipment, valued at approximately $500,000, to Cormeum at its laboratory in Louisiana. Coastal complied.

67. Cormeum's actual purpose for "borrowing" Coastal's valuable laboratory testing equipment was to prevent Coastal from using it in its own medical testing operations at the Arizona Labs, and to make Coastal even more reliant on Cormeum for medical testing.

68. Coastal and Cormeum operated under the terms of the June 18 letter agreement until the week of July 13 when, despite that Coastal was in full compliance with its obligations, Cormeum began making aggressive demands for payment of invoices *prior* to the agreed due dates.

69. On July 10, 2020, Jolly sent an email message to Britton-Harr claiming that Coastal was far behind on its payments for testing and that critical vendors were not shipping supplies until they are paid, and that therefore COVID-19 testing is either "at a stop" or "significantly delayed." This was a lie – Coastal was then current on its payment obligations.

70. Coastal had in fact paid to Cormeum a total of $1,723,856 which satisfied all invoices Cormeum issued through June 28, 2020. Therefore, as of July 10, Coastal was current on all its obligations to Cormeum and there was no basis for Jolly's threats and demands.

71. Three days later, on July 13, 2020 Jolly again emailed Britton-Harr threatening to stop testing unless payments were made immediately. At that time, no invoices were overdue, and the parties' agreement provided that no payment was due until at least July 17.

72. On July 14, 2020, without any legitimate basis to do so and without warning to Coastal or AMS, Cormeum and Sensiva, at the direction of co-defendants Jolly and Silliman, suddenly halted shipments of test kits to Plaintiffs' customer Nursing Homes.

73. On July 16, while Coastal was still in compliance with the parties' invoice payment terms, Jolly's attorney, Asher J. Friend of the Jones Walker LLP law firm, emailed to Coastal representatives a proposed "settlement" agreement under which Coastal's purportedly "past-due" invoices to Cormeum would be deemed satisfied if Coastal: a) forfeited to Cormeum the equipment and supplies Coastal had loaned to Cormeum to facilitate COVID-19 testing; b) assigned to Cormeum all of its claims for Medicare reimbursement for COVID-19 testing and

appointed co-Defendant James Silliman as Coastal's "true and lawful attorney-in-fact" with regard to those claims; and most tellingly, c) "formally introduce[d] and refer[ed] to Cormeum its current and prospective third party customers" and "use[d] its best efforts to assist Cormeum and its Affiliates in consummating the direct commercial engagement of Cormeum and its Affiliates by the Coastal Customers for, potentially among other things, COVID-19 Testing and related products and services."

74. Defendants' scheme at this point was quite clear. Cormeum now insisted that Coastal surrender its entire business at a time when Coastal had not committed any default of any then-existing agreement with Cormeum.

75. Defendants used a coordinated strategy of luring Coastal into an agreement to purchase the Arizona Labs, falsely promising Plaintiffs that the Defendants would perform key tasks to equip and manage the Arizona Labs, squeezing payment terms tighter and tighter while, at the same time, failing to provide a functioning LIMS that would enable Coastal to process, report and bill for testing services performed by the Arizona Labs.

76. Defendants' goal was to provide Plaintiffs with only one solution to these manufactured problems: turn over to the Defendants all of Plaintiffs' businesses, including its Nursing Home customers, and drive Plaintiffs out of business.

77. Coastal refused to sign the settlement agreement.

78. On July 17, following Coastal's refusal to accept the proposed "settlement," Defendants suddenly and without any warning blocked Plaintiffs from access to the web portal where COVID-19 test results were required to be reported.

79. The next day, July 18, again without any warning, Defendants suddenly cut off all of AMS' Nursing Homes customers' access to the COVID-19 test results web portal. This act

was especially egregious because Defendants knew that Nursing Homes were required to provide daily COVID-19 test results to state health departments, including the Maryland Department of Health. By cutting off Nursing Homes' ability to comply with state authorities' COVID-19 test result reporting requirements, Defendants created an unreasonable risk to public health and intentionally put thousands of lives at risk by preventing the Nursing Homes and the states from monitoring and adjusting to the deadly COVID-19 threat.

80. COVID-19 testing for Nursing Homes, including AMS' customers, was needed not merely to meet clinical needs *but also to satisfy strict COVID-19 test result reporting requirements imposed by state, local and regulatory authorities* as part of a worldwide effort to stem the rapid spread of the deadly COVID-19 virus.

81. Defendants blocked portal access to all of Plaintiffs' Nursing Home customers, including all of Plaintiffs' Maryland-based Nursing Home customers.

82. Immediately after Defendants cut-off Nursing Homes' access to COVID-19 test results, Coastal and AMS received an intense storm of complaints from their Nursing Home customers.

83. The Nursing Homes feared that lack of access to COVID-19 test results forced them to "fly blind" in the virulently contagious COVID-19 environment by making infection identification, prevention and control completely impossible.

84. In addition, Defendants' actions exposed the Nursing Homes to regulatory and enforcement action by federal and state authorities, including the Maryland Department of Health, that include severe financial penalties and other enforcement action.

85. But cutting off access to the portal was just the half of it. Defendant Vita Health, which hosted the web portal where COVID-19 test results were to be reported to the Nursing

Homes, provided a link to a "help desk" service that falsely claimed Coastal was not paying its bills to the lab (Defendant Cormeum) and that Defendant Sensiva was ready and able to restore service if only the Nursing Homes would switch from Coastal and AMS for COVID-19 testing.

86. For example, on July 18 at 3:36 p.m. UTC, an employee of AMS' customer Hyattsville Nursing and Rehabilitation Center, located in Hyattsville, Maryland, tried to access the portal, couldn't, and then clicked on the "help desk" to which an agent with an email address of "support@sensiva.zendesk.com" responded and informed the Nursing Home employee:

> "At this time, we have unfortunately had to turn off access for this facility due to long-standing non-payment. We are happy to continue processing and reporting samples from this facility **as long as we are contracted directly** and can receive demographic information and medical necessity information prior to processing the sample. **The service level will improve with this in place** and all reports will be delivered the day of receipt in the lab. We are happy to ship supplies as needed to the facilities. For further assistance with this matter **your administrators may contact our President of Sensiva Health, Dr. Jim Silliman and he can be reached by phone at 864.901.7590, and by email at jsilliman@sensivahealth.com**. Is there anything else I can help you with?"

(Emphasis supplied.)

87. In other words, if that (or any) Maryland customer broke its contract with AMS and contracted directly with Sensiva, the test results would be miraculously released.

88. Upon information and belief, all of Plaintiffs' Maryland customers received similar messages from Defendants.

89. Defendants' conduct caused Plaintiffs' to lose potential Nursing Home customers in Maryland and actual Nursing Homes customers in other states, harming Plaintiffs' Maryland-based businesses. Defendants continue in their efforts to steal Plaintiffs' business and Nursing Home customers even as of the date of this filing, and therefore the threat and damage to Plaintiffs is ongoing and increasing.

90. For example, in Maryland, AMS sought to expand its relationship and its proprietary Sterisis program to additional Nursing Homes, including CommuniCare Health Services, which has a location in Elkton, Maryland. CommuniCare Health Services declined to employ AMS in additional facilities, citing the difficulties described above and that were caused by defendants' unlawful scheme to steal Plaintiffs' businesses.

91. On July 31, 2020, the day the initial complaint in this case was filed, Plaintiffs emailed counsel for Defendants, Jones Walker LLP law firm partner Tarak Anada, and demanded that the laboratory equipment Plaintiffs loaned to Cormeum be returned by August 4, 2020.

92. On August 3, 2020, in a conference call between counsel for the parties, Mr. Anada stated that the equipment would not be returned, claiming that Coastal "gifted" the equipment to Cormeum.

93. Mr. Anada's assertion conflicted with the written "settlement" agreement proposed by his law partner Mr. Friend just two weeks earlier, on July 16, 2020.

94. As noted above, that proposed settlement agreement included the transfer of ownership of the borrowed equipment from Coastal to Cormeum that was to be evidenced by a bill of sale Coastal previously refused to sign.

95. Cormeum remains in possession of Coastal's equipment as of this filing on August 19, 2020 in violation of Coastal's rights to possession as lawful owner thereof.

96. Since filing this lawsuit Plaintiffs obtained evidence that Defendants have attempted, without authorization, to obtain the personal information of patients who reside in Nursing Homes for which Plaintiffs administer the Sterisis program.

97. Specifically, Plaintiffs obtained a copy of a letter printed on Sensiva letterhead

and dated July 31, 2020, which was sent to the Fort Washington Health Center in Fort Washington, Maryland, and which states in its subject line "Urgent **COVID-19 Compliance** information request for the attached patients." (Emphasis in original.)

98. The body of the Sensiva letter states that it is a "formal legal request" for certain "patient demographic information" needed "to comply with **CDC, HIPAA and local Department of Health** regulations." The letter requests 10 items of personal information for each patient listed on an attached spreadsheet, including: (1) insurance subscriber IDs or copies of insurance cards, (2) street address, (3) zip code, (4) county of residence, (5) phone number, (6) race, (7) ethnicity, (8) gender, (9) the "ICD-10 diagnosis codes supporting reasons for administering a COVID-19 test," and (10) "[a]ny medical records supporting reasons for administering a COVID-19 test" on the dates listed in the spreadsheet. (Emphasis in original.)

99. The Sensiva letter's signature line indicates that it was sent by attorney "Edmond DeFrank, Esq.," who is identified as Sensiva's "Compliance Counsel."

100. Mr. DeFrank is a patent attorney practicing in Los Angeles, California.

101. When Plaintiffs' attorneys contacted Mr. DeFrank, he confirmed that he sent the letter to the Fort Washington Health Center. Mr. DeFrank also admitted sending similar letters to other Nursing Home customers of Plaintiffs.

102. Mr. DeFrank refused to provide copies of the other letters he sent to Plaintiffs' customers.

103. Mr. DeFrank informed Plaintiffs' counsel that he was instructed by attorneys at the Jones Walker LLP law firm not to provide copies of the Sensiva letter to Plaintiffs' counsel.

104. Mr. DeFrank stated that the attorneys at Jones Walker LLP told him the letters were "attorney-client privileged" and confidential documents, and that disclosing them to

Plaintiffs' counsel would also violate certain patients' privacy rights.

105. Contrary to its claims in the Sensiva letters, Sensiva had no need to obtain the requested patient information "to comply with **CDC, HIPAA and local Department of Health** regulations." Rather, Sensiva sought this information so it could bill directly for the COVID-19 tests that Cormeum had conducted on behalf of Coastal, and for which Cormeum had already billed Coastal, and thereby cut Coastal out of receiving payment for its invoices.

106. In fact, disclosure to Sensiva or Cormeum of the information Sensiva sought in the Sensiva letters may implicate violations of laws and regulations governing the patients' private personal health information.

**COUNT I -Tortious Interference with Prospective Business Relations**
**(Against All Defendants)**

107. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

108. Defendants or their agents intentionally and willfully refused to send testing kits to Plaintiffs' Nursing Home partners and blocked Plaintiff and those same Nursing Homes from accessing their test results. Then, when the Nursing Homes (including a Nursing Home located in Maryland) inquired about the lack of access, defendants or their agents told the homes that they would be "happy" to restore access to essential (and legally mandated) COVID-19 tests and test results if the Nursing Homes discharged Plaintiffs and instead "contracted directly" with co-Defendant Sensiva.

109. Defendants' actions were plainly and deliberately calculated to cause damage and loss to Plaintiffs in their lawful business as evidenced by the fact that CommuniCare refused to

enter into a business relationship with Plaintiffs for COVID-19 testing, when Plaintiffs already had a business relationship with CommuniCare for other testing, because of the perceived concerns identified above that CommuniCare naturally attributed to Plaintiffs but were in fact manufactured by the defendants.

110. Defendants' actions constituted malice as they were done with the unlawful and deliberate purpose of causing such damage and loss to plaintiffs' business, without right or justifiable cause on the part of the defendants.

111. Actual damage and loss resulted.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by this Court.

**COUNT II – Tortious Interference with Economic Relations**
**(Against All Defendants)**

112. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

113. Plaintiffs had contracts with third-party nursing homes, including entities in Maryland, under which they were to collect and test samples for COVID-19 and other respiratory pathogens.

114. Defendants knew of those contracts through their many business dealings with Plaintiffs, all of which were intended to assist Plaintiffs in fulfilling their contractual obligations to third-party Nursing Homes.

115. Defendants intentionally interfered with those contracts by holding hostage COVID-19 tests and test results in the hope that the Nursing Homes would break their contracts with Plaintiffs and directly engage the services of Defendants.

116. Defendants' actions rendered it impossible for Plaintiffs' Nursing Home customers to obtain COVID-19 test results called for in their contracts with Plaintiffs.

117. The Nursing Homes were in fact unable to perform under their contracts with Plaintiffs due solely to Defendants' intentional interference with COVID-19 test result reporting.

118. Defendants' intentional and unlawful actions interfered with Plaintiffs' and the Nursing Homes' business expectations that they would be able to access the COVID-19 test result reporting portal, and in fact Plaintiffs and the Nursing Homes were unable to access the portal to obtain COVID-19 test results.

119. The Maryland Department of Health contacted Defendants on or about Saturday, July 25, 2020, to demand that Defendants release COVID-19 test results to the Nursing Homes that Defendants held hostage by shutting down access to the results reporting web portal.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

**COUNT III – Civil Conspiracy**
**(Against All Defendants)**

120. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

121. Defendants agreed to work together and in concert to tortuously interfere with Plaintiffs' business and contractual partners, as evidenced by the coordinated actions of Defendants to

a. impede Coastal's effort to obtain an EUA for COVID-19 testing,
b. deny Coastal a functional LIMS for the Arizona Labs,
c. divert Plaintiffs' medical testing business to Defendants' own lab, Cormeum,
d. manipulate the payment terms for COVID-19 testing to increase pressure on Plaintiffs,
e. falsely declare that Coastal untimely paid its obligations to Cormeum for COVID-19 testing,
f. divert Plaintiffs' Nursing Home customers to Defendant Sensiva, and ultimately,
g. steal Plaintiffs' entire business by denying their Nursing Home customers access to COVID-19 tests and results.

122. As result of Defendants' coordinated effort to impede, divert, and then steal Plaintiffs' business, Plaintiffs suffered actual legal damage.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

**COUNT IV - Conversion**
**(Against Defendant Cormeum)**

123. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

124. In mid-June, 2020, Cormeum requested to borrow from Coastal certain valuable laboratory testing equipment from Coastal's Arizona labs, ostensibly so that Cormeum could meet the testing volume coming from Plaintiffs.

125. Coastal complied with the request and sent the equipment overnight to Cormeum's laboratory in Louisiana.

126. Plaintiffs expected the equipment to be returned when Cormeum ceased conducting testing on its behalf.

127. On July 31, 2020, the day this suit was filed, and after Cormeum had ceased testing samples for Plaintiffs, Plaintiffs demanded that Coastal's equipment be returned immediately.

128. Defendant's attorney, again Mr. Anada of the Jones Walker LLP law firm, stated his client refused to comply with this demand, and claimed for the first time that the valuable laboratory testing equipment belonging to Coastal actually was a "gift" by Coastal to Cormeum.

129. Mr. Anada maintained this assertion despite that two weeks before, on July 16, 2020, Mr. Anada's law partner at the Jones Walker LLP law firm, Mr. Friend, sent Plaintiffs a draft agreement stating that "Coastal hereby assigns and transfers to Cormeum all of its right, title and interest of Coastal or its Affiliates in and to . . . the Equipment." There would have been no need for that language if the equipment had indeed been "gifted" to Cormeum.

130. Advised that the equipment was not a gift and that its immediate return to Coastal was required, Defendants' attorney Mr. Anada again stated that his client nonetheless refused to comply with Plaintiffs' demand that it be returned.

131. Defendant Cormeum's continued detention of Coastal's equipment is the wrongful exercise of dominion over and control thereof that unlawfully denies Coastal's right to possession and use of its equipment.

132. Defendant Cormeum's continued detention of Coastal's equipment is inconsistent with Coastal's ownership of and right to possess the equipment.

133. Cormeum's unauthorized and intentional retention of Coastal laboratory equipment, valued at approximately $500,000, constitutes a conversion of that property.

WHEREFORE, Plaintiffs demand a judgment against Defendant Cormeum for compensatory damages exceeding $500,000, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

**COUNT V – Unfair Competition**
**(Against All Defendants)**

134. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

135. Defendants engaged in a coordinated series of unfair and deceptive acts intended to damage and destroy Plaintiffs' business and ultimately steal Plaintiffs' Nursing Home customers.

136. First, Defendants convinced Coastal to purchase the Arizona Labs in part by

assuring Plaintiffs that ZDX would promptly obtain the necessary EUAs for those labs to perform COVID-19 testing. But instead of obtaining the necessary EUAs for Coastal's labs, ZDX used Coastal's personnel and resources to obtain an EUA for Defendants' own lab, Cormeum.

137. Defendants also promised to deliver to Coastal a functioning LIMS that would allow Coastal to perform, report and bill for COVID-19 and other medical testing. Defendants never delivered a functioning LIMS that met the promised criteria.

138. Next, when Coastal faced the anticipated surge in demand for COVID-19 testing from its Nursing Home customers, Defendant James Silliman recommended that Coastal use Cormeum to meet its testing needs while ZDX pretended to obtain the EUAs for Coastal's labs, and pretended to deliver a functioning LIMS which, of course, ZDX never did. Plaintiffs were thus placed in a position where they would be forced to rely indefinitely on Cormeum to meet their testing needs.

139. Having put Plaintiffs in a position of dependency, Defendant Cormeum then repeatedly, artificially and deceptively manipulated the test prices and terms under which it would perform COVID-19 testing. Defendant Cormeum first claimed it needed to raise the price to comply with the "most favored nation" terms of a supposed government contract. Defendant Cormeum then suddenly offered a lower price provided that Coastal supplied a certain minimum volume of testing samples and ensured that at least 75% of those samples were for COVID-19 testing *and* non-COVID-19 testing.

140. In other words, Plaintiffs could only get the lower COVID-19 testing price if they turned over to Defendant Cormeum a significant portion of the non-COVID-19 testing Plaintiffs were able to perform themselves.

141. On July 14, 2020, less than a month after Coastal agreed to the latest pricing modification, and while Coastal was current on its payment obligations, co-Defendants Jolly and James Silliman, acting through their entities Sensiva and Cormeum, halted delivering COVID-19 test kits to Plaintiffs' Nursing Homes customers without warning or justification.

142. Then, four days later, on July 18, 2020, and again without warning or justification, Defendant Vita suddenly cut off access to the web portal through which Plaintiffs' nursing home customers accessed their COVID-19 test results. When Nursing Homes used the portal's "help desk" feature to inquire about their lack of access to test results, they were told by an agent that access had been denied "due to long-standing non-payment," but that the processing and reporting of samples would be restored "as long as we are contracted directly," which could be done by "contact[ing] our President of Sensiva Health, Dr. Jim Silliman."

143. Thus, Defendants cynically and deliberately created a manufactured emergency in the midst of the deadly COVID-19 pandemic. By holding COVID-19 test results hostage on the pretext of alleged nonpayment by Coastal, Defendants created an environment in which the Nursing Homes were desperate to obtain COVID-19 test results. Leveraging the Nursing Homes' daily need to monitor and report COVID-19 infections, Defendants then presented the solution to their manufactured emergency: Nursing Homes should fire Plaintiffs and contract directly with Defendants for future testing services.

144. As consequence of Defendants' unfair and deceptive statements and conduct directed at Plaintiffs and their Nursing Home customers, Plaintiffs' business was severely damaged through the loss of valuable business relationships with Nursing Homes customers in Maryland and other locations.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each

Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

**COUNT VI – Fraud**
**(Against All Defendants)**

145. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

146. Defendant ZDX and its officers, co-Defendants James Silliman, Bo Silliman, and Vigerust falsely represented to Coastal that ZDX would promptly obtain the EUAs and a functioning LIMS that would allow Coastal to perform high-volume COVID-19 and other medical testing services at the Arizona Labs.

147. Defendants intended for Coastal to rely on this false representation so that Coastal would enter into the Management Services Agreement and Technology Transfer Licensing Agreement with ZDX.

148. Defendants knew this representation was false because Defendants subsequently used Coastal personnel and resources to obtain an EUA for Defendants' own lab, Cormeum, and never took any steps to obtain EUAs or a functioning LIMS for Coastal's Arizona Labs.

149. Coastal justifiably relied on Defendants' false representations, to include all such representations set forth in detail throughout this Amended Complaint, when Coastal purchased the Arizona labs, entered into the Management Services Agreement and Technology Transfer Licensing Agreement with ZDX, and contracted with additional Nursing Homes to provide COVID-19 testing, including approximately 30 Nursing Homes in Maryland.

150. As a result of Defendants' false representations Coastal was forced to turn to Defendants' own lab, Cormeum, to meet its COVID-19 testing needs. Defendants then used Coastal's dependence on Cormeum to cripple Coastal's business by, among other things, deceptively and artificially manipulating the price of COVID-19 testing; falsely claiming Coastal was behind in its payment obligations; refusing to ship testing kits to Coastal's Nursing Home customers; shutting off access to the web portal through which those customers accessed their COVID-19 test results; and using the denial of access to the web portal as means to coerce Coastal's customers to terminate their contracts with Plaintiffs and contract directly with Defendant Sensiva.

151. The lack of access to test kits and test results put Coastal's Nursing Home customers at risk of state and federal regulatory enforcement actions and fines, and in fact caused a number of those customers to end their testing relationships with Coastal.

152. Moreover, Defendants' calculated scheme led to the perception that Coastal was unable to meet its Nursing Home customers' testing needs, which caused it to lose business and business opportunities in Maryland among other places.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

**JURY DEMAND**

Plaintiffs demand a trial by jury pursuant to Fed R. Civ. P. 38(b) on all triable issues.

Dated: August 19, 2020

Respectfully submitted,

/s/

Andrew C. White, Esq. (Bar No. 08821)
awhite@silvermanthompson.com
Steven N. Leitess, Esq. (Bar No. 05856)
sleitess@silvermanthompson.com
William N. Sinclair, Esq. (Bar No. 28833)
bsinclair@silvermanthompson.com
SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel: (410) 385-2225
Fax: (410) 547-2432

*Attorneys for Plaintiffs*